1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2
    ------------------------------x
3                                       13-CV-7420(CBA)
    MASSIMILIANO LUONGO,
4                                       United States Courthouse
              Plaintiff,               Brooklyn, New York
5
              - versus -               June 26, 2017
6                                       1:00 p.m.
    44-37 RESTAURANT CORP., THE
7   RUSSO'S PAYROLL GROUP, INC.,
    and FRANK RUSSO,
8
              Defendants.
9
    ------------------------------x
10
                  TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
11              BEFORE THE HONORABLE CAROL B. AMON
                  UNITED STATES DISTRICT JUDGE
12                       BEFORE A JURY

13  APPEARANCES

14  Attorney for Plaintiff:  OFFICE OF MICHAEL G. O'NEILL
                             30 Vesey Street
15                           Suite 301
                             New York, New York 10007
16                           BY:  MICHAEL G. O'NEILL, ESQ.

17
    Attorney for Defendant:  MILMAN LABUDA LAW GROUP, PLLC
18                           3000 Marcus Avenue
                             Suite 3W3
19                           Lake Success, New York 11042
                             BY:   JOSEPH M. LABUDA, ESQ.
20                                 EMANUEL KATAEV, ESQ.

21

22  Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
                             Phone:  718-613-2330
23                           Fax:  718-804-2712
                             Email:  LindaDan226@gmail.com

24

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

PROCEEDINGS

1              (In open court; Jury not present.)

2              THE COURTROOM DEPUTY:  This is civil trial,

3    Massimiliano Luongo versus 44-37 Restaurant Corp., et al.

4              MR. O'NEILL:  Good afternoon, Your Honor, Michael

5    O'Neill on behalf of the plaintiffs.

6              THE COURT:  Good afternoon.

7              MR. LABUDA:  And good afternoon, Your Honor, Joseph

8    Labuda and Emanuel Kataev for the defendants.

9              MR. KATAEV:  Good afternoon, Your Honor.

10             THE COURT:  Who do you have at counsel table with

11   you?

12             MR. LABUDA:  At counsel table we have Joseph

13   Competiello, who is the representative for the defendants.

14             Do you need him for this conference, Your Honor?

15             THE COURT:  Here's not a party?

16             MR. LABUDA:  No, he is -- no, he is just a rep.

17             THE COURT:  He is just to assist you for the trial?

18             MR. LABUDA:  He's a representative for the corporate

19   defendants.

20             THE COURT:  Who would that be?

21             MR. LABUDA:  That is 44-37 Restaurant Corp.

22             THE COURT:  Now, that he's a representative, what

23   does that mean?

24             MR. LABUDA:  He works for the corporation.  So we

25   had, as Your Honor may recall, we had an issue with

PROCEEDINGS

1    Mr. Connolly being here.

2                THE COURT:  Right.

3                MR. LABUDA:  So he could not be here for the

4    remainder of the day, so we did want to at least have somebody

5    from the corporation here during the --

6                THE COURT:  He's not a witness?

7                MR. LABUDA:  He's not a witness.

8                THE COURT:  All right, so this is just someone who

9    would assist you with the case?

10               MR. LABUDA:  Yes.  Yes.

11               THE COURTROOM DEPUTY:  Emanuel Kataev?  So you

12   should be on the calendar?

13               MR. KATAEV:  I'm an attorney.

14               THE COURT:  I'm sorry, let me just get how you spell

15   your last name?  It K-A?

16               MR. KATAEV:  T as in Tom, A-E-V, as in Victor,

17   Kataev.

18               THE COURT:  Now, the jury selection I understand is

19   completed with respect to the case with Magistrate Bloom?

20               Let me just inquire now, and I'll do in this in

21   front of the jury as well, is the jury satisfactory to the

22   plaintiff?

23               MR. O'NEILL:  It is, Your Honor.

24               THE COURT:  And the defense?

25               MR. LABUDA:  Yes, Your Honor.

4

PROCEEDINGS

1          THE COURT:  Okay.  So when we come back at 2, I'll

2    swear in the jury and give them some opening instructions and

3    then we'll begin with opening statements.

4          I guess that each side is going to make an opening

5    statement?

6          MR. LABUDA:  Yes, Your Honor.

7          THE COURT:  Okay.  Any outstanding issues that we

8    need to resolve before then?  I didn't that there were, but...

9          MR. O'NEILL:  Well, Your Honor, we have the tip

10   credit issue outstanding and, you know, it would be something

11   that would affect the opening.

12         THE COURT:  How would it affect the opening?

13         MR. O'NEILL:  Well, it will affect what I say about

14   it in terms of what they are going to hear and what they have

15   to decide.  I mean, if you haven't decided yet I'll just --

16         THE COURT:  Well, I wasn't going to require -- you

17   sent a new letter in about New York State, that it's different

18   with New York State.

19         I was of the view that having reviewed that

20   Department of Labor opinion in Judge Forrest's opinion, that I

21   wasn't going to make it to say that they had to show that

22   there was written notice, that there would be a requirement

23   for written notice.  Obviously they have to give notice, there

24   has to be proof of some oral notice.

25         But you raise a different point here in your letter,

PROCEEDINGS

1    which is that the tip credit has to be recorded on a weekly

2    basis as a separate item in the wage record.

3              What is defendant's proof on that going to be when

4    you don't have the records?

5              MR. LABUDA:  We have all of the time -- all of the

6    payroll records indicate each week how much he made in tips.

7    So I don't think that's an issue.

8              THE COURT:  So it was recorded on a weekly basis as

9    a separate item on the wage record?

10             MR. LABUDA:  Correct.  Correct.  And Mr. Luongo also

11   testified how much he made in tips, too.

12             THE COURT:  Those are the records that you have?

13             MR. LABUDA:  Yes, yes, we have those.  We were able

14   with -- anything that was computerized, we still had.

15             THE COURT:  Okay.

16             MR. LABUDA:  So we have that.

17             MR. O'NEILL:  That's not the requirement.  The

18   requirement is to show the tip credit as a separate item, not

19   tips, the tip credit.  And the case that I cited, I think I

20   forget the exact --

21             THE COURT:  What does that mean that you would have

22   to show?

23             MR. O'NEILL:  That the payroll record has to show

24   the basis for the earnings.  In other words, has to show hours

25   worked, has to show the wage paid, the rate of payment, and

PROCEEDINGS

1  has to show how much of that is satisfied by the tip credit.

2          And that's a case I cited where the holding in that

3  case was just putting down amount that you received in tips

4  doesn't satisfy that.

5          And the records here, they don't have the hours

6  worked, they don't have the wage paid.

7          THE COURT:  Well, you can argue that.  You can argue

8  that the records don't comply with it.

9          MR. O'NEILL:  Right.  But under the -- most of the

10  cases hold that if you don't have that in your records, you

11  don't get the tip credit as a matter of law.

12          THE COURT:  You can make that argument to the jury.

13          MR. O'NEILL:  But it's a matter of law, Your Honor,

14  it's not an argument to the jury, it's an argument to you

15  that --

16          THE COURT:  You haven't raised this issue before

17  right now, this is the first time you're raising this.

18          MR. O'NEILL:  No, it's in my earlier letter, Your

19  Honor.

20          THE COURT:  Not about this charge and -- you said

21  before that the written notice was required as a matter of

22  law.  I rejected your argument on that.  This is something

23  different.  You're raising that for the first time on

24  June 26th.

25          MR. O'NEILL:  I'm really not, Your Honor.  Look at

PROCEEDINGS

1    my June 21 letter, it discusses the fact there are different

2    regulations up to 2011, and under those regulations a writing

3    was required.

4            The reason that I went into it and explained it a

5    little bit further in yesterday's letter --

6            THE COURT:  Are you talking about a writing being

7    required in what sense?  We're talking about whether they had

8    to give written notice to the employee, or whether they had to

9    give oral notice.  But this record issue is a different issue.

10           MR. O'NEILL:  It's raised in my June 21 letter.

11           MR. LABUDA:  It's not, Your Honor.

12           THE COURT:  Where is it?

13           (Pause.)

14           THE COURT:  Well, in any event, I mean I haven't

15   looked at the records.  Counsel claims the records show it, I

16   haven't looked at the records.  You can argue to the jury that

17   their records don't meet this requirement.  I haven't looked

18   at them.

19           MR. O'NEILL:  I did, Your Honor.  I attached it a an

20   exhibits to my letter of June 21.  I showed you the form of

21   their records.  They have three different forms before 2011.

22   I attached a copy of each one.  And I discuss the *Copantitla*

23   decision which says that just noting that the employee

24   received tips doesn't satisfy this.

25           And, Your Honor, until Mr. Labuda responded to my

PROCEEDINGS

1   letter, that was their position in their jury instructions.

2           THE COURT:  I don't think he is claiming that the

3   jury instructions are wrong.  I understood him to say just now

4   that he has that complied with the requirement that they be

5   reported on a weekly basis as a separate item in the wage

6   records.  That's what I understood him to say.  We were not

7   concentrating on this portion of it last time.  I grant you

8   it's in your letter.  We weren't concentrating on that.  The

9   argument we were concentrating on was the notice.

10          MR. O'NEILL:  Right.

11          THE COURT:  This is a different question.

12          MR. O'NEILL:  Correct, Your Honor.

13          THE COURT:  An entirely different question.

14          MR. LABUDA:  And, Your Honor, if I may, there are

15  issues with respect to the tip credit notice aspect, and then

16  also recordkeeping claims, and there's a separate statute for

17  recordkeeping and making sure that the employer is keeping all

18  the records listed there.

19          THE COURT:  This is for the New York State labor

20  law.  You indicated in your own instructions that they had to

21  establish that the tip credit was recorded on a weekly basis.

22  You agree that you have to show that under New York labor law.

23          MR. LABUDA:  Yes, and so what New York labor law

24  says is respect to a notice.  We would say that this a notice

25  issue, this isn't whether or not you can actually take the

PROCEEDINGS

1    credit.

2            THE COURT:  You said it was an element of the

3    offense, I mean an element that had to be established.  I

4    understood it was in your jury instructions.  That's just -- I

5    mean if it's an element, it's an element.

6            MR. LABUDA:  Yes, I would say that it's -- I would

7    say it's an element with respect to the recordkeeping issue

8    but not with respect to the notice.  And in this case there is

9    no recordkeeping claim, it's just whether or not he had --

10           THE COURT:  If it's -- I know there's no

11   recordkeeping claim, that's not --

12           MR. LABUDA:  And that's -- and the pre-2011 --

13           THE COURT:  Look --

14           MR. LABUDA:  -- regs.

15           THE COURT:  -- let me -- I don't know what the regs

16   have do with anything one way or the other, but let me just...

17           All right, I mean I'm looking at your instructions,

18   page 10 and 11:  Minimum wage tip credit under New York labor

19   law.

20           Defendants are entitled to the tip credit under New

21   York labor law only if they prove by a preponderance of the

22   evidence, first, second, third, fourth, that the tip credit

23   claimed by the defendants was recorded on a weekly basis as a

24   separate item in the wage records.  That's your jury

25   instructions.  That's something that required, according to

10

PROCEEDINGS

1    you, under New York law to do that.  It's in your

2    instructions.

3         MR. LABUDA:  Yes.  And what I'm saying is I think

4    with respect to that, that has to do with the recordkeeping,

5    not with respect to the notice.

6         THE COURT:  What are you talking about?  It says the

7    fourth thing you have establish, that the tip credit claimed

8    by the defendants was recorded on a weekly basis as a separate

9    item in the wage record.

10         In order for you to get the credit, you're saying

11    you have to prove that.  Now I'm being told that you can't

12    prove that, that it was recorded on a weekly basis.

13         MR. LABUDA:  We're saying it has -- the tips are

14    listed there as well as the tip credit wage rate.

15         THE COURT:  You're saying your records show that.

16         MR. LABUDA:  Yes.  Yes.

17         THE COURT:  You know what, we keep going around in

18    circles.

19         MR. LABUDA:  We don't believe that under the Forrest

20    decision and/or the New York labor law letter that there is

21    this requirement.

22         THE COURT:  What requirement?

23         MR. LABUDA:  Just in terms of having a separate line

24    item that says tip credit or something like that.  We think

25    we've complied with the tips listed, as well as the wage rate

PROCEEDINGS

1    that's listed.

2              MR. KATAEV:  And, Your Honor, just one thing.  Even

3    if there is that kind of violation, his claim under the New

4    York labor law for minimum wage, overtime and spread hours,

5    there is no 195 record violation claimed.

6              MR. LABUDA:  We've said that.

7              THE COURT:  The question is what that means, and

8    whether you can establish that.  I haven't looked at the

9    record.

10             MR. O'NEILL:  Your Honor, this is probably something

11   we can address further after the close of evidence when the

12   records are in evidence.

13             THE COURT:  I think we can.  So let's just deal with

14   it then.

15             Is there anything else that we need to address?

16             Let me ask one question.  In looking through all of

17   the jury instructions and further in other cases that I've

18   had, it seems that when we're talking about overtime and

19   minimum wage, both of those are simultaneously can be awarded

20   under New York State and federal.

21             But the rate sheets just traditionally have one

22   line.  They just say overtime, minimum wage, they don't break

23   it down by New York State, they don't break it down by state

24   or federal.

25             And I haven't seen in the charge, but it seems to me

12

PROCEEDINGS

1   that the jury has to be told that they are not awarding double

2   damages.  In other words, you don't get both, you get the

3   greater of whichever one they're entitled to.

4          Have you ever seen verdict sheets where they

5   separate them out and then tell the jury that they only get

6   one or the other?

7          MR. O'NEILL:  No, Your Honor.  I mean this is a

8   pretty basic thing.  It's whatever wage is higher, that's what

9   they get.  There's no reason to separate it out.

10          THE COURT:  But you do.  I haven't seen in the

11   instructions, and I think the jury needs to be told, that they

12   get the higher.  Whether calculated under New York State or

13   federal, they don't get both of them and add them together,

14   they get the higher.

15          MR. O'NEILL:  Sure.  That's fine.

16          THE COURT:  But I don't see that anywhere in the

17   charge.

18          MR. O'NEILL:  I think the -- in our instructions we

19   just put in the higher rate and didn't make that distinction

20   so.  I don't -- you know, if you want to tell the jury there's

21   two different rates but use the higher one, that's fine.

22          THE COURT:  Well, two different rates.  Are you

23   talking about in the minimum wage category?

24          MR. O'NEILL:  Yes.  I think that the New York State

25   minimum wage was higher than the federal minimum wage during

PROCEEDINGS

1   part of this time.  I'm pretty sure.

2              MR. LABUDA:  Yes.

3              MR. O'NEILL:  But I don't see the reason for

4   introducing the lower rate, because you can't have a violation

5   of one without having a violation of the other.  And the only

6   rate that can be used is the New York State rate.  So I don't

7   see why we would -- I don't want to say confuse the jury, but

8   just -- and I have no objection to it, but I don't really see

9   that we need to.  And so my instruction just uses the higher

10  rate.

11             THE COURT:  You know, in looking at your

12  instructions, there's a period of time where he wasn't working

13  there at all?

14             MR. O'NEILL:  That's right.

15             THE COURT:  I don't think the defendant raised that

16  issue; do you?

17             MR. LABUDA:  Well, I would -- that was something

18  that would we raise to the jury during the argument.  I mean

19  it will come out in evidence when and where he was working, et

20  cetera.  I think they will have to take that into

21  consideration and block out whatever time they -- I mean just

22  like with he's also testified about taking vacation every year

23  and sick days and all that stuff, so that evidence will come

24  out as well, and I think the jury's got to account for that.

25             MR. O'NEILL:  We're not making any claims for the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

14

PROCEEDINGS

1   time he wasn't there.  I mean this is an undisputed fact.

2   It's just he wasn't there and then he came back.  And so we're

3   only making a claim for the time that he was there.

4           MR. LABUDA:  And that I will say the wage records

5   indicate, you know, there's no payment during, say, June of

6   2010 to October 2010.

7           MR. O'NEILL:  Right, it's very clear when he wasn't

8   there.

9           MR. LABUDA:  If the Court is so inclined, I don't

10  think there will be an issue with respect to either

11  stipulation to that effect or it doesn't confuse the jurors or

12  a question that they answer on that, but I don't think that's

13  really in contest.

14          MR. O'NEILL:  I don't know what the jurors would

15  decide, Your Honor.

16          MR. LABUDA:  I mean, it may be a bit confusing to

17  the jury just in terms of the fact that it is a six years'

18  claim and they have to figure out --

19          THE COURT:  How is the plaintiff -- at what point in

20  time did we have records?

21          MR. LABUDA:  We have records, we have --

22          THE COURT:  You have some records that were

23  computerized records.

24          MR. LABUDA:  Yes.

25          So we have payroll records for the whole time.

PROCEEDINGS

1          THE COURT:  What records are you missing?

2          MR. LABUDA:  We're missing the time records when he

3    punched in and out from '08, '09, 2010 and '11.  Those are all

4    destroyed in Sandy.  And then in 2012, they started using a

5    computer-punch system, and so we have those time records there

6    because they're on computer.  But the punch cards were just

7    physical punch cards and they were all destroyed.

8          THE COURT:  But you have payroll records.

9          MR. LABUDA:  We have the payroll records for the

10   whole time and we have --

11         THE COURT:  But the payroll records don't show the

12   hours.

13         MR. LABUDA:  In the first couple of years they did

14   it on a flat, like a flat amount.  It would say $74, $83,

15   $106, whatever it is.  And then that ultimately then that the

16   changed --

17         THE COURT:  So is the only thing you're missing from

18   Sandy the actual punch-in and punch-out records?

19         MR. LABUDA:  I punched cards.  I mean there's also

20   other, you know, employment records and whatnot.

21         THE COURT:  What do you mean by "employment

22   records?"

23         MR. LABUDA:  So I think we don't have any employment

24   file.  We don't have any tip, you know, any applications, any

25   notices.

PROCEEDINGS

1          THE COURT:  But you have basic payroll records.

2          MR. LABUDA:  We have the basic payroll.

3          THE COURT:  Do you have the paystubs?

4          MR. LABUDA:  We have the payroll runs, you know,

5   from like ADP that show, you know, X amount of dollars or X

6   amount of hours pay, tips, all that stuff.

7          So the big issue I think in this case is that the

8   plaintiff is saying that in the years that he was on the punch

9   card system, he worked more hours than what he got paid.  I

10  mean there's still an issue, quite frankly, even afterwards,

11  I'm not sure how he's going to prove it, but after he was

12  punching in and out on the computer system, he's saying that

13  some of those records, I think, are not accurate as well.  But

14  we'll certainly deal with that.

15         MR. O'NEILL:  Your Honor, just -- we don't have any

16  records -- the records start in March of 2008 and the --

17         THE COURT:  Which records, what period of time do

18  you have for all this just so we have the exact date?

19         MR. O'NEILL:  The exact date of our limitations, we

20  filed the case December 31, 2013.  So we go back to

21  December 31, 2007.  Now, you know, real easy just to say

22  January 1, 2008, but I think from January to March 2008, there

23  are no records at all.

24         THE COURT:  And no payroll records.

25         MR. O'NEILL:  No payroll records.  The payroll

PROCEEDINGS

1   records that were produced in discovery begin in March of

2   2008, unless there's some records I haven't seen, and I'll

3   stand corrected if they do have they them, but I have never

4   seen them.

5          There are no time records.  There's no indication on

6   the payroll records that time was used to calculate the

7   paycheck.  In fact, they switched people, they went from

8   Paychex to ADP, and then Paychex changed the format of their

9   payroll records.  During some of this time he's listed as a

10  salaried employee.  Our position --

11         THE COURT:  That's not your claim.

12         MR. LABUDA:  No, no, no.

13         THE COURT:  You don't dispute that he was an hourly

14  employee, correct?

15         MR. LABUDA:  Right.

16         THE COURT:  All right.

17         MR. O'NEILL:  But our contention is there were no

18  time punch cards.  I mean, he's going to testify he never used

19  a punch card, and the paychecks weren't, you know --

20         THE COURT:  The payroll records don't show hours; is

21  that correct?

22         MR. O'NEILL:  They don't show hours.

23         MR. LABUDA:  In the early years, they just have

24  amounts.  So it's like I said 74, 83, 106, whatever it is.

25         MR. O'NEILL:  The records start showing him as an

PROCEEDINGS

1   hourly employee in about February 2012, like the middle of

2   February 2012.

3            THE COURT:  These are the same payroll records

4   you're talking about.

5            MR. O'NEILL:  Right, these are the ones that the

6   employer receives from the payroll service.

7            And they also have now time records which purport to

8   show check in and check out.  This was something that was part

9   of the point-of-service computer system, the same system that

10  they used to put in their orders for the restaurants and all.

11           These records are widely inaccurate because for the

12  most part they don't have the punch-out time.

13           THE COURT:  All right, well, you know, this is all

14  stuff that --

15           MR. O'NEILL:  Right.

16           THE COURT:  -- we don't need to worry about, I'm

17  just trying to get a sense.

18           And you're still pursuing -- is it correct that

19  you're still pursuing three different defendants?

20           MR. O'NEILL:  Yes, Your Honor.

21           THE COURT:  44-37 Restaurant Corp., The Russo's

22  Payroll Group and Frank Russo?

23           MR. O'NEILL:  Yes, Your Honor.

24           THE COURT:  So you will offer testimony about how

25  they are all his employer?

19

PROCEEDINGS

1        MR. O'NEILL:  Well, certainly the corporation that

2   owns the restaurant was his employer.

3        THE COURT:  Which corporation was that?

4        MR. O'NEILL:  That's 44-37 Restaurant Corp.

5        THE COURT:  And Frank Russo will offer testimony

6   that it was established he was the employer?

7        MR. O'NEILL:  Yes, he's the control person.

8        THE COURT:  But The Russo's Payroll Group, why are

9   they here?

10       MR. O'NEILL:  They issued the paychecks.  So, you

11  know, they apparently took on the responsibility for paying

12  him, and so they would have -- you know, it would be them who

13  calculated I think the checks and all.

14       THE COURT:  Are you going to explain who all these

15  people are?

16       MR. LABUDA:  Yes.

17       THE COURT:  Is it your contention that one of the

18  three -- is the employer an issue here?

19       MR. LABUDA:  It seems, depending on the evidence,

20  but I mean it's 44-37 Restaurant Corp., which is Giardino's,

21  that's the name of the restaurant, so that seems to be -- I

22  mean with respect to Russo's Payroll Group, they named them,

23  we don't think he's the -- you know, they're an employer, the

24  jury will figure that out; and Mr. Russo we don't think is an

25  employer.

PROCEEDINGS

1          THE COURT:  All right, so you're contesting.  So the

2     only one that's not being contested as an employer is 44-37

3     Restaurant Corp.

4          MR. LABUDA:  Right, and that will be the evidence.

5          MR. O'NEILL:  I'm happy to let out the payroll

6     company, as long as there is not going to be anybody pointing

7     to the empty chair.  There's not going to be any distinction

8     between the work that was done by the Giardino's people and

9     the payroll corporation.  As long as they'll take

10    responsibility for whatever is supposed to be done with

11    respect to this.  I don't need the payroll company, I think it

12    just clutters up the case.

13         THE COURT:  Do you understand that?

14         MR. LABUDA:  Yes.  I mean I can't -- if he wants to

15    take them out, that's fine.  I mean in terms of what we're

16    going to be arguing and not arguing, I mean it's not as if --

17         THE COURT:  Well, maybe at the end of trial we can

18    decide the payroll company is out?

19         MR. LABUDA:  Yes, that's fine.

20         THE COURT:  Okay.

21         All right, what witnesses do you have here today?

22         MR. O'NEILL:  I have the plaintiff.

23         THE COURT:  Will it take up the rest of the day?

24         MR. O'NEILL:  We're starting at 2?

25         THE COURT:  Yes.

PROCEEDINGS

1      MR. O'NEILL:  Yes, it seems possible.

2      I've asked for -- I mean my other witnesses are

3  defendant's people, and so I've asked to have them here.

4      THE COURT:  When?

5      MR. O'NEILL:  Today.  But I was told that's not

6  likely or not possible.

7      MR. LABUDA:  So this is the issue.  We got notified

8  by Mr. O'Neill on Saturday, I think it was Saturday, about

9  calling our witnesses.  So as we explained before,

10  Mr. Connolly was disposed today, his son is graduating.

11     THE COURT:  He's a witness?

12     MR. LABUDA:  Yes, he's going to be available

13  tomorrow, but Mr. Russo, he's out.  I don't think he's going

14  to be here.  He's not going to be in the area, he's out for

15  business.

16     THE COURT:  You mean today?

17     MR. LABUDA:  No, Monday, Tuesday and Wednesday.  So

18  I don't know if they want call him or whatnot, but I mean we

19  never got notified until Saturday.  And then when I did find

20  out, I asked him and he said he's gone, he's out.

21     THE COURT:  He's not your witness?

22     MR. LABUDA:  Well, we weren't -- he's somebody that

23  has an ownership interest in it, but his testimony was such

24  that he really doesn't have that much involvement.  He went

25  there once in a while and that was it.

PROCEEDINGS

1          So we were not actually planning on calling him at

2    all so and, you know, then when Mr. O'Neill on Saturday said,

3    well, I'm thinking of calling him and issued a subpoena to me

4    on Friday via the internet, I contacted him and he said he's

5    gone Monday, Tuesday, Wednesday.  So he's not around.

6          THE COURT:  Where is he?

7          MR. LABUDA:  I think he's in Texas.

8          THE COURT:  He's a party and he's not here?

9          MR. LABUDA:  Like I said, he's not that involved.

10   He has an ownership interest, but he didn't hire this guy, he

11   didn't fire him, he didn't set his wages, he didn't direct

12   him.  I mean he knows who he is, but that's it.

13         THE COURT:  You know, this is the kind of thing that

14   I'm trying to avoid.  I mean, this is ridiculous, that this is

15   the witness that one of the party's needs and because this

16   hasn't been clarified, we're supposed to wait 'til Thursday

17   for this guy to show up?

18         MR. LABUDA:  I didn't know --

19         THE COURT:  Counsel, I mean come on.  Why can't you

20   guys talk to each other so we don't have this kind of stuff

21   going on?

22         MR. O'NEILL:  He's on both party's witness list.

23         THE COURT:  Mr. O'Neill, that doesn't mean that, you

24   know, you put yourself in this position because you didn't

25   mention him until today.

PROCEEDINGS

1           MR. O'NEILL:  But that's not true.  I sent

2     Mr. Labuda emails well over a week ago asking him, you know,

3     just to get a dialogue going about sharing witnesses.  In

4     other words, in a lot of these trials where you have somebody

5     who is going to be a witness for plaintiff and a witness for

6     defendant, we talk and say do we put him on the stand once or

7     twice?  And I kept getting the run around, and so finally he

8     tells me some time in the middle of last week --

9           THE COURT:  You should have asked to make sure that

10    Frank Russo was available.

11          MR. LABUDA:  Saturday.

12          MR. O'NEILL:  No, that's not true.

13          So he told me then, some time in the middle of last

14    week, if you want any of my people, you have to subpoena them.

15    So, you know, under New York law, you can serve subpoenas on

16    the party's attorney, so I sent subpoenas.

17          THE COURT:  When?

18          MR. LABUDA:  One, that's not the law, but anyway.

19          MR. O'NEILL:  Friday probably.

20          MR. LABUDA:  Saturday.

21          MR. O'NEILL:  But, you know, I attempted to have a

22    discussion with him well before that.

23          THE COURT:  You know, this is just -- you know, this

24    is no way to run a railroad.  You know, this is gotcha.

25          MR. LABUDA:  Your Honor --

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1                THE COURT:  It's gotcha.

2                MR. LABUDA:  -- he asked me who our witnesses were,

3       I said I don't know who we're going to be calling.

4                THE COURT:  You've got no idea who you are calling?

5                MR. LABUDA:  Some of it depends on what the

6       testimony is.

7                THE COURT:  This is garbage.  Really.  I mean, I

8       think people are just playing games here.  I mean, you're

9       being lax, Mr. O'Neill, by not doing what you need to do,

10      then, you know, it's a little gamesmanship going on and it

11      wastes the time of the jury and it wastes my time, and I don't

12      appreciate that lawyers should act towards each other this

13      way.

14                MR. O'NEILL:  Your Honor --

15                THE COURT:  This is ridiculous.

16                MR. O'NEILL:  I don't want to wait to Thursday.  I

17      don't want to wait.

18                THE COURT:  Well, what do you want to do, have a

19      deposition from Texas?

20                MR. O'NEILL:  I'll proceed with my case.  I'll put

21      my case on.  But I want Mr. Connolly and I want a keeper of

22      the records.  If somebody can testify with respect to payroll

23      records, and I've asked for that and I'm entitled to that.

24                MR. LABUDA:  That's fine.  And I asked Mr. O'Neill

25      when he was subpoenaing these guys on Saturday, I said is it

PROCEEDINGS

1   what you want?  Do you want to put in the payroll through, you

2   know, so that he can ask him --

3                THE COURT:  So you don't want Mr. Russo?

4                MR. O'NEILL:  I can try my case without Mr. Russo.

5   I don't want to delay the trial.

6                THE COURT:  Okay.

7                MR. O'NEILL:  But I do want somebody from the

8   corporation who can answer questions about the payroll

9   records.

10               THE COURT:  You must know who that is.

11               MR. O'NEILL:  I don't know who that is because every

12  witness we depose says we don't know how the payroll gets

13  done.  So I basically subpoenaed the corporation by the keeper

14  of the records.  Maybe Mr. Connolly's the person who can

15  testify, I don't know.

16               MR. LABUDA:  We've already stipulated all the

17  payroll time records they're coming, so he can use them during

18  Mr. Luongo's testimony.  I think Mr. Connolly will be able to

19  testify tomorrow about the payroll processes.

20               THE COURT:  Okay.

21               MR. LABUDA:  So that should satisfy --

22               THE COURT:  All right, I will see you all at 2.

23               MR. O'NEILL:  Thank you, Your Honor.

24               MR. LABUDA:  Thank you, Your Honor.

25               (Whereupon, a recess was taken at 1:19 p.m.)

26

PROCEEDINGS

```
 1                 A F T E R N O O N   S E S S I O N

 2              (Time noted:  2:30 p.m.)

 3              (In open court; Jury not present.)

 4              THE COURTROOM DEPUTY:  Luongo versus 44-37

 5    Restaurant Corp.

 6              Please state your appearances for the record.

 7              MR. O'NEILL:  Good afternoon, Your Honor, Michael

 8    O'Neill for plaintiff.

 9              MR. LABUDA:  Good afternoon, Your Honor, Joseph

10    Labuda and Emanuel Kataev for the defendants.

11              THE COURT:  All right, we're ready to proceed, I'll

12    ask my courtroom deputy to bring the jury up.

13              MR. LABUDA:  Just one issue that we had just with

14    respect to the openings.  I know in terms of dealing with

15    Mr. O'Neill at other trials, Mr. O'Neill's a little bombastic.

16              THE COURT:  Don't be bombastic.

17              MR. O'NEILL:  I promise, Judge, I've never been

18    bombastic.

19              MR. LABUDA:  There were arguments.  No arguments to

20    be made during the openings.

21              MR. O'NEILL:  Just what the evidence that is going

22    to show.

23              MR. LABUDA:  That's fine.

24              THE COURT:  All right, bring the jury in.

25              (Pause.)
```

PROCEEDINGS

```
 1            THE COURT:  How do you pronounce your client's name?

 2            THE PLAINTIFF:  Massimiliano Luongo.  I think I'll

 3  probably Mr. Luongo.

 4            MR. LABUDA:  Your Honor, for the entire case, the

 5  depositions and whatnot, we've used his nickname or short name

 6  Massimo.

 7            MR. KATAEV:  M-A-S-S-I-M-O.

 8            (Pause.)

 9            (Jury enters the courtroom.)

10            THE COURT:  Good afternoon.  If the jurors would all

11  rise, please.

12            First of all, I'll ask:  Is the jury satisfactory to

13  the plaintiff?

14            MR. O'NEILL:  It is, Your Honor.

15            THE COURT:  It is satisfactory to the defense?

16            MR. LABUDA:  Yes, Your Honor.

17            THE COURT:  All right, I'll ask my courtroom deputy

18  to administer an oath to the jury.

19            THE COURTROOM DEPUTY:  Yes, Judge.

20            (Jury sworn.)

21            THE JURY:  Yes.

22            THE COURTROOM DEPUTY:  You may be seated.

23            THE COURT:  All right.  Good afternoon.

24            THE JURY:  Good afternoon.

25            THE COURT:  I'm Judge Amon and I will be presiding
```

PROCEEDINGS

1    over the trial, the trial which you heard a little bit about

2    this morning during the course of jury selection.

3          Mr. Luongo is the plaintiff in this action.  It is

4    the plaintiff who sues to recover for alleged violations of

5    the federal and state labor laws.  The parties against whom

6    the suit was brought are called defendants.  In this case, the

7    defendants are 44-37 Restaurant Corp., The Russo's Payroll

8    Group, and Frank Russo.

9          What I want to do now is just to begin to give you a

10   few opening instructions, and the most important instruction

11   that I have to give you is that you should not discuss the

12   case with anyone.  This includes even discussing it among

13   yourselves until all the evidence has been presented, the

14   attorneys have given you their summations, and I tell you to

15   go to deliberate.  That's the first time you discuss it, even

16   among yourselves.

17          And when I talk about not discussing it, that means

18   not to talk about it in any kind of social media way; you

19   know, whatever it is that people do these days, Twitter,

20   Facebook, internet, chat rooms, websites, any of that kind of

21   thing.  You should not discuss the case at all.

22          As I said before, the first time you ought to

23   discuss it is when you retire to deliberate.

24          Now, if someone asked you about the case or, you

25   know, your spouse or employer, you can indicate that you're

PROCEEDINGS

1    serving on a jury and how long the case is to last, but you

2    should not tell anyone what the case is about.

3              And I think the reason for this is obvious.  We want

4    you to decide this case based solely on the evidence that you

5    hear in this courtroom and not on the basis of anything else

6    that has happened outside the courtroom, about what any other

7    person might think about the case.

8              If you were asked or approached in any way about

9    your jury service or about anything else related to the case,

10   you should tell the court about that, but don't discuss it

11   with anybody else, because if you discuss it with someone

12   else, more than one person might be affected.

13             Now, along these same lines you should not try to

14   access any information about the case or do any independent

15   research on any issue that arises in this case or from any

16   source.  So you're not supposed to consult dictionaries or

17   reference books or go on the internet or Google.

18             The parties or the attorneys or, whatever, the

19   Court, none of that is relevant evidence and, again, you have

20   to decide the case based on what you hear in this court.

21             Now, I'm going to tell you a little bit about how

22   the trial will proceed.  The lawyers first will make openings

23   statements to you and they'll give an overview of the case and

24   what they think will be produced.  What is said in the opening

25   statements is not itself evidence, it's just the attorneys

PROCEEDINGS

1   giving you the preview of what they think the case will show.

2           The evidence will only come from the witness stand

3   and any exhibits that are introduced.  After the opening

4   statements, the plaintiff will proceed with the introduction

5   of evidence.

6           After the plaintiff has completed the introduction

7   of all his evidence, the defendant may present witnesses and

8   exhibits to establish defense.  If the defendant does present

9   evidence and the plaintiff is permitted, so if he wishes to

10  offer additional evidence to rebut the defendant's case.

11          Each witness, by whomever called them, is examined

12  first by the party who called them to testify, and then the

13  opposing party is permitted to cross-examine that witness.  So

14  that's the order of things.

15          The evidence in the case will consist of sworn

16  testimony of a witness, and that doesn't make any difference

17  who called the witness.  All exhibits received into evidence

18  and, again, regardless of who may have produced the exhibits,

19  and all facts that may have been stipulated to or judicially

20  noted.

21          Depositions might be received in evidence.  They

22  contain sworn testimony with the lawyers for each party having

23  asked questions.  So deposition testimony may be accepted by

24  you subject to the same instructions that apply to witnesses

25  testifying here in open court.

PROCEEDINGS

1    Some things aren't evidence.  Statements and

2 arguments of the lawyers are not evidence.  So that shouldn't

3 be considered.  Anything that the Court says or does during

4 the course of the proceedings should not be considered as

5 evidence.

6    Upon the completion of the instruction of the

7 evidence, the introduction of the evidence rather, attorneys

8 will make closing statements or summations.  In summing up,

9 the attorneys will tell you what they say they believe the

10 evidence has shown, what inferences they believe you should

11 draw from the evidence, and what conclusion they believe you

12 should reach.  What the attorneys say again is not evidence.

13    The plaintiff sums up first, followed by the

14 defendant, then the plaintiff has an opportunity to make a

15 brief rebuttal.

16    It's your job to determine what the facts are, and

17 that's a very important role.  As judge I have no role at all

18 to play in your determination of the facts.  After summations

19 are concluded, I will instruct you on the applicable law and

20 you will then retire to your deliberations.

21    Your function as jurors is to determine what the

22 facts are and apply the rules of law that I give you to the

23 facts as you determine them to be, and then your conclusion is

24 your verdict.

25    You will determine what the facts are only from the

PROCEEDINGS

1    testimony and the exhibits.  You are the sole and exclusive

2    judges of the facts.  I do not intend to express any opinion

3    concerning the facts.  If anything I say gives you the

4    impression that I have some opinion as to the facts, please

5    disregard it.

6           On the other hand, you are bound to accept the rules

7    of law as I state them.  If you perceive the law as stated by

8    the lawyers is different from the law as stated by me, it is

9    my instructions that you are required to follow.

10          At times during the trial an attorney may stand to

11   object to evidence or a question.  And what they're doing is

12   asking me to make a ruling of law on the admissibility of the

13   evidence.

14          If I sustain an objection, it means that I think the

15   law does not permit the evidence in question, and you are to

16   disregard the question asked and can't speculate about how it

17   might have been answered.  You simply have no evidence on the

18   subject before you.

19          If I sustain an objection after an answer is given,

20   I'll strike the answer; meaning that you should not consider

21   it at all in your deliberations, you are to act as if the

22   answer had not been given.

23          If I overrule an objection, it means that I find the

24   law allows the evidence to come before you.  You should not,

25   however, attach any special weight to evidence that comes in

PROCEEDINGS

1    over objection, you consider it together with all the

2    evidence.

3            There may be an occasion that I might ask a question

4    of a witness, but I do so solely to bring out a matter that I

5    think ought to be brought out and not to indicate to you any

6    opinion about the facts or the weight that you should give the

7    testimony of that witness.

8            You are the sole judges of the facts.  You must

9    determine which of the witnesses you believe, what portion of

10   their testimony you accept, and what weight you attach to it.

11   The law does not require you to accept all the evidence

12   admitted.  In determining what evidence you will accept, you

13   must evaluate the testimony of each of the witnesses and

14   determine the weight to give to it.  It is no magic formula

15   about which to evaluate testimony, you just bring with you all

16   the experience and background of your lives.  In your everyday

17   affairs, you determine for yourself the reliability or

18   unreliability of statements made to you by others.  The same

19   test that you use in your everyday dealings are the tests that

20   you should apply here.

21           The interest or lack of interest of any witness in

22   the outcome of the case, the bias or prejudice of a witness,

23   if there be any.  The appearance, the manner in which the

24   witness gives his or her testimony on the stand.  The

25   opportunity that the witness had to observe the facts

PROCEEDINGS

1    concerning about which he or she testified.  The probability

2    or improbability of the witness' testimony in view in light of

3    all the other evidence in the case are all items that may be

4    taken into consideration in determining the weight, if any,

5    you give to a witness' testimony.

6           Please do not have any discussions with the lawyers

7    or the parties or witnesses in this case.  By this I mean not

8    only to not converse about the case, but do not have any

9    conversation at all, even to say "hello."  It's very important

10   that we maintain the appearance of propriety.  And if someone

11   saw a juror talking with a party or a lawyer, then that person

12   might think that something improper was being discussed, so

13   please don't do that.

14          I can tell you that the lawyers as officers of the

15   court are very sensitive to this.  So if one of them sees you

16   in the lobby downstairs and they turn around and walk the

17   other way, they're not doing it to be rude, they just know how

18   important this rule is that they not have any conversation

19   with you.

20          So with that by way of opening instructions, we will

21   now turn to opening statement by plaintiff's counsel.

22          Mr. O'Neill.

23          MR. O'NEILL:  Thank you, Your Honor.

24          If it may please the Court, Mr. Labuda.

25          Good afternoon, ladies and gentlemen.  Now you're

Opening Statement by Mr. O'Neill

1   going to find out what the case is about.  Before I do that, I

2   want to thank you for you service.  You know, jury service has

3   a bad rap, but I think you're going to enjoy the experience.

4   I tried a case a couple years ago, it was the longest case in

5   the history of the Manhattan courthouse.  We started in

6   September of 2014, we ended in August of 2015.

7           THE COURT:  I can assure you that's not going to

8   happen here.

9           MR. O'NEILL:  Nothing like it, Judge.

10          The court believed that the jurors should have

11  lifetime exemptions from jury service.  And do you know what?

12  They didn't want it.  They said we'll serve again.  They were

13  so -- they enjoyed it so much.  And so I hope you get some of

14  that here.

15          Now, what is this case about?  This case is about a

16  restaurant that did not pay its waiter properly.  Did not pay

17  him for all the hours that he worked.  Did not pay him when he

18  worked overtime.  Did not pay them other wages he was entitled

19  to.

20          Now, there are rules in New York State, both federal

21  and state, that govern how wages must be paid.  And those

22  rules are fairly simple.  The restaurant has the obligation to

23  make a record of when the waiter shows up for work.  The

24  restaurant has an obligation to make a record when the waiter

25  leaves, finishes work.  The restaurant has an obligation to

Opening Statement by Mr. O'Neill

1    pay for all of the hours worked, at least minimum wage.  If

2    the waiter works more than 40 hours, he or she is entitled to

3    overtime.

4           Now, there's something called "spread of hours,"

5    which I don't know, maybe you've heard of, maybe you haven't,

6    but in New York State, if you work more than ten hours in one

7    day, you work ten hours and one minute and up, you are

8    entitled to one extra hour of pay.  So you're entitled to the

9    pay for the hours that you worked plus one extra hour, if you

10   work over ten hours.  That's called "spread of hours."

11          Now, we're here because the defendants, who operated

12   a restaurant called Giardino's did not follow those rules.

13   And you're going to learn -- now, Mr. Luongo worked for the

14   Giardino's restaurant for approximately 19 years.  I think, do

15   I have that right?

16          THE PLAINTIFF:  Probably 16, 17.

17          MR. O'NEILL:  Okay.  We can only go back six years.

18   So we can go back -- the lawsuit was filed in December,

19   December 31, 2013.  So we can go back to December 31 of 2007.

20   We can't go back all the years before that Massimiliano Luongo

21   worked.  So what you're going to find, what the evidence is

22   going to show, certain things.  And it depends on what period

23   of time.  Because there were some changes over that time.

24          But from the beginning that you're concerned with,

25   December 31, 2007, until early February of 2012, there are no

Opening Statement by Mr. O'Neill

1    records that show when Massimiliano arrived at work.  There

2    are no records that show when he left work.

3          We have the payroll records.  The payroll records

4    don't say how many hours he worked.  They don't say what wage

5    he was paid.  In other words, they don't say what hourly wage

6    he was paid.  They don't say what -- you know, how many hours

7    they were paying him for.  There was just a number called

8    regular, regular pay, that's what it was called.

9          And in 2008, it was a very small number.  It was $74

10   is what his regular pay was.  The records give no indication

11   of how that amount was arrived at.

12         Now, beginning in early 2012, they implemented a

13   system for keeping track of time.  And this was in connection

14   with the computer system for placing orders.  Sometimes they

15   call it a "POS," a point of sales system.  And under this

16   system, the waiter would put his I think thumb or fingerprint

17   down and that would record when he showed up.  And he would do

18   it again when he left and that's supposed to show when he

19   left.

20         But you're going to see, when you look at these

21   records and you look at evidence, the payroll records, that

22   there's no connection between the hours that the system shows

23   and the paychecks.  As a matter of fact, for the first year,

24   so from 2012 to 2013, February to February, approximately, the

25   first year of these records are crazy.  They don't make any

Opening Statement by Mr. O'Neill

1   sense at all.  Most of the time there's no punch out at all.

2   And when there's no punch out, the computer just says 6:00 in

3   the morning.

4           There are punch-in times that don't make any sense.

5   And I'll talk to you in a minute about Massimiliano's

6   schedule.  But, for example, on Friday he worked the dinner

7   shift.  And that would be, he would show up about 5:00 and he

8   would leave when the last table finished and the restaurant

9   was open until 11:00.  That was basically, could be a seven-

10  to eight-hour day.  These records show on one occasion him

11  punching in at 9 something, 9:16 at night.  I mean this is

12  ridiculous.  That never happened.

13          And you're also going to see that the paychecks that

14  were given to Massimiliano, now they had changed to Paychex.

15  So beginning in 2012, these checks now had the amount that he

16  was being paid per hour.  They were paying him $5 an hour, and

17  I'll talk about that in a second.  And they would have a

18  number of hours and it would multiply out and that's what they

19  were paying him.  But the hours bore no relationship to the

20  time records; sometimes they were less, sometimes they were

21  more.  So it's our contention that those time records are

22  basically useless.

23          Now, 2013.  The records become -- now there's some

24  connection between the pay and the records, but they're not

25  right yet.  And here's the biggest problem.  There is still

Opening Statement by Mr. O'Neill

1    some dates where there's no punch out.

2            So what did the restaurant do when there was no

3    punch out?  So you'll learn Massimiliano had a five-day

4    schedule, Monday, Wednesday, Friday, Saturday, Sunday.  And

5    you'll see that maybe on Sunday there was no punch out, or

6    maybe on Wednesday there was no punch out.

7            The restaurant just didn't pay him for that day.

8    They just paid him for the rest of the hours.  So they gave

9    him hours on days that he did not punch out.  Now that didn't

10   happen all the time, it only happened most of the time.  Every

11   once in a while it appears that they made some estimate about

12   when he left.

13           Now, Massimiliano worked until about the middle of

14   October.  The records that we have, the payroll records that

15   defendant has produced, run from March of 2008.  So we don't

16   have anything before March of 2008.  Up until September of

17   2013, we don't have anything, we don't have the last month or

18   so, but we have Massimiliano's paychecks so we can see what he

19   was paid.  But, again, the time records, and this is -- the

20   time records in August of 2013 through the end of his

21   employment have almost no checkouts, they're almost -- you

22   know, there's two or three checkouts during that period of

23   time.

24           So they changed their paycheck system in August of

25   2013, and they started paying spread of hours, which they had

Opening Statement by Mr. O'Neill

1    never paid up to that point, but we still can't tell from the

2    records whether or not he was paid accurately.

3             So what are our contentions?  The contentions are

4    that he was not paid for all the hours that he worked.  He was

5    not paid overtime when he worked over 40 hours per week.  He

6    was never paid spread of hours until approximately July or

7    August of 2013.  Now, there's the issue of how much should he

8    have been paid?  Not how many hours, but what was the hourly

9    pay that he should have received?

10            Now, under federal and New York State law, there is

11   something called a "tip credit."  Maybe you've heard of it,

12   maybe you haven't, sometimes it's called the "tip allowance."

13   And what this is is that if you work in a job that pays tips,

14   or you receive tips from customers, the employer is allowed to

15   allocate, devote part of that, those tips to the minimum wage

16   that's supposed to be paid, and that's called the "tip

17   credit."

18            So, for example, if the minimum wage was $7.15 and

19   the tip credit was $2.25, as long as the employee received

20   more than $2.25 an hour in tips, the employer was allowed to

21   dedicate, allocate that $2.25 towards the minimum wage, so

22   that the employer would only end up paying 4.90 or $5 for

23   every math that is on the example I gave you.  But it's not

24   automatic.  You can't -- a restaurant can't just say, oh, I'm

25   going to pay you whatever the wage is after the tip credit.

Opening Statement by Mr. O'Neill

1    There are some conditions to the employer's right to give to

2    use the tip credit.

3           Now, those conditions, you are going to hear about

4    them at the end of the case, the judge will instruct you, but

5    there's a couple of things that are required here.  Number

6    one, is the employee has to be informed.  The employee has to

7    understand what's going on.  And you're going to find, nobody

8    explained to Massimiliano how his checks were computed, how

9    his pay was computed.

10          As a matter of fact, you're going to see that for

11   most of the weeks that he worked there, his check was zero.

12   I'm talking about the check that he actually received that he

13   could deposit in the bank.  Sometimes it would be $4,

14   sometimes it would be 12, sometimes it would be as high $50.

15   But for the most part, it was zero.  Because the way the

16   waiters get paid, is in addition to the minimum wage payment,

17   they get tips.  And it's the employer's obligation to keep

18   track of those tips.  And I'll talk about that in just a

19   second.  But the tips are put on the paystub in order to

20   figure out the withholding taxes.

21          So what would happen most weeks is that the

22   withholding on the tips would basically wipe out the minimum

23   payment, whatever payment the employer decided to give that

24   week.  So going to the beginning, the checks were $74 a week,

25   and then there would be -- the tips would be put on the check

Opening Statement by Mr. O'Neill

1   and the withholding would wipe out the $74 and Massimiliano

2   would get a check for zero.

3          Now, that's okay, in other words, it's certainly

4   okay, it's required by law to withhold taxes from the tips and

5   if that reduces the paycheck to a very low amount or nothing,

6   that's okay as long as he's getting paid the proper minimum

7   wage.

8          But Massimiliano did not understand why this was

9   going on, and he once in a while he would ask a manager, say

10  How come my checks are zero?  The manager says, Well, let me

11  talk to Mr. Russo, let me talk to Mr. Russo.  Mr. Russo, the

12  owner of the restaurant.

13         So we have -- the restaurant is the corporation of

14  44-37 Restaurant Corp., and then Mr. Russo, Frank Russo

15  himself, who's the owner, he's a defendant, because it's our

16  contention, as the control person, he was responsible for

17  making sure that his company followed the law.  And then

18  there's the other defendant here is called Russo's Payroll

19  Group.  This is a corporation Mr. Russo started to pay the

20  employees from his different companies.  He had different

21  restaurants and different business interests, and apparently

22  he used this corporation for the purpose of actually issuing

23  the checks.  So anyway, one of the requirements of the tip

24  credit, as I said, is that the employee be notified as to what

25  is going on and have it explained to him.

Opening Statement by Mr. O'Neill

1           Now why is that?  Well, the purpose of that is

2    because if the employee doesn't get enough in tips to make the

3    minimum wage, he or she knows that he's entitled to the

4    employer to chip in to get you up to minimum wage.  But if the

5    employer doesn't know that, he can't enforce it.

6           And the other requirement, under the New York labor

7    law, is that the payroll records actually make a notation as a

8    separate item of the tip credit.  You're going to see none of

9    the payroll records have that.  So it's our contention that

10   they don't get the benefit of the tip credit.

11          Now, this is something most likely that you will

12   decide, at the end of the case, and so you'll use either the

13   minimum wage without the tip credit, or the minimum wage with

14   the tip credit to calculate the wages that are due to

15   Mr. Luongo.

16          One piece of evidence you're going to see is the tip

17   book.  Now, in restaurants it's common for the employees to

18   pool their tips.  And during the time in question, that's what

19   happened at this restaurant.  And it's also common that the

20   restaurant keeps a tip book, everybody writes down what the

21   tips are, they add them all up and then they distribute them

22   according to points.

23          The waiters usually get one point, busboys and food

24   runners, they'll get a half point or three quarters of a

25   point.  And then they'll use that to allocate the tips

Opening Statement by Mr. O'Neill

1   according to the number of points that you have.

2           Okay, we have a tip book from a date in 2013, I

3   believe it's February, could be March, until a date in --

4   well, it goes into 2014.  There's some months in 2013 that are

5   missing.  Since Mr. Luongo, Massimiliano, worked only until

6   October of 2013, the tip book after that isn't really

7   important.

8           But what does the tip book show?  It's a book that

9   shows what the tips were?  And they had a tip book during the

10  whole period of time, but the only one that they apparently

11  had left that they can produce in the case is the one that

12  you're going to see.  And that kept track of both the cash

13  tips and the credit card tips.  And an employer's under an

14  obligation to report those tips accurately to the government.

15          Now, you may hear something about whether or not

16  Massimiliano declared all of his tips on his paycheck.  That

17  wasn't his job.  That was the employer's job.  The employer's

18  job is to use the tip book to put the accurate tips into the

19  paycheck.  The tip book will also show that Massimiliano

20  worked on days where he got zero pay when these things had no

21  check out.

22          Now, Massimiliano's schedule, as I told you, was

23  Monday, Wednesday, Friday, Saturday and Sunday.  Mondays he

24  would either work lunch and dinner, that's called a double, or

25  he would work dinner.  He and another waiter would swap the

Opening Statement by Mr. O'Neill

1   lunch sometimes.

2          Now, if you work lunch, you're supposed to show up

3   at 11:00.  If you work dinner, you're supposed to show up at

4   4:00.  If you work lunch, you leave at 3 or 4:00.  If you work

5   dinner, you stay until you can leave, the last table is empty,

6   your last table.

7          That would usually be, on a Monday, around anywhere

8   from 10 to 11:00.  So if you worked a double on Monday, it

9   could be ten hours, it could be 11 hours.  Wednesday, and if

10  you worked just the dinner shift, obviously it would be less,

11  seven to eight hours.

12         Wednesday he worked a double, so he would show up --

13  scheduled to show up at 11, and then he would leave somewhere

14  between 10 and 11, and, again, you would have somewhere

15  between 11, 10 or 11 hours of -- or it could be 11 to 12

16  hours, if you went 11 to 11.  So you have about 10 or 11 hours

17  on a double on Wednesday.

18         Wednesday he worked dinner.  Show up at 7, they

19  stayed open later on Friday nights.  Did I say Wednesday, I

20  meant -- Friday he worked dinner.  The restaurant stayed open

21  later on Fridays, so he would work on Fridays from 4:00 until

22  anywhere from 11 to 12, so that would be seven to eight hours.

23         Saturday and Sunday he worked doubles.  Saturday,

24  again, show up at 11, he would leave somewhere between 11 and

25  12, and it would be 12 to 13 hours.  Sunday show up at 11,

Opening Statement by Mr. O'Neill

1    restaurant closed a little earlier, he leaves, could be, 9,

2    10:00.  Again, you get 10 or 11 hours on a Sunday shift.

3           Now, during a period of this time, they had brunch

4    on Sundays, so that would be he had to start at 10:00 not

5    11:00 when they had brunches.  You'll also hear they had

6    parties from time to time and sometime that would involve

7    extra hours.

8           So when you put all this together, you're going to

9    see that his schedule had him working.  He worked from 48 to

10   57 hours, depending on whether he worked a double or a single

11   on Monday, and depending on, you know, the variations in

12   leaving time.

13          So that's our contention, that those are the hours

14   that he worked.  You might ask, well, why don't we just use

15   the time records from 2013 to estimate how many hours he

16   worked and then extrapolate that backwards?

17          Well, you can't do that because they're not

18   accurate.  They're only for a short period of time.  They

19   don't show his departure many, many times.  And what you'll

20   find out is when they actually put in this fingerprint system

21   and started paying attention to the hours, they would start

22   sending waiters home early.  And the estimation was that

23   Mr. Russo didn't want anyone to get overtime.  And for the

24   most part, he was not paid overtime.  Every now and then the

25   check would show he worked over 40 hours, he would get

Opening Statement by Mr. O'Neill

1   overtime, but you'll also see many, many checks where he was

2   paid 39, 38, 35 hours.  He should have been paid overtime and

3   was not, and that's why we can't use those records to go back

4   in time.

5            And for personal reasons, and the last couple of

6   months, August, September, October, he cut down on his hours.

7   So that would not be representative of the hours that he

8   worked.

9            Now, in the case you're going to have to do some

10  calculations here.  We have some accountants in the jury; some

11  people with computer experience, which is good, I was very

12  glad to see that.

13           And we'll get a verdict form and the verdict form

14  will indicate how you express your verdict, what you find.

15  And I don't know what that's going to look like yet.  I don't

16  think anybody here knows exactly what it's going to look like.

17  But at the end of the case, I guess she has to talk to you

18  again, and we will have a verdict form by that time and I'll

19  be able to go over it with you and give you my ideas on it and

20  what I think the evidence has shown in this case.

21           You're going to have conflicting testimony, you're

22  going to have to weigh that and decide who's telling the

23  truth, who's shading the truth, who's not telling the truth.

24           So that's our case.  I appreciate your service.  I

25  appreciate, I know you all will pay close attention, I really

Opening Statement by Mr. O'Neill

1   appreciate that, and I'll talk to you again at the end of the

2   case.   Thank you very much.

3              (Continued on next page.)

49

Opening Statement by Mr. Labuda

1          MR. LABUDA:  Good afternoon.

2          Again, my name is Joe Labuda and I represent the

3    defendants in this case.

4          Now, this case -- this is a story about plaintiff,

5    Massimiliano Luongo, trying to get something for nothing.

6    He's trying to get extra pay for hours that he did not work.

7          Now, let me give you a little bit of background.

8    Giardino's is an Italian restaurant located in Douglaston,

9    Queens.  In this case there's three different defendants.

10   There's 44-37 Restaurant Corp., that's the corporation for the

11   restaurant, Giardino's.  There's also a Russo's Payroll Group

12   which is a payroll company; didn't employ him, didn't do

13   anything other than issue a check.  Just like everybody here

14   who gets ADP or Paychex.  That's all it is.  It's not an

15   employer.  There's also defendant Frank Russo who is a part

16   owner of 44-37, but he didn't employ Mr. Luongo as well.  The

17   employer for Mr. Luongo is Giardino's.

18         Now, Giardino's was a good place to work.  It treats

19   its customers and its employees like family.  It pays its

20   employees well and pays them for all the hours that they work.

21         Now, plaintiff was there for 16 years, from '97 to

22   2013 on and off.  He left Giardino's several times to "try

23   something new," but he always came back.  Now, he opened a

24   bagel store with one of his coworkers, Gennaro; he worked at

25   Cardozo High School; he went to Sunrise Auto Mall.  And every

Opening Statement by Mr. Labuda

1    time he left, tried that, he came back.  He came back because

2    he got treated well there and he got paid even better.

3           Now, literally there are tens of thousands of

4    restaurants in New York City and Long Island where Mr. Luongo

5    could have gone back to after he stopped working there.  The

6    bagel place, school, Sunrise Auto Mall, wherever, but he came

7    back to Giardino's each and every time.  Now that's saying

8    something.

9           Now, Mr. Luongo was treated well at Giardino's.  He

10   got good pay, he got good tips, he got vacation, he got

11   holidays, sick, personal days.  Now, with respect to the hours

12   that Mr. Luongo -- sometimes he was part time, sometimes he

13   was full time.  Now, part time means that he was working 15,

14   20 hours, a couple shifts, three shifts, four shifts.  Full

15   time means 30-to-40 hours.  Not the 47-to-57 hours, whatever,

16   that Mr. O'Neill was talking about.

17          Now, he -- in addition, Mr. O'Neill was talking

18   about don't use the 2013 payroll records to extrapolate is his

19   term.  The reason why he doesn't want to do that, that's when

20   there was a finger system that you had to put in your finger

21   to punch in and punch out, those records show 30 hours a week.

22   That's why he doesn't want you to look at those.  So think

23   about those when you see that evidence.

24          Now, at Giardino's you will hear evidence that there

25   are seven waiters that split the shifts, lunch and dinner,

Opening Statement by Mr. Labuda

1   lunch and dinner so there's no need to have somebody working

2   47, 57 hours or whatever it is per week.  Now, you're going to

3   hear evidence that back in 2008 and '9, and you'll see

4   evidence too with the payroll, that he was part time.  He

5   didn't work, you know, all these hours that's being claimed.

6   He worked 15-to-20 hours a week and he got paid correctly.

7   That's what the payroll shows and those are his hours.

8         And you'll see and hear evidence that starting in

9   late 2009 he began working more hours and he was more full

10   time, 30-to-40 hours a week.  And, again, he was paid

11   correctly.  And you'll also see when he became full time, he

12   wasn't necessarily working five days a week.  He was working

13   three days a week, four days a week, five days a week.  Why?

14   Because that's just how the restaurant industry works.

15   Sometimes it's slow, sometimes you've got something else to

16   do, sometimes it's raining, it's snowing, there just aren't

17   that many customers, and when you've got other waiters there,

18   nobody is going to be waiting around.  So you'll see the punch

19   cards that show three days a week, four days a week and five

20   days a week.

21         Now, you'll also hear and see evidence that

22   Mr. Luongo, he was late for his shifts, okay.  So you heard

23   about lunch, supposed to be there at 11:00.  You'll see punch

24   cards -- punch-ins 11:30, 11:15, 11:40, whatever.  Then you'll

25   see for the dinner shifts they're supposed to be there at

Opening Statement by Mr. Labuda

1   4:00.  4:30, 5 o'clock, even later than that, 6 o'clock.

2            And you'll hear and see evidence that during his

3   time at Giardino's plaintiff would take a lunch break.  So in

4   that time and you'll see evidence and you'll hear the judge's

5   instructions about the fact that when you're not working for

6   lunch, you don't get paid.

7            And you'll also hear evidence that at the end of the

8   day, and we've all been to restaurants, that sometimes he

9   would leave his shift early.  When it wasn't busy, the

10  restaurant was winding down, he would leave early.  One of the

11  other individuals.  And you'll hear that Mr. Luongo is from

12  Freeport.  So he's down in Freeport, the restaurant is up in

13  Douglaston, he's got about a 40-minute commute.  So whenever

14  it was time to wind things down for the rest of the night, he

15  was one of the first ones to go just because he had a long

16  commute.  The other waiters you'll hear lived closer.  Again,

17  you will see the punches for that.  You'll see punches at

18  8 o'clock at night, you'll see punches at 9 o'clock at night

19  when the restaurant closed at 10:00.  Even on the weekends

20  when the restaurant closed at 11:00, you'll see punches out at

21  9 o'clock, 9:30, 10 o'clock.

22           Now, all the plaintiff, we have -- we have punch

23  cards showing the hours.  Now, all that Mr. Luongo has is his

24  general recollection.  He never kept track of his hours.  He

25  never wrote down his hours on a diary.  He never wrote it down

Opening Statement by Mr. Labuda

1   on a calendar, not on a piece of paper.

2           Now, you'll hear evidence that back in 2008

3   Giardino's used physical manual time cards; took it out of the

4   shelf, punched it in to keep track of the employee hours.

5   Then starting in 2012 they went to the POS system that Mr.

6   O'Neill was referring to.  That's where you punched in a code

7   onto the computer and you punched out at the end of the night

8   and that was it.  And then in 2013 they used the same POS

9   system, but they went to a finger scan so that you could --

10  you had to use your finger to punch in and out.

11          And you heard Mr. O'Neill talking about the fact

12  that there aren't all these punch-outs.  He's the one that is

13  responsible to punch-in and punch-out every night.  And

14  especially in 2013, we couldn't do that for him.  Why?

15  Because we didn't have his finger, okay.  If he left, drove

16  home without punching out, we did not have his finger to be

17  able to punch himself out.  And you'll see the evidence.

18  You'll look at it.  In 2013 he failed to punch out 79 times,

19  okay.  That's from January to October, 79 times.  You'll see

20  the records for this.  In 2012 for the full year he failed to

21  punch out 135 times.

22          Now, when he did forget to punch out, he would call

23  the manager from either the road or from or -- let them know

24  the next day.  And you'll hear and see evidence, including

25  from Mr. Luongo, that the managers fixed that so when he

Opening Statement by Mr. Labuda

1   forgot to punch in this 135 times or the 79 times in 2013, we

2   fixed it.  You'll hear him testify to that fact.

3           And you'll see the evidence that shows on the time

4   payroll records that sometimes he worked 16 hours a week,

5   sometimes 18, 20, 30, 40 hours, but you'll never see the hours

6   that Mr. O'Neill is talking about in terms of this 47 plus

7   50 hours, something like that.

8           Now, with respect to his pay, you'll see evidence

9   and hear testimony that the plaintiff was paid the minimum

10  wage less the tip credit.  That's what waiters did.  You'll

11  hear that back in 2008 the minimum wage with the tip credit

12  was $4.60 an hour.  In 2009 it switched to 4.65 and in 2011 it

13  was $5 an hour, and that's how Mr. Luongo got paid.  He got

14  that pay per hour plus his tips.  Okay.

15          And Mr. O'Neill may be right that on some weeks the

16  check was nothing because the tips were so high and the taxes

17  from the tips were so high that it negated the $5, 4.60 that

18  he was making because you'll hear testimony that Mr. Luongo

19  was getting over $700 a week in tips, okay.

20          And in terms of being informed about things, you'll

21  hear testimony that he was told this is how he was paid; that

22  this is standard in the industry; and that there was posters

23  in the restaurant informing him of all of this stuff.

24          Now, you'll hear evidence that Mr. Luongo doesn't

25  recall even how he was paid in 2008 and '9.  You'll hear

ANGELA GRANT, RPR, CRR
Official Court Reporter

Opening Statement by Mr. Labuda

1    evidence that was confused about his pay, okay.  But you'll

2    also hear evidence that his pay always accurately reflected

3    the hours that he worked.

4           Now, you're also going to hear testimony about

5    Hurricane Sandy, and you're going to hear that when Superstorm

6    Sandy hit back in October of 2012, Russo's on the Bay, which

7    is where Giardino's kept its payroll records, was decimated.

8    Russo's on the Bay, as the name indicates, is down in Howard

9    Beach.  It was under eight feet of water.  All the time

10   records, the punch cards, they were stored in the basement.

11   So we don't have any of those records up through 2011.  We

12   have the time records from 2012 and '13.  Why?  Because you

13   had that POS system so that was intact and we have those.

14   And, again, those show more along the lines of 30 hours a week

15   being worked.  We also have all the payroll records going back

16   to 2008 when the time for this case begins.

17          And you'll see, as I indicated before, when

18   plaintiff was working part time, he got paid part time.  When

19   he was working full time, he got paid full time meaning

20   30 hours a week, 40 hours a week.

21          Now, you're also going to hear some testimony and

22   evidence about taxes.  You're going to hear and see evidence

23   that will lead you to believe that the plaintiff is not a

24   credible witness.  As I told you before, you'll hear evidence

25   that he made $700 a week in tips, including cash tips.  And

ANGELA GRANT, RPR, CRR
Official Court Reporter

Luongo - Direct - O'Neill

1    the way it worked at the restaurant is the waiters would

2    collect the tips from the customers and at the end of the

3    night they would tell the restaurant how much they made.  Then

4    the restaurant puts that into the record and puts that

5    ultimately on to his paycheck.

6           And you're going to hear testimony that Mr. Luongo

7    did not report his tips accurately to the restaurant.  That's

8    his obligation.  He pockets the tips and he puts them in his

9    pocket and then he tells us what it is.  And you'll hear

10   testimony that he underreported his tips $80 to $150 a week.

11   He didn't report these tips to Giardino's and he didn't report

12   these tips to the federal government.  He knowingly lied on

13   his taxes.  And this is the same tax form that everybody fills

14   out that says under penalty of perjury, this is how much I

15   made in your pay and your tips.  In fact, you'll hear evidence

16   that Mr. Luongo took the Fifth Amendment against

17   self-incrimination when asked about his taxes.

18          Now, this is the same person that will be testifying

19   before you in a couple minutes.  And it's your job to

20   determine whether or not he's lying or if he's telling the

21   truth.

22          And, ladies and gentlemen of the jury, I submit to

23   you when you hear and see all of the evidence, you will

24   conclude that the plaintiff is lying about working all these

25   extra hours, and that the truth is that he was paid and that

LUONGO – DIRECT – O'NEILL

 1    he is owed absolutely nothing.

 2                    Thank you very much.

 3                    THE COURT:  Mr. O'Neill, do you want to call your

 4    first witness?

 5                    MR. O'NEILL:  I do.  I call Massimiliano Luongo.

 6                    (Witness takes the witness stand.)

 7                    (Witness takes the witness stand.)

 8    MASSIMILIANO LUONGO, called as a witness, having been first

 9    duly sworn/affirmed, was examined and testified as follows:

10                    COURTROOM DEPUTY:  You maybe seated.

11                    Please state and spell your name for the record.

12                    THE WITNESS:  My first name is Massimiliano Luongo,

13    M-a-s-s-i-m-i-l-i-a-n-o L-u-o-n-g-o.

14                    THE COURT:  All right, Mr. O'Neill.

15                    MR. O'NEILL:  Thank you, Your Honor.

16    DIRECT EXAMINATION

17    Q    Good afternoon, Massimiliano.

18    A    Good afternoon.

19    Q    I want to ask you first just some general background

20    questions.

21    A    Sure.

22    Q    Starting with when were you born?

23    A    August 27, 1967.

24    Q    Where were you born?

25    A    Naples, Italy.

LUONGO - DIRECT - O'NEILL

1   Q     When did you come to the United States?

2   A     1997.

3   Q     And when you came to the United States, where did you

4   first work?

5   A     First was at Giardino Cafe in Roslyn.  That's where Bruno

6   Rinaldi put me to work over there.

7   Q     How did you get that job?

8   A     Well, I -- my mother back like 20 years ago, knew Bruno

9   Rinaldi's mother and basically, you know, because I wanted to

10  try a new experience, she said if you want to try to go to the

11  United States, I'll call Bruno's mother and, you know, I will

12  see if we can do anything.  So I called Bruno, I spoke to

13  Bruno, and Bruno said, okay, come over here and, you know, we

14  will see.

15  Q     Who is Bruno Rinaldi?

16  A     Bruno Rinaldi at that time I remember was a manager of

17  Giardino Cafe.

18  Q     And Giardino Cafe, is that related to Giardino

19  Restaurant?

20  A     Yes.  It was one restaurant that Mr. Russo opened, the

21  father, opened in Roslyn.

22  Q     That's the cafe?

23  A     Cafe.

24  Q     And how long did you work at the cafe?

25  A     I'd say probably a year, year and a half I'd say so.

LUONGO - DIRECT - O'NEILL

1  Q    And after that where did you go work?

2  A    I did probably a couple weeks in Puchinella in Great Neck

3  and then after that they moved me in Giardino Restaurant which

4  is in Douglaston.

5  Q    I didn't catch the name of the place you worked for a

6  couple weeks.

7  A    Puchinella.

8  Q    Is this a restaurant?

9  A    Yes, it is a restaurant which is not open anymore and

10 neither Giardino Cafe.

11 Q    Did that have anything to do with either Mr. Rinaldi or

12 Mr. --

13 A    Mr. Bruno Rinaldi was the manager in Giardino Cafe.

14 Puchinella, I don't know who was the manager.  It was another

15 Italian guy, I forget the name right now.  And everything was

16 opened by Mr. Russo.  At that time it was the father.

17 Q    And how did you get to Giardino Restaurant?  Were you

18 told to go there?

19 A    Yes.  Bruno called the manager at that time, Nick Rifino,

20 a very nice guy I'd say, which was one of the first manager

21 since they opened Giardino Restaurant.  Along with them there

22 was a Jamie, another manager, and we -- I started working over

23 there.  You know, I was going to school to learn some English

24 because coming from Italy English was not my language.  And

25 one day after the other I became, you know, I worked as a

LUONGO – DIRECT – O'NEILL

1   busboy and then waiter.

2   Q    And when you started working at Giardino's, who was the

3   owner?

4   A    Mr. Russo, Sr., the father of Mr. Russo, you know, Frank.

5            THE COURT:  What year was that that you began

6   working there?

7            THE WITNESS:  1997, Your Honor.

8            THE COURT:  Okay.

9   Q    And when you started working there, how did you get paid?

10  A    Well, the restaurant paid nothing because that restaurant

11  at that time was accepting only --

12           MR. LABUDA:  Objection, Your Honor.  Relevance.

13  '97.

14           THE COURT:  I'm not sure of the relevance in the

15  earlier time period.

16           MR. O'NEILL:  Could we have a sidebar, Your Honor?

17           THE COURT:  No.  Just move on.

18  Q    At some point during your employment with Giardino's --

19  A    Yes.

20  Q    -- did you start receiving a paycheck?

21  A    That was way -- probably 2004/2005 I believe.

22  Q    And at that time who was the owner of the restaurant?

23  A    Still Mr. Russo.

24  Q    Senior or Junior?

25  A    Well, Mr. Russo father died I'd say 2008/'9 probably.  I

LUONGO – DIRECT – O'NEILL

1    really don't remember exactly what year.  Of course, you know,

2    the son, Frank Russo, had to take over, you know, the

3    restaurant and, you know, the Giardino.

4    Q    And when you started receiving a paycheck, did anyone

5    explain to you why you were starting to receive a paycheck?

6    A    No.

7    Q    Did anyone explain to you how the paycheck was being

8    calculated or created?

9              MR. LABUDA:  Objection.  Leading.

10             THE COURT:  Overruled.

11   Q    At any point?

12             THE COURT:  I'm sorry.  Did we have an answer?

13             MR. O'NEILL:  He said --

14   A    I said no.

15   Q    At any point during your employment at Giardino's, did

16   anyone explain to you what the minimum wage was?

17   A    Well, I -- there was -- no.  Nobody told me how much was

18   that we were getting an hour.  You know, I mean, it was just

19   about making money.  They're trying to make people happy and,

20   you know, customers happy and doing my job.  At the end of the

21   day, at the end of the week when you get the check, it would

22   always be zero.

23   Q    Can anyone explain to you why the check was zero?

24   A    No.  I tried to talk to Anthony at that time, one of the

25   manager -- you have to understand from 1997 to 2013, since the

LUONGO – DIRECT – O'NEILL

1  last day that I've been there, they change about eight, nine

2  managers.

3  Q    So did you ask someone why your paycheck was zero?

4  A    Yes.  I ask I believe his name was Anthony and, you know,

5  he said, well, we'll see.  And I'll talk to Mr. Russo.  We'll

6  try to do something about it.  Of course, it was not only me.

7  It was the other waiters as well.

8           MR. LABUDA:  Objection.

9           THE COURT:  I'll sustain the objection to other

10  waiters.

11  Q    Did you ask any other managers about the zero paychecks?

12  A    The last one that I ask was -- it was one of the manager,

13  it was a Greek guy.  I don't remember the name right now.

14  It's been a long time ago.  Same, same answer.  You know, he

15  said Max, we'll see, you know.  And, actually, every waiter

16  was kind of complaining as well.  It was not only me because

17  as I was --

18           MR. LABUDA:  Objection.

19           THE COURT:   Yes.  I'll sustain the objection to

20  other waiters.

21  Q    Just talk about yourself.

22  A    Okay.  Sure.

23  Q    So finish the answer but just keep it to yourself.

24  A    Yes.  I spoke to him and basically he said the same

25  question -- the same answer he will give to me was I'll talk

LUONGO – DIRECT – O'NEILL

1    to Mr. Russo, to PJ and that's about it.

2    Q    And did anyone ever explain to you?

3    A    No.

4    Q    When you worked at Giardino's, did you ever hear anyone

5    talk about a tip credit?

6    A    No.

7    Q    Did you know what a tip credit was?

8         You have to give an out-loud answer.

9    A    No.  I'm sorry.  No.

10   Q    Did any manager ever explain to you that part of your

11   tips would be going towards your minimum wage?

12   A    No.

13   Q    Now, these questions that I'm going to ask you now are

14   really basically from December 31, 2007 to the end of your

15   employment.  And during that time, who owned the restaurant?

16   A    Russo.

17   Q    Did he have any partners?

18   A    That I remember, it was Bruno Rinaldi, but they also had

19   another restaurant in Howard Beach, Carosello, which they

20   closed because I believe that's what I heard.  They argued

21   about something so they split.  That's about it.  Then Bruno

22   Rinaldi opened up another restaurant in Howard Beach, and

23   Mr. Russo kept whatever was his.

24        THE COURT:  What was Mr. Russo's first name?

25        THE WITNESS:  Frank.

ANGELA GRANT, RPR, CRR
Official Court Reporter

LUONGO - DIRECT - O'NEILL

1  Q    And at that time did Mr. Frank Russo become the only

2  owner of the restaurant?

3  A    Well, technically, I don't know if it was before the

4  owner or after.  You know, it was a family-owned business, you

5  know, father and him and.

6  Q    Now, who did you consider to be the main boss?

7  A    When the father died, you know, because the father

8  died -- he was in a wheelchair.  He couldn't see anymore so

9  basically his son was in charge.

10 Q    And that's Frank Russo, Junior?

11 A    Yes.

12 Q    And so he was the person ultimately in charge of the

13 restaurant?

14 A    Yes.  He was in charge of the restaurant.  Any time there

15 was a meeting, he was part of it with the managers of the

16 Giardino Restaurant.

17 Q    Now, was there a period of time that you left employment

18 at Giardino's?

19 A    Yes.

20 Q    Now I'm only talking about December 1997 until the end of

21 your employment.  When or how many times did you leave

22 employment at Giardino's?

23 A    Well, as mentioned before by that gentleman, Mr. Labuda,

24 I left working Cardozo School.  It lasted probably six, seven

25 months.  And every time -- I got to tell you this -- every

LUONGO - DIRECT - O'NEILL

1   time I would leave the restaurant, Mr. Russo would tell me,

2   Max, the door is open for you.  Any time you want, you can

3   come back.

4   Q    Okay.  When did you work at Cardozo High School?

5   A    Cardozo, I don't remember the exact dates.  Must have

6   been, I don't know, 2007, 2006.

7   Q    But I'm only concerned about 2008 until the end of your

8   employment.

9   A    Okay.

10  Q    Was there a time during that period when you didn't work

11  at Giardino's?

12  A    Probably it was the car dealer that I worked at, if I

13  don't mistake.

14  Q    Do you remember the name of that car dealer?

15  A    Oh, yeah, it was Atlantic Honda.  It was a car salesman.

16  Q    For approximately how long did you work there?

17  A    Not even a year.  Didn't like it.

18  Q    So you're not claiming that Giardino's owes you any money

19  for the time you worked at the car dealership, are you?

20  A    Absolutely not.  And it doesn't owe me any money even

21  though I was on vacation.  I'm, you know, two weeks off, I

22  don't get paid.  That's fine.

23  Q    Did you get paid personal days?

24  A    No.

25  Q    Did you have health insurance?

LUONGO - DIRECT - O'NEILL

1   A    Nope.

2   Q    Did you --

3   A    No health insurance, no sick days, no personal days.  No

4   nothing.

5   Q    So if you didn't work, if you weren't actually there

6   waiting tables, did you get paid?

7   A    Nope.

8          And the last time that I was off for six days I had

9   to call Gennaro Picano in the morning, Sunday morning, I

10  remember, June 25th I believe, 25.  I had a kidney stone six

11  days at home.  They didn't pay me.  That was the longest sick

12  day in 17, 18 years.

13         My daughter communion they make me work half day

14  because they needed me.  So that's how these company is.

15         THE COURT:  I'm sorry.  I wasn't clear.  Did you get

16  paid vacation?

17         THE WITNESS:   No, Your Honor.

18         THE COURT:  So you got paid no sick or no vacation?

19         THE WITNESS:  No.

20  Q    Now, did you ever work a shift and receive no tips?

21  A    That happened a couple times at lunch time twice.  One

22  day happen with Gabriella, and one of the manager, and the

23  second one Susanna, the other manager.  Zero tables in the

24  morning so zero money.  No tips.

25  Q    Did anyone tell you that if you didn't receive tips,

LUONGO - DIRECT - O'NEILL

1   you'd be entitled to an increase in your pay?

2   A     No.  The only, of course, you know, from the manager the

3   only good words from them was I'm sorry, Max.  I said well,

4   you know what it is, that's the life of being a waiter.  When

5   you make money, you make money.  When you don't make money,

6   you don't make money.

7   Q     Now, did anyone at Giardino's ever tell you that if you

8   work more than ten hours a day, that you were entitled to an

9   extra hour of pay?

10  A     No.

11  Q     Did you ever work more than ten hours a day?

12  A     Absolutely.  Only Saturday and Sunday we work 15 hour,

13  12-to-15 hours.  So right there is 26 hours, Saturday and

14  Sunday.

15        THE COURT:  Every Saturday and Sunday?

16        THE WITNESS:  Absolutely, Your Honor.  Because that

17  was the only -- well, in every restaurant, but especially in

18  that restaurant, Giardino.  They had three rooms.  There was a

19  lot of bodies Saturday on Sundays.  There were six parties on

20  Saturday and six parties on Sunday.

21        THE COURT:  So from the time that you worked for

22  them from 2007 until the end of your employment every Saturday

23  and Sunday, did you work every Saturday and Sunday?

24        THE WITNESS:  Absolutely.

25        THE COURT:  And you always worked more than ten

LUONGO - DIRECT - O'NEILL

1    hours on Saturday and Sunday?

2              THE WITNESS:  Yes.  It was mandatory for me to work

3    those hours and those days.  It wasn't even in my mind to take

4    a day off Saturday and Sunday because that was the day that I

5    was making money.

6    Q    Did you have a regular schedule during your employment at

7    Giardino's?  Again, I'm just talking 2008 until the end of

8    your employment?

9    A    Personally not, but there was -- oh, yes.  Well, the

10   Monday double, Tuesday off and Wednesday double, Thursday off.

11   Friday was a dinner, one shift.  Sometimes I would switch with

12   Dominic Rizzo, another guy, if I didn't work Monday.  And then

13   Saturday and Sunday doubles, that means coming in in the

14   morning, early in the morning and you go home at night.

15   Q    So starting with Monday, now what was the switching

16   Mr. Rizzo?

17   A    Yes, Mr. Rizzo, yes.  Because we have to understand that

18   most of the waiters in this case in Giardino, some of them

19   were going to college or to work part time, so the full time,

20   the full time people was me, Mario, Gennaro.  And there was a

21   Nino that came onboard later.  So these four people, who were

22   the people who worked the most.

23              And then Saturday and Sunday when we have the big

24   parties and the big amount of people coming to work, you know,

25   you need more waiters.

LUONGO - DIRECT - O'NEILL

1  Q    But you mentioned Mr. Rizzo.  What's Mr. Rizzo first

2  name?

3  A    Dominick.  Dominic Rizzo.

4  Q    He was not full time?

5  A    No.

6  Q    When did you switch with him?

7  A    On the Mondays -- I would work Friday in the morning for

8  him, sometimes, not every, every Monday.  And sometimes he

9  would work a lunch for me on a Monday.  So we would just swap

10 the day, switch the day.

11 Q    Approximately how many Mondays did he work versus you?

12 A    That I don't recall.  Probably four, five, six Mondays in

13 a year or so, I mean.

14         THE COURT:  And the rest of the time you worked on

15 Mondays?

16         THE WITNESS:  Yes.

17 Q    And what were your hours on Monday?

18 A    Monday, of course, you know, you start at 11:00.  I have

19 to be there 11 o'clock.  Coming from Freeport, I mean, I could

20 say that I was never on time, yes, I was never on time.

21 11:15, 11:10, coming from Freeport, the traffic, 25 miles back

22 and forth, yes.  Until, you know, sometimes it was not even,

23 you know, until 10 o'clock at night when the restaurant would

24 close.

25         Sometimes I will leave at 9:30 because the manager,

LUONGO - DIRECT - O'NEILL

1    Gabriella or Susanna, one was the manager, says, guys, let's

2    close a little earlier because it's not worth it for us to be

3    open, not any tables.  So that's why we would leave early.

4    Q    So the closing time of the restaurant was what?

5    A    10 o'clock on Monday.

6    Q    So but if there was nobody in the restaurant at 9:30,

7    they would close early?

8    A    Yes.  We would wait another probably three, four minutes

9    and then if nobody was there, I would go to Gabriella or any

10   other waiter.  Gabriella, can we close.  Okay.  Let's close.

11   Q    If there were tables, how later did you stay?

12   A    If there was a table, we had to stay, of course.

13   Q    Until when?

14   A    Well, it could be -- for $5 table could be -- if a table

15   would come in at 9:30, we were 11 o'clock for $5 tip.

16   Q    So you would work past 10 o'clock?

17   A    Absolutely.

18   Q    Now, approximately, you know, what percentage of the

19   Mondays did the restaurant close early?

20   A    Out of ten times, ten times.  Out of ten times, probably

21   I'd say probably five times.

22   Q    So about half the time?

23   A    Yeah.

24   Q    How often would you work past 10 o'clock?

25   A    Probably out of ten, five, six times.  Yes.

LUONGO – DIRECT – O'NEILL

1   Q    Were Wednesdays the same or was there anything different

2   about Wednesday?

3   A    Wednesday I started, yes.  Wednesday I started at

4   10 o'clock -- 11 o'clock, of course.  I had to be at 11:00,

5   11:15, 11:20.  I leave possibly earlier than 10 o'clock

6   because what happened was if you worked lunch and dinner, you

7   could leave even half hour, an hour earlier if there was -- if

8   it was not busy.  So the other waiters will take care of the

9   other tables.  So, of course, I wouldn't leave if the main

10  dining room was full of tables.  So I couldn't leave one

11  waiter with all those customers.

12          So most of the time I would leave at 9:30,

13  9 o'clock, asking the manager first.  And then sometimes I

14  would stay until 10 o'clock or more than 10 o'clock.  That's

15  how the restaurant life is.

16  Q    And Friday, what were your hours on Friday?

17  A    Friday, if I was not switching with Dominick Rizzo, it

18  would be 4 o'clock in the afternoon.  But I was in the car

19  coming to work, Gennaro would call me.  3:30, 3:45, I'm in the

20  car.  Oh, Max, you're gonna attend the party.  I go like what

21  do you mean?  I'm coming to work.  Well, you know, the party

22  comes at 7 o'clock so don't come at 3:00 or 4 o'clock.  Like,

23  I'm already in the car so what I'm gonna do, I'm gonna go back

24  home and come back over there?  So I would go to the

25  restaurant, just set up the tables and everything and then

LUONGO - DIRECT - O'NEILL

1   just wait for the party to come.

2   Q    And how late would you work on Friday nights?

3   A    Well, it depends.  If the party start at 7:00, 8 o'clock,

4   especially those like birthdays or 50 years old birthdays, you

5   know, they will finish even after 11:00, 11:30, 12 o'clock at

6   night.

7   Q    And how often out of ten times would Gennaro call you and

8   tell you to come in late?

9   A    Well, every time they decided to put me on to do some

10  parties, to attend the parties.  Most of the time I was doing

11  a la carte so I was coming at 4 o'clock, doing regular tables.

12  But sometimes they would call me.  Sometimes they will call me

13  when I was getting out of the house or before 2 o'clock, Max,

14  listen, you know, can you come at 7 o'clock because you going

15  to do a party.  They requested you or anything.

16  Q    I'm just trying to get a sense of how many times you

17  showed up at -- out of ten, how many you showed up at

18  4 o'clock and how many you might have showed up later?

19  A    Probably four times they called me in out of the ten, ten

20  times.

21  Q    So six out of ten you would show up at 4 o'clock?

22  A    Yes.

23  Q    And the other times you might show up --

24  A    7:00.  6:00, 7:00.  7 o'clock.

25  Q    6:00 or 7:00?

ANGELA GRANT, RPR, CRR
Official Court Reporter

LUONGO - DIRECT - O'NEILL

1   A    Yes.

2   Q    Would you work as a party, did that typically work later

3   than a la carte?

4   A    Yes.  The party usually was the last, you know, like room

5   to leave.

6         THE COURT:  If you went at 4:00, what time did you

7   leave?

8         THE WITNESS:  If I went at 4:00, I was supposed to

9   close the restaurant to be there until the end.

10        THE COURT:  Which would be what?

11        THE WITNESS:  Well, on Friday they close at

12  11 o'clock.  So but you have to understand that if, Your

13  Honor, if a table leaves at 11:30, 12 o'clock, you cannot

14  leave because you got to be there.

15        THE COURT:  So whether you showed up at 4:00 or

16  7:00, you stayed the same amount of time.

17        THE WITNESS:  Yes.

18  Q    And on Saturday what was your schedule?

19  A    Saturday, lunch and dinner, we were supposed to be there

20  11 o'clock.  But sometimes because there was a party, it's a

21  lot of parties on Saturday, especially baby shower, bridal

22  shower, Gabriella, the manager, the night before, Massamino,

23  Massamino, which, you know, that's the way she called me,

24  Massimo or Massamino, please, can you come a little bit

25  earlier because the lady is a little crazy.  She wants things

74

LUONGO - DIRECT - O'NEILL

1  done this way.  So I like, okay, no problem.  So I will get

2  there, me, Gennaro, and every other waiter like at 10:30.

3  Q     Ordinarily, what was your schedule on Saturday?

4  A     Like 11 o'clock.

5  Q     Until when?

6  A     Until probably 11:00, 10:30, 11 o'clock.

7  Q     What time did the restaurant close on Saturday?

8  A     Saturday, 11 o'clock.

9  Q     Would you have to stay later if there were tables?

10  A     Yes.  Especially if I had those requested tables that

11  requested me or Max is there.  We have a table for four.  So

12  we want Massimo to attend us.

13  Q     And Sunday what was your regular schedule?

14  A     It was since the brunch was introduced we basically

15  started a little early in the morning.

16         THE COURT:  Since what was introduced, the brunch

17  did you say?

18         THE WITNESS:  Since the brunch was introduced

19  because regularly, you know, and all Giardino schedule they

20  had only a la carte in the morning so regular tables.  But

21  then since PJ and the new chef came on, they started thinking

22  about, you know, doing this brunch in the morning.  So

23  11 o'clock people would come in, 11:30.  So we had to be there

24  early in the morning, 10:00, 10:15, 10:30 because we had to

25  set up along with the busboys in connection with the kitchen,

ANGELA GRANT, RPR, CRR
Official Court Reporter

LUONGO – DIRECT – O'NEILL

1    of course.

2    Q    How late did you stay on Sunday?

3    A    Sunday, Sunday the restaurant, be honest with you, was

4    closing always kind of early, like 9:30.  Was close to

5    10 o'clock.

6    Q    Would this be a similar situation, there was no business,

7    you would close at 9:30?

8    A    No.  It was just because Sunday usually in the restaurant

9    business, in every restaurant you go it's very difficult that

10   it's very, very late.  It's not Saturday.  People go back to

11   work on Monday.  So what they do, they just dinner kind of

12   slow down like 8:30, 9 o'clock unless you were in the city,

13   you know, the best spot.  They keep on going until.

14   Q    Did you show up every day at exactly the same time?

15   A    To be honest with you, Mr. O'Neill, I mean, I had to be

16   there 11 o'clock, but, you know, sometimes 11:15, 11:20.  The

17   manager was coming, opening the door with me at the same time.

18   So, I mean, as long as everything was done at 12 o'clock was

19   fine.  We were ready to open.  She wouldn't say like, oh, Max,

20   that's the second time, third time.  No, she wouldn't say so.

21   Q    Now, it sounds from your testimony you didn't leave the

22   same time every night, every day, right?

23   A    No.

24   Q    Now, was there a system for keeping track of when you

25   showed up and when you left?

76

LUONGO - DIRECT - O'NEILL

1   A    Which year?

2   Q    Any year.

3   A    To keep hours in track was when they put the fingerprints

4   to clock in and clock out.

5   Q    Now, before the fingerprint system, was there any type of

6   timekeeping system?

7   A    We had a computer.  I don't know the name right now of

8   the type of computer that.  Basically that computer was the

9   initiation.  You would put your number.  My number was 20 --

10  1724, something like that.  When I would digit the 24, it

11  would give me basically the initiation to start a table.  Like

12  with the lunch, dinner, appetizers, wines, vodka, cocktails

13  and stuff like that.  That was the computer for.

14  Q    Was that for ordering food?

15  A    Yes.

16  Q    What I want to know, for example, was there a time clock?

17  Did you have a card where you punched in and punched out?

18  A    That card was just for the busboys.

19  Q    And did you ever use it?

20  A    Nope.  No.  Sorry.

21  Q    Did anyone ever tell you that Russo's was damaged in

22  Hurricane Sandy?

23  A    We heard that, you know, because he's on the water, but I

24  mean, I'm sorry, but I don't know what was the connection with

25  me not being paid or.

LUONGO - DIRECT - O'NEILL

1   Q    No.  I'm just trying to -- what did Mr. Russo have on the

2   water, what restaurant or restaurants?

3   A    The last -- well, he has Russo's on the Bay and has Vetro

4   which is a restaurant that they opened up six, seven years ago

5   I believe.

6   Q    I'm only interested in Russo's on the Bay.

7        Were you told that it was damaged in Hurricane

8   Sandy?

9   A    I heard that Vetro was damaged.

10  Q    Right.  I'm not interested in Vetro.  I'm interested in

11  Russo's on the Bay.

12  A    No.

13  Q    You weren't told anything about damage there?

14  A    No.

15  Q    Did anyone ever tell you that there were records that

16  were destroyed in that hurricane?

17  A    No.

18  Q    Now, when the --

19        THE COURT:  I'm sorry.  Your answer to that was no?

20        THE WITNESS:  No.  No, Your Honor.  I'm sorry.

21  Q    When they put in the fingerprint system, tell us how that

22  worked.

23  A    Come in in the morning and put my finger on the machine

24  and it would just read my name, it would come up my name and

25  clock in in the morning, like 11:15, 11:30, whatever time it

ANGELA GRANT, RPR, CRR
Official Court Reporter

LUONGO – DIRECT – O'NEILL

 1   was that I was coming in.  So basically I'm in at 11 o'clock,

 2   11:30.

 3   Q    And how would you check out?

 4   A    Well, I will check out the same way, a fingerprint at

 5   night, okay.  But sometimes I will forget.  Reason why because

 6   we were never used to any machinery like that so I will call

 7   Gennaro, one of the waiter or Mario or Susanna.  I'm sorry,

 8   guys.  Can you tell Susanna that I left at 10 o'clock or 9:30

 9   or 9:40, she can clock me out.  Okay, Max.  Don't worry.

10   Q    Now, Susanna was who?

11   A    The manager.

12   Q    And did she have your finger or your thumb?

13   A    No.  No.  No.  I would tell her because she had access

14   from a computer in the office, and she would check in and out.

15   Q    And did she tell you that she would check you out when

16   you called?

17   A    Yes.  When I saw the day after, I apologized to her.  I

18   said, Susanna, I'm sorry, you know.  She goes, Max, don't

19   worry about it.  Everything is fixed.

20   Q    Did anyone ever tell you that they couldn't fix the time

21   record because they didn't have your finger or thumb?

22   A    No.

23   Q    Now, how often would you forget to check out?

24   A    I'd say probably I forgot at the most six, seven times.

25   Q    Out of ten days working, how many times would you have

LUONGO – DIRECT – O'NEILL

1  forgotten to check out?

2  A    I will try to do my best to remember.  If I was in the

3  car and I was not already on Cross Island Parkway, if I was in

4  the parking lot, I would come back and tell, you know, I was

5  done at 10 o'clock, for example.  And, you know, I won't take

6  advantage of taking another 15, 20 minutes.  I would tell the

7  manager Susanna.  Or if I was in the parking lot, I could come

8  back.  If I was on Cross Island, I would call.

9  Q    Now, if I told you that the time records for Giardino's

10 from November until January of 2012 to 2013 show that you did

11 not punch out for 40 straight days that you worked, would that

12 be true?  Did that happen?

13 A    Um, I would probably be I'm not sure fired, but I would

14 probably be --

15 Q    No.  No.  No.  I just want to know did that ever happen?

16 A    Forty times?

17 Q    Yes.  Forty times in a row.

18 A    No.

19 Q    Did anyone ever tell you that you were forgetting too

20 often?

21 A    No.

22 Q    Did anyone threaten you with discipline or being fired --

23 A    No.  Absolutely not.

24 Q    -- not checking out enough?

25 A    No.  Absolutely not.

LUONGO – DIRECT – O'NEILL

1          Every time it happened I apologize and, you know,

2    that's the best I could do and try to remember the next time.

3    Q    Now, in his opening statement Mr. Labuda said that you

4    forgot to punch out I think 67 times in 2000 and one of the

5    years.  Did that happen?

6    A    We probably be not here.  Probably –– at that time I'll

7    be fired or ––

8          THE COURT:  No.  Just listen to the question.  The

9    question is only did that happen?

10          THE WITNESS:  No, it didn't happen.  Absolutely not.

11    Q    Did anyone ever tell you why they put the fingerprint

12    system into the restaurant?

13    A    No.  I guess they wanted to.

14    Q    If they didn't tell you, that's the answer.

15    A    No.

16          THE COURT:  When did it begin, to your memory?

17          THE WITNESS:  2012.

18          THE COURT:  Do you know what month or do you have

19    any approximation?

20          THE WITNESS:  I'd say probably February or March,

21    something like that.

22    Q    Now, the schedule that you described, was that a

23    permanent schedule for you?

24    A    Yes.

25    Q    So 2008 until the time you left ––

LUONGO – DIRECT – O'NEILL

1   A    Yes.

2   Q    -- the schedule would have been about the same?

3   A    Yes.  Unless I wanted to make some switch or some change

4   with somebody else.  But as I mentioned that before, the four

5   waiters that worked full time, they will always try to keep

6   the same schedule.

7            MR. LABUDA:  Objection.

8            THE COURT:  Overruled.

9   Q    Did you ever work part time at Russo's?

10  A    No.  That was my -- my first and the only job that I had

11  so I couldn't work, couldn't afford to pay all my bills

12  working part time.

13  Q    Do you have a family?

14  A    Yes.

15  Q    Do you have any children?

16  A    Yes.

17  Q    How many?

18  A    Two.

19  Q    Did you have any job other than Russo's?

20  A    No.

21  Q    After they put the fingerprint system into the

22  restaurant, did that change the number of hours that you

23  worked?

24  A    I always try to keep my schedule the same.  The only way

25  they could change the hours, just because I was taking extra

LUONGO – DIRECT – O'NEILL

1    day off where I wasn't working five days, I was work four days

2    because it was my choice.

3    Q    And did anyone limit the amount of time that you worked

4    during that time?

5    A    I remember that the manager, Susanna, certain time during

6    the week, of course, you know, it was during the week Monday

7    through probably Thursday.  Well, Thursday I was not working,

8    but that happened on Wednesday or Monday.  If just to leave

9    half hour, an hour before.  Say, Max, don't worry about it.

10   You can leave and, you know, Nino or Mario, the other waiter,

11   will stay and take care of your tables.

12   Q    Did she tell you why she was doing this?

13   A    Yes.

14   Q    What did she say?

15   A    They didn't want to pay overtime.

16   Q    What is that?

17   A    They didn't want to pay overtime.

18   Q    Did she say who?

19   A    Mr. Russo.

20   Q    Is that what she told you?

21   A    Uh-huh.

22        THE COURT:  When was this that this happened?

23        THE WITNESS:  That happened one day when they

24   started -- when they put the fingerprint machine, you know,

25   clock-in machine that they will keep all the hours, you know,

LUONGO - DIRECT - O'NEILL

1   counting all the hours and stuff like that.  So since she

2   started, you know, sending people home because, you know,

3   there was no need for everybody to stay there so she would

4   send people home.

5          THE COURT:  Were you sent home?

6          THE WITNESS:  Yes.

7   Q   Now, you mentioned taking days off.  Did there come a

8   time when you started working fewer days?

9   A   Yes.  2013 was that Susanna the manager had a book where

10  basically if we wanted an extra day off, we had to put the day

11  request it on the book, and I was actually one probably of the

12  most to ask for an extra day.  Sometimes I work five days,

13  sometimes four.  It was almost at the end of it.

14  Q   When you say "the end of it," what do you mean?

15  A   I'd say probably starting July, August before me leaving

16  in October.  It was like the last two, three months.

17  Q   How were tips paid at Russo's -- at Giardino's?

18  A   We would -- every waiter would collect the money and we

19  would pool the money together at the end of the night.  We had

20  to basically write everything on a piece of paper, a sheet of

21  paper.  The captain would get this amount of points, the

22  busboy would get this amount of points, the waiter would get

23  this amount of points, bartender, coffee boy.

24  Q   So how was -- how was this done?  Was there a record

25  made?

LUONGO – DIRECT – O'NEILL

1  A    Yes, there was this sheet of paper basically that, you

2  know, they would keep in a book.

3  Q    And would everyone's tips be in that record?

4  A    Yes.

5  Q    Is that cash tips, credit card, something --

6  A    Well, most, most was credit card, of course, because

7  everybody will pay credit card.  But there was some cash as

8  well, of course.

9  Q    And the cash was also put on the tip sheet?

10  A    Yes.

11  Q    Now, the tips that were --

12        THE COURT:  Can I just ask you a question about

13  that.  You pooled the tips.  Everybody figured out how much

14  they received in tips.  But how much you personally received

15  is not the amount of tips that actually went to you

16  necessarily; is that correct?

17        THE WITNESS:  Whatever at the end of the day, at the

18  end of the shift I had in my pocket because basically what

19  happened was that each waiter had a bank in their pocket,

20  meaning hundred dollars to start.  So we didn't have a hostess

21  to close the tables with money.  There was no register that we

22  would just -- she will cash in the money.  So we had

23  everything.  So at the end of the day we would make a report

24  of the shift, of my number.  So Massimiliano Luongo owes

25  Giardino Restaurant a thousand dollars.  That was basically

ANGELA GRANT, RPR, CRR
Official Court Reporter

LUONGO - DIRECT - O'NEILL

1    all the tables that I served.  So whatever was left was my

2    tips.

3              THE COURT:  I'm not understanding that.

4              THE WITNESS:  The computer basically keeps

5    everything, all the food that you sold, okay.  Each table,

6    whether they paid cash or credit cards.  So at the end of the

7    night when I was -- when we will close the restaurant and, you

8    know, make all -- to keep all the money together, every waiter

9    will make a report, okay, that dinner time.  So you sold a

10   thousand dollars of food tonight.  So that's what you owe the

11   house.

12             THE COURT:  That's what?

13             THE WITNESS:  Thousand dollars of food and liquor.

14   So basically I had $13,000 -- $1,300 in my pocket, I would

15   give a thousand dollars to the house, to the manager.  And

16   whatever was left was $300, that was the tip that I had to

17   divide with everybody.  And that was, you know, everybody's,

18   you know, job to do.  You know, every, every waiter had to,

19   you know, do the same thing.

20             THE COURT:  So it wasn't calculated by somebody

21   actually looking at a bill and deciding how much you were

22   given as a tip?

23             THE WITNESS:  Yes, because when you close a table,

24   Your Honor, you put the tip and everything.  So at the end of

25   the night, everything will come out.  Especially if it was a

LUONGO – DIRECT – O'NEILL

1    credit card.

2            THE COURT:  All right.  So it would then total your

3    tips what the individual person had written down as your tip?

4            THE WITNESS:  Yeah.

5            THE COURT:  It would total that tip?

6            THE WITNESS:  Uh-huh.

7            THE COURT:  And then if you got a tip in cash, you

8    would tell them about that?

9            THE WITNESS:  Yes.  We would share that with the

10   busboys and everybody.

11           THE COURT:  All right.  So my question to you

12   though:  The tips that were put on individual bills, did you

13   get the tips that you actually earned or were all the tips put

14   together and you got some percentage of that pursuant to some

15   formula that had been worked out?

16           THE WITNESS:  All the tips were put together.

17           THE COURT:  Including the ones on the credit card?

18   Not just the cash?

19           THE WITNESS:  Absolutely.

20           THE COURT:  So all of the tips were put together?

21           THE WITNESS:  Yes.

22           THE COURT:  From every waiter?

23           THE WITNESS:  Every waiter.

24           THE COURT:  And then as a waiter you got a certain

25   percentage of that money?

LUONGO – DIRECT – O'NEILL

1            THE WITNESS:  Yes.  They were called points.  So

2       the captains was getting, I believe, 10 points; the waiters,

3       or 8 or 7; and the busboy was 6; and that's also coffee boy

4       and the bartender.  And at the end of the day, you know, there

5       was everything written and, you know.

6            THE COURT:  So then that would mean that every

7       waiter that night would get the same amount in tips?

8            THE WITNESS:  Yes.

9            THE COURT:  Okay.

10           THE WITNESS:  It was a pool, basically.

11           THE COURT:  It was what?

12           THE WITNESS:  A pool.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

LUONGO - DIRECT - O'NEILL

1    DIRECT EXAMINATION

2    BY MR. O'NEILL:

3    Q    Who kept that record, the tip book?

4    A    It was in the office, the manager office.

5    Q    And were the tips that you received, were they put on

6    your paycheck?

7    A    My -- I believe so, yeah.

8    Q    Did you play any role in what amount of tips went into

9    your paycheck?

10   A    Sometime the managers and they were calling us in the

11   office and they would ask each one of the waiter, what do you

12   want to declare this month -- this week.  And we would declare

13   whatever we wanted to.

14             THE COURT:  I'm sorry, you mean the manager said in

15   terms of figuring out what would go on your paycheck, they

16   would ask you how much you want to declare?

17             THE WITNESS:  Yes.

18             THE COURT:  So if you got a thousand dollars in

19   tips, you could tell the manager, oh, I only want to declare

20   500 and the manager would do that?

21             THE WITNESS:  Yes, something like that, yes.

22   BY MR. O'NEILL:

23   Q    All managers or some managers?

24   A    No, not all the managers, some managers.

25   Q    Now if the -- by the way, did you ever declare only half

LUONGO – DIRECT – O'NEILL

1   your tips?

2   A    If I made a thousand dollars that week I would probably

3   declare six, seven, eight, but never $50 or $150.

4   Q    If the manager who asked you how much you wanted to

5   declare in tips wanted to, could that manager have gone to the

6   tip book and seen exactly what you received?

7   A    After I told them how much money I wanted to declare,

8   it's then his job to put down the amount of money, that's it,

9   I don't know what happened then.

10  Q    That's not my question.  Here's is the tip book, right?

11  A    Uh-huh.

12  Q    The tip book says exactly what you received in tips.

13  A    Right.

14  Q    Did the manager -- if the manager wanted to know how many

15  tips you received, couldn't the manager have just looked at

16  the tip book?

17            MR. LABUDA:  Objection, speculation.

18            THE COURT:  Overruled.

19  A    That was before -- yes.  They could, yes.

20  Q    Okay.

21            THE COURT:  Did every manager do that every time,

22  every paycheck?

23            THE WITNESS:  No, that happened with one manager

24  only.

25            THE COURT:  That was just one and what period of

LUONGO – DIRECT – O'NEILL

1  time did that manager work there?

2  THE WITNESS:  I'd say 2010, '11 probably, Your

3  Honor.

4  THE COURT:  Who was that manager?

5  THE WITNESS:  I forget the name now.  It's —

6  THE COURT:  Was it a man or a woman?

7  THE WITNESS:  No, A man, a man.

8  THE COURT:  So it was a male manager who worked

9  there from 2010 to 2011 and that was the one who would give

10 you the option of what to report?

11 THE WITNESS:  He would call, yeah, each one of us in

12 and say, Max, how much money you want to declare, how much

13 money you made, you know, and we would tell them how much.

14 THE COURT:  To your knowledge, apart from that

15 manager during that time period, did other managers, as far as

16 you know, determine what your tips were based on

17 recordkeeping, records that they had?

18 THE WITNESS:  No.  The only time that they would

19 keep record of our tips a hundred percent was when we started

20 with points.

21 THE COURT:  When was that?

22 THE WITNESS:  The tip points that means the captain

23 would get 10 points.

24 THE COURT:  Right, when did that start?

25 THE WITNESS:  2009, '10.  That was the manager at

LUONGO – DIRECT – O'NEILL

1   that time I believe was Jamie.

2           THE COURT:  So once you started the pooling system?

3           THE WITNESS:  Well, the pooling system we started

4   many, many years ago 'cause --

5           THE COURT:  There came a point in time where you

6   didn't -- points were assigned based on your position?

7           THE WITNESS:  No, they decided -- when PJ came on,

8   which is the general manager, he decided to keep everything

9   like with points, everything on paper, so -- but the pooling,

10  pooling, pooling, was about many, many years ago.

11          THE COURT:  How did --

12          THE WITNESS:  We would just --

13          THE COURT:  How was it calculated then?

14          THE WITNESS:  We would give 20 percent to the

15  busboys, okay, then 10 percent to the bartender, and 8 percent

16  I believe to the coffee boy and then whatever was left it was

17  divided between the waiters.  Now instead of percentage,

18  20 percent, we get points.

19          THE COURT:  So you went from a percentage system to

20  a point system?

21          THE WITNESS:  To point system, yes.

22  BY MR. O'NEILL:

23  Q    When you had the percentage system, did you use paper as

24  well to write down?

25  A    No.

LUONGO – DIRECT – O'NEILL

1    Q    That was done just how?

2    A    It was done just put the money together all the waiters,

3    whoever was working that night, if it was two waiters, five

4    waiters, Saturday and Sunday depends on the amount of money,

5    20 percent for the busboys, right, then the busboy was or I

6    would get my money, I would give 20 percent of $200 I made

7    that night gross, okay, $40 to the busboy, 10 percent to the

8    bartender and 6 percent, 8 percent, I don't remember now

9    exactly.

10          THE COURT:  But you would do it by waiter, you

11   didn't pool it?

12          THE WITNESS:  We –– well, it's called pooling

13   because basically when I started back in 1997 everyone had his

14   own section.

15          THE COURT:  Let me just talk about, I think we're

16   talking about 2007, how was it done in 2007?

17          THE WITNESS:  2007, pooling 20 percent of percentage

18   of the amount of money.

19          THE COURT:  But everybody pooled it together and

20   then took 20 percent?

21          THE WITNESS:  No.  Each waiter would pay 20 percent

22   of the station, 20 percent to the busboys, and then when every

23   waiter paid the busboys, the waiter and the coffee boy, then

24   we would put the money together, and then we divide it.  So

25   every waiter made the same amount of money.

LUONGO - DIRECT - O'NEILL

1          If I made $200 clean after I paid and another waiter
2     would pull 120, $130, of course, you know, I was the one that
3     I made more money, right, you know, to help the other waiter
4     to make the same amount of money.  So everyone was happy to
5     the same amount of money every night, every waiter.  Every
6     waiter was making the same exact amount of money --
7          THE COURT:  Except you would have been paying more
8     to the busboy?  I mean, you would have been paying more --
9          THE WITNESS:  Yes, if I made $400 in one night, you
10    know, 20 percent it's $80.  If another waiter made $200,
11    20 percent is $40.  So now one waiter would go, you know, home
12    with -- busboy with go $80, the other one with 40.
13         THE COURT:  Were they keeping written records, was
14    there a tip book when you were doing this system?
15         THE WITNESS:  No, this type of system, no.
16         THE COURT:  No books, no records?
17         THE WITNESS:  No.  With the points, yes.
18    BY MR. O'NEILL:
19    Q    The point system started when PJ Connolly came to the
20    restaurant?
21    A    Yes.  When PJ came on board he changed many, many things
22    in the restaurant and one of those things were like, you know,
23    to make things a little fair even for busboys, you know, we
24    have to make this, let's see if you guys like it.  But of
25    course, you know, there was an extra pay that we had to do to

LUONGO – DIRECT – O'NEILL

1   the captain that was basically 10 points.  He was making more

2   money than us.

3   Q    So we'll talk about that in a second.

4   A    Yes.

5   Q    That tip book started when Mr. Connolly started?

6   A    Not really.  It didn't really start when he started that

7   year.  He came up with the idea because --

8   Q    I just want to know in relation to when he started when

9   you started using the tip book.

10  A    No, when he started working was, let's say five years

11  ago, and then he started two years later to use the points.

12  Q    Okay.  Now, you mentioned that the captain was making

13  more money in tips than the waiters.

14  A    Yes.

15  Q    Did that cause a problem for you?

16  A    Yes.

17  Q    And did you talk to anyone about that?

18  A    Yes.

19  Q    Who did you talk to about that?

20  A    Well, we spoke to PJ, all the waiters were kind of like

21  tried to call a meeting with Mr. Russo --

22          MR. LABUDA:  Objection.

23          THE COURT:  Just tell us what you did.  Did you

24  speak to this person about it, PJ about it?

25          THE WITNESS:  Yes.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO – DIRECT – O'NEILL

1          THE COURT:  Were you alone or was there a group of

2     you when you had this conversation?

3          THE WITNESS:  There was a group of people, most of

4     the waiters.

5          THE COURT:  Okay.

6          MR. LABUDA:  I just object relevance in terms of

7     whether or not the captain got more of a tip --

8          THE COURT:  Overruled.

9          MR. LABUDA:  -- in this case.

10    BY MR. O'NEILL:

11    Q    As a result of this conversation, what happened?

12    A    The last time we had a meeting.

13    Q    With whom?

14    A    With Mr. Russo, PJ, Gabriella, the other manager, all the

15    waiters.

16    Q    Mr. Russo, Frank Russo was at that meeting?

17    A    Yes.

18    Q    And why was he at the meeting?

19    A    Well, because we -- still make the long story short,

20    Gennaro was the captain, basically his job was telling the

21    specials to the tables and bring some of the food to the

22    table.  Basically every other thing we were supposed to do it.

23    So we were doing -- we were pooling all the tips and making

24    all the money.

25          So we had a meeting and I said to Mr. Russo -- we

LUONGO – DIRECT – O'NEILL

1   all said to Mr. Russo if there was any other way that Gennaro

2   could be paid rather than just us.  And Mr. Russo tells me

3   that I was thinking -- because I was the only one to talk,

4   nobody else spoke.  And he said to me, he said, well, you only

5   think about money.  I said, okay, if you think that way.

6   Q    Now how is your relationship with Gennaro?

7   A    Me and Gennaro -- Gennaro came on the job in the

8   restaurant way after I started 'cause he was working at

9   Giardino Cafe, the one in Roslyn, so he came on board.  We

10  became good friends, we went out together sometimes.  He would

11  come to my house, I would go to his house.  You know, it

12  was -- I did a lot of things for him, you know.  We were

13  really, you know, good friends.

14  Q    Did you start a business together?

15  A    Yes.  We started a business together.  It was -- I don't

16  remember the year right now, but we open a store, a bagel

17  store in Mineola in Willis Avenue.

18  Q    So you and Gennaro were partners?

19  A    Yes.

20  Q    After you left Giardino's, did you continue to stay in

21  touch with him?

22  A    Absolutely, until the last day that I left.  Actually

23  when I started working in the other restaurant in Manhattan he

24  kept on calling me, you know, Max, how you doing, are you

25  okay.  He came to my restaurant because I was manager at that

LUONGO - DIRECT - O'NEILL

1    at a restaurant in city, he came a couple of times to have a

2    lunch and after that another couple phone calls and that's

3    about it.

4    Q    Are you still friends with him, do you still have a

5    relationship?

6    A    No.  And I believe I'm not friend with him because --

7              MR. LABUDA:  Objection.

8              THE COURT:  I'll sustain the objection.

9    BY MR. O'NEILL:

10   Q    Did something to end the friendship?

11   A    Well, I was invited to go to his wedding and I couldn't

12   go.  I sent back the invitation and that's it, I never heard

13   from him anymore.

14   Q    When did you leave Russo's?

15   A    Giardino Restaurant?

16   Q    I'm sorry, Giardino's.

17   A    2013, I believe it was probably the end of September.  I

18   sent an email to PJ, Gabriella, Susanna.

19   Q    Where did you go after that?

20   A    After that I was hired in the city on Fifth Avenue and

21   55th Street between Fifth and Sixth Avenue in the Pizza Arte

22   Restaurant.

23   Q    How did this payment system at Pizza Arte compare to the

24   payment system at Giardino?

25             MR. LABUDA:  Objection.

LUONGO – DIRECT – O'NEILL

1       THE COURT:  I'll sustain the objection.

2   Q    You haven't gone back to Giardino since leaving, have

3   you?

4   A    No.

5       MR. O'NEILL:  Your Honor, I'm going to just pull up

6   an exhibit.  This is Plaintiff's Exhibit 6, I think we have it

7   as 2013.

8       MR. LABUDA:  Okay, thanks.

9       MR. O'NEILL:  We've stipulated to the admission of

10  these records.

11      MR. LABUDA:  Yes, Your Honor, we stipulated to the

12  admission of the time and payroll records.

13      THE COURT:  What exhibit is it?

14      MR. O'NEILL:  It's Exhibit 6.

15      THE COURT:  Exhibit 6 is in evidence.

16      (Plaintiff Exhibit 6, was received in evidence.)

17      MR. O'NEILL:  Your Honor, this may be a good time to

18  take a five-minute break or so if it's convenient to the

19  Court.

20      THE COURT:  All right, ladies and gentlemen, I

21  excuse you for a five-minute recess.

22      (Jury exits courtroom.)

23      (Recess.)

24      (Jury enters courtroom.)

25      (In open court.)

LUONGO – DIRECT – O'NEILL

1    THE COURT:  Please be seated.  Mr. O'Neill.

2  BY MR. O'NEILL:

3  Q    Okay, Massimiliano, I'm going to show you some documents

4  that are now in evidence, and I'll put these up on the Elmo.

5    Do you see it in front of you?

6  A    Yes.

7  Q    Do you recognize this as a paystub from Giardino's?

8  A    Yes.

9  Q    And what was the week that this paystub covered?

10  A    You mean the dates?

11  Q    Yes.

12  A    Pay period, 6/17/13 to 6/23/13.

13  Q    Do you see how many hours you were paid?

14  A    Forty.

15  Q    And were you paid any -- is there anything here that

16  shows you were paid extra for 10 hours, spread of hours pay?

17  A    It doesn't say that.

18  Q    Do you know if you worked more than 10 hours during that

19  week?

20    THE COURT:  On a given day you mean?

21  Q    On any given day, correct.

22  A    Yes, Saturday and Sunday.

23  Q    Let me show you the paystub from the period 6/10 to

24  6/16/2013, and does it say how many hours you worked that

25  week?

LUONGO – DIRECT – O'NEILL

1    A    It says 33.

2    Q    And at what rate?

3    A    Five.

4    Q    Anything for spread of hours?

5    A    It doesn't say that.

6    Q    Do you know if you worked more than 10 hours on any given

7    day that week?

8    A    It would have been probably Saturday and Sunday again.

9              MR. LABUDA:  Objection.  Speculation.

10             THE COURT:  Yes, I'll sustain the objection to the

11   response.  If you want to try and clarify the answer you can.

12   Q    Well, I'm going to show him -- this is also another page

13   from the same exhibit and this is what was produced by

14   defendant to show your sign-ins and sign-outs and the number

15   of hours you were credited.

16             So if you look at June 10, 2013, that's a Monday,

17   you worked a double or simply dinner that day?

18   A    The time says could have been dinner only.

19   Q    It credits you with $5 -- I'm sorry five hours point 65,

20   correct?

21   A    That's what I read, yes.

22   Q    And the next entry is for the Wednesday and it looks like

23   you worked a double; is that correct?

24   A    Yes.

25   Q    It shows that you worked 10.07 hours, correct?

LUONGO – DIRECT – O'NEILL

1   A    Yes.

2   Q    Did you get paid an extra hour for the 10.7 hours?

3   A    No.

4   Q    The next entry is for the Friday, and it shows you worked

5   the dinner, correct?

6   A    Yes.

7   Q    That's six hours and 45 cents -- I'm sorry, six hours

8   point 45?

9   A    Yes.

10  Q    The next entry is for Saturday and you showed up at

11  11:10; is that correct?

12  A    Saturday, 11:10, yes.

13  Q    6:15?

14  A    Uh-huh.

15  Q    Then the sign out shows 06:00, do you know why?

16  A    No.

17  Q    All right.  Now if you had come to work at 11:10,

18  approximately how many hours would you have worked that

19  week -- I mean that day?

20          MR. LABUDA:  Objection.

21          THE COURT:  Overruled.

22  A    Okay, if I started 10:00 o'clock in the morning, 10:30.

23  Q    No, this is 11:10.

24  A    11:10.

25          THE COURT:  On a Saturday.

LUONGO – DIRECT – O'NEILL

1   A    On Saturday, yes.  I would leave probably at 10:30,

2   11:00 o'clock.

3   Q    So let's be conservative and say 11 hours?

4   A    Yeah.

5   Q    Then the next is Sunday, what time did you show up?

6   A    10:40.

7   Q    You left at 8:58 does that seem right?

8   A    8:58, almost nine, yes.

9   Q    You were credited with 10 hours, 10.8 or 10.3, do you see

10  that?

11  A    Yes.

12  Q    Now, you see there is a line drawn through the entry for

13  June 15?

14  A    Uh-huh.

15  Q    Do you know why?

16  A    No.

17  Q    I'm going to represent to you that if you add up 5.65,

18  with 10.7, 6.45 and 10.8 it comes to 32.97 hours.  If I show

19  you the paycheck, you look again at the check for that week,

20  how many hours were you paid for?

21  A    Thirty-three.

22       MR. O'NEILL:  Judge, I must confess I don't know how

23  to get rid of the little pointer thing here.  Thank you.

24  Q    Now we saw that you also worked a double on -- look at

25  the paystub, there is no spread of hours here, correct?

LUONGO – DIRECT – O'NEILL

1   A    Yes.

2   Q    Go back to the time sheet that shows your punch in and

3   punch out, if we add in 11 hours for the double that you

4   worked on Saturday, how many hours did you really work that

5   week?

6           MR. LABUDA:  Objection, speculation.

7           THE COURT:  Overruled.

8   A    Thirty-three plus 11 is 44.

9   Q    And did you get paid 44 hours?

10  A    The paper doesn't say that.

11  Q    Well, that's the paystub?

12  A    Yes.

13  Q    Did you get paid any overtime that week?

14  A    No.

15  Q    Do you know why Giardino's did not pay you for working on

16  June 15, 2013?

17  A    No.

18  Q    Did you know you didn't get paid for that time?

19  A    No.

20  Q    They didn't tell you?

21  A    No.

22          THE COURT:  Did you see that pay record or paystub?

23  You want to switch back to the other document a minute.

24          That's not a document that you would get?  You

25  didn't get something that looked like that?

LUONGO - DIRECT - O'NEILL

1          THE WITNESS:  Yes.

2          MR. O'NEILL:  This is the paystub, it shows --

3          THE COURT:  Well, but the paystub shows you only got

4     paid for 33 hours.

5          THE WITNESS:  Yes.

6          THE COURT:  You didn't notice that at the time?

7          THE WITNESS:  No.

8     BY MR. O'NEILL:

9     Q    Were you given a printout of your hours like this

10    document?

11    A    No, I don't have that.

12    Q    They never gave that to you?

13    A    No, that's probably something that it's only office

14    purposes or office papers.

15         MR. O'NEILL:  Your Honor, I'm going to introduce

16    Exhibit 1, which is also stipulated to be admitted.

17         (Plaintiff Exhibit 1, was received in evidence.)

18         MR. O'NEILL:  Exhibit 1 are the defendant's payroll

19    records for 2008 at least beginning in March.  I'm going to

20    start with the second page because the first page is not

21    legible.  This is from the defendant's payroll system.  You

22    would not have seen this document I'm sure but it's in

23    evidence and so I'm going to ask you some questions about it.

24         This shows that for -- this is the pay period from

25    11 -- November -- hard to read, but 11/9 to 11:20 it looks

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO - DIRECT - O'NEILL

1    like.  It shows --

2          MR. LABUDA:  Your Honor, we'll stipulate it says in

3    the upper left-hand corner, Mr. O'Neill, pay period ending

4    11/9/2008.

5          MR. O'NEILL:  Okay.

6    Q    It shows the regular pay $74, do you see that?

7    A    Yes.

8    Q    Now does this here -- does this record indicate anywhere

9    how many hours you worked that week?

10   A    No.

11   Q    Does it indicate what your hourly rate was, which would

12   be in this column right here?

13   A    No.

14   Q    Do you know what you were being paid per hour in

15   November 2008?

16   A    No, probably five or seven.

17   Q    But you're saying probably, do you know?

18   A    No.

19   Q    Again, I'm going to point this out to you here, this is

20   the box that says I think -- I can't read it it's too small

21   but what does this say here?

22   A    Weekly.

23   Q    And do you know what that's a reference to?

24   A    No.

25   Q    Now I'm going to show you additional pages from the

LUONGO - DIRECT - O'NEILL

1   exhibit.  We'll just go week by week.

2              THE COURT:  Do they have Bates numbers on the bottom

3   of them?

4              MR. O'NEILL:  They have Bates numbers somewhere.

5   This is D9 that I'm showing him now.

6              MR. LABUDA:  They are in the upper left-hand corner,

7   Your Honor.

8              MR. O'NEILL:  I've zoomed so it's not visible if you

9   want --

10             THE COURT:  Well, I just want a record of what's

11  being shown him, that's all.

12             MR. O'NEILL:  Okay.  Well, this is D9 and this is

13  the week ending 11/16/2008.

14  Q    What was your pay that week?

15  A    Seventy-four dollars.

16  Q    Now if I represent to you that at that time, if defendant

17  was entitled to the tip credit, you would be paid $4.60 an

18  hour and if you divide 74 by that, by $4.16, you get something

19  around, I think, 16 hours.

20             Were you working 16 hours a week then?

21  A    No.

22  Q    And if you see underneath the 74 regular, what does it

23  say for tips?

24             You want me to zoom it?  I can make it bigger.

25  A    639.

LUONGO – DIRECT – O'NEILL

1    Q    Could you make $639 in tips in 16 hours at Giardino's?

2    A    No.  Absolutely not.

3    Q    I show you D10, which is the pay period ending

4    11/23/2008, again what is the regular pay?

5    A    It says $74 and then 509 maybe.

6    Q    509 is what?

7    A    $509.

8    Q    In tips?

9    A    In tips.

10   Q    And here under this box I can read it it says, rate

11   weekly, do you see that?

12   A    Yes.

13   Q    I'm going to show you the next D11 which is the week

14   ending 11/28/2008, what is your pay that week?

15   A    It's $74 again and $519 in tips.

16   Q    And does it anywhere indicate how many hours you worked?

17   A    No.

18        THE COURT:  Which exhibit number is this?

19        MR. O'NEILL:  This is Exhibit 1, Your Honor.

20        THE COURT:  What D number is it?

21        MR. O'NEILL:  This is D11.

22        THE COURT:  What pay period, I didn't hear that.

23        MR. O'NEILL:  11/30/2008, the week ending 11/30.

24        Your Honor, I don't want to go through each and

25   every one on the Elmo, can I approach the witness and just

LUONGO - DIRECT - O'NEILL

1    have him look at the exhibit to shorten it?

2         THE COURT:  Yes.

3         MR. O'NEILL:  Thank you, Your Honor.

4    Q    Massimiliano, I've handed you a paper copy of the Exhibit

5    1 without the pages we've already seen, I would just like you

6    to look through it and tell me if you find any weeks that you

7    were not paid $74.

8    A    This one says 89.  74, 74, 74, 74, 74, again 74, 74, 74.

9    Same.  74.  Should I keep on going?

10   Q    You don't have to read them out loud, if you could just

11   look through and see if there are any that are not 74.

12   A    Oh.  74.  It was only one $89.

13        THE COURT:  Which time was that, the 89, what pay

14   period was that?

15        THE WITNESS:  Oh, I'm lucky.  It says 12/07/2008 to

16   12/10/2008.  It says D12.

17        THE COURT:  Can we have a stipulation as to what

18   period of time is covered by the records that witness is

19   looking through?  Do we have an agreement on that?

20        MR. LABUDA:  Yes, I didn't look through all them,

21   but I think these are the ones for 2008.  So they would cover

22   the tax year, calendar year 2008.

23        MR. O'NEILL:  I think beginning in March because I

24   don't think we have anything before March.

25        THE COURT:  Is that right, beginning in March,

LUONGO – DIRECT – O'NEILL

1    Mr. Labuda?

2              MR. LABUDA:  It appears to be that.

3              THE COURT:  Okay.

4    BY MR. O'NEILL:

5    Q    Massimiliano, do you know why you were paid $74 every

6    week in 2008?

7    A    No.

8    Q    Do you know how many hours you were working on average

9    every week during that time?

10   A    Well, according to my schedule, I was working almost the

11   same hours unless I wanted to switch with someone or take an

12   extra day off.

13   Q    Right.  How many hours was that?

14   A    Probably more than 40 hours.

15   Q    Can you be a little more specific?

16   A    Okay, so double on Monday, let's say 10 hours.  Saturday

17   and Sunday about 48, 49 hours.

18   Q    Would that have been the same for 2009?

19   A    Yes.  As I mentioned before, the food waiters always kept

20   the same schedule because we were the ones that be more longer

21   than everybody else, so we were advantaged on that.  So to get

22   the best schedule whatever we wanted to get.

23   Q    And that would be the same for 2010, '11, '12?

24   A    Yes.

25              THE COURT:  So was generally you worked -- I'm sorry

LUONGO – DIRECT – O'NEILL

1    if I misunderstood you.  You said most weeks you worked 48

2    hours?

3              THE WITNESS:  Yes.  Let's say 45 to 48.  The most

4    days that I would work was a Saturday and Sunday because it

5    was always double and a lot of hours were longer.

6              MR. O'NEILL:  I have no further questions, Your

7    Honor.

8              THE COURT:  Counsel.

9              MR. LABUDA:  Your Honor, can we have a sidebar?

10             (Continued on the next page.)

11             (Sidebar conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar conference

1        MR. LABUDA:  I just want in terms of scheduling, I'm

2    probably going to be a few hours with him.

3        THE COURT:  So start.

4        MR. LABUDA:  Okay, my preference would be to start

5    it all at the same time.

6        THE COURT:  That's not my preference.

7        MR. LABUDA:  That's fine.

8        THE COURT:  I'm in charge.

9        MR. LABUDA:  Yes, you are.

10        We're going to until like five?

11        THE COURT:  Probably 5:15.

12        (End of sidebar conference.)

13        (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

LUONGO – CROSS – LABUDA

1              (In open court.)

2    CROSS-EXAMINATION

3    BY MR. LABUDA:

4    Q    Good afternoon, Mr. Luongo, my name is Joe Labuda.  I'm

5    going to ask you some questions about your employment over at

6    Giardino's.

7              So you were a long-term employee at Giardino's; is

8    that right?

9    A    Yes.

10   Q    And you started in 1997; is that right?

11   A    Yes.

12   Q    And you quit in October of 2013, correct?

13   A    Correct.

14   Q    That's 16 years you worked there?

15   A    Yes, on and off.

16   Q    On and off, right.  You quit several times and then came

17   back to Giardino's several times, correct?

18   A    Yes.

19   Q    And Mr. Nick Rifino was the manager back in '97 and he

20   hired you; is that right?

21   A    I believe so, yes.

22   Q    And in October of 2010, when you went to I think it was

23   Atlantic or Sunrise Auto Car dealership, you were hired back

24   by Gennaro, correct?

25   A    When I left, yes, when I left -- every time I left

LUONGO - CROSS - LABUDA

1    Giardino, Mr. Russo always told me the door is open for you.

2    Q    Okay.

3    A    So I took the opportunity to go back over there after,

4    you know...

5    Q    I'm going to move to strike that.  My question had to do

6    with after Atlantic and you stopped working there, Gennaro

7    hired you, correct?

8    A    I spoke to Gennaro and I said, Gennaro, if there was a

9    chance for me to go back over there and he spoke to Gabriella

10   and Gabriella said, yes.

11        Gennaro was a waiter.

12   Q    Yes.  And you considered Gennaro a friend, correct?

13   A    Yes.

14   Q    Now you were not hired by Mr. Russo; is that right?  He

15   never personally told you you're hired, correct?

16   A    No, he never -- no, absolutely, no.

17   Q    You were never fired by Mr. Russo, correct?

18   A    No.

19   Q    You were never scheduled by Mr. Russo?

20   A    No.

21   Q    And you were not directed by Mr. Russo in terms of what

22   to do on a daily basis, correct?

23   A    No.

24   Q    Those tasks that I just described, those were all tasks

25   done by the general manager or manager at Giardino's, correct?

114

LUONGO – CROSS – LABUDA

1    A    Yeah, that was the manager, yes.

2    Q    Now with respect to Russo's pay group, have you ever

3    heard of that entity?

4    A    No.

5    Q    You were never employed by Russo's pay group?

6    A    They was -- nobody had never told me you were hired by

7    the Russo payroll.

8    Q    All right.  Now you live in Freeport; is that right?

9    A    Correct.  Yes.

10   Q    And the restaurant, Giardino's, is located up in

11   Douglaston; is that right?

12   A    Yes.

13   Q    And on a good day it would take you about 45 minutes to

14   get to Giardino's, correct?

15   A    I would say a little less than that.

16   Q    On a bad day it would take you longer, correct?

17   A    Say about 30 to 35 minutes.  Depends on how fast I was

18   going.

19   Q    We don't want you to speed.

20   A    Yeah, no.  It's past.

21   Q    Right.  Freeport, that's on the water, right?

22   A    Yes.

23   Q    And Freeport was affected by Hurricane Sandy; is that

24   right?

25   A    Yes.

LUONGO – CROSS – LABUDA

1   Q    You have friends that had their houses flooded; is that

2   right?

3            MR. O'NEILL:  Objection.  Beyond the scope,

4   irrelevant.

5            THE COURT:  I'm failing to see the relevance.

6            MR. LABUDA:  Okay.

7   Q    Well, you know, Russo –– Mr. O'Neill was asking questions

8   about Russo's On the Bay, right?

9   A    Yes.  Yes.

10  Q    You've been to Russo's On the Bay?

11  A    Probably in 17 years, only once.

12  Q    It's located on the water, right?

13  A    Yes, correct.

14  Q    And it's your understanding that that flooded, correct,

15  that Russo's On The Bay ––

16  A    It's my understanding nobody told me anything and as an

17  mean if I have information I would accept it was nothing I was

18  working at Giardino restaurant.

19  Q    All right.  Now you took off for vacation two weeks every

20  year; is that right?

21  A    Yes, I would say so, yes.

22  Q    And you took off holidays at Russo's, a few holidays a

23  year; is that right?

24  A    Holidays?

25  Q    It was closed a few days.

LUONGO - CROSS - LABUDA

1   A    You have to understand, sir, that holidays is the best

2   part of being a waiter.  You have to work Christmas, you have

3   to work Christmas --

4            THE COURT:  Just the answer, did you take off

5   holidays --

6            THE WITNESS:  No.

7            THE COURT:  -- or did you work on holidays?

8            THE WITNESS:  No, I didn't.

9   BY MR. LABUDA:

10  Q    There were holidays that the restaurant was closed,

11  correct?

12  A    Only the Christmas Day, the 25.  Okay.

13  Q    Okay?

14  A    That's the only day.

15           THE COURT:  Just tell me so I can clarify.  How many

16  weeks of vacation did you take every year?

17           THE WITNESS:  I would say two weeks, Your Honor.

18           THE COURT:  Okay.

19  BY MR. LABUDA:

20  Q    Wasn't the restaurant also closed on Thanksgiving or

21  Fourth of July?

22  A    They -- probably they did close for a year or year and a

23  half, two years, but I believe they open back because it was

24  not worth it not to be closed -- it was worth it to be open

25  for them, so...

117

LUONGO - CROSS - LABUDA

1    Q     You also took off --

2               THE COURT:  Wait a minute, on both days were they --

3    just take it one at time.  There was some years when they were

4    closed on Thanksgiving?

5               THE WITNESS:  Yes, they decided to close.

6               THE COURT:  Do you remember --

7               THE WITNESS:  The managers --

8               THE COURT:  Do you remember what years they were

9    closed on Thanksgiving?

10              THE WITNESS:  No, I don't.

11              THE COURT:  Were they ever closed on Fourth of July?

12              THE WITNESS:  I think they did once, I believe one

13   or twice.

14              THE COURT:  Okay.  And other times were they open on

15   Fourth of July?

16              THE WITNESS:  Yes, yes, yes.

17   BY MR. LABUDA:

18   Q     You were sick some days and couldn't work; is that right?

19   A     Say it again?  I'm sorry.

20   Q     You were sick some days and you couldn't work, correct?

21   A     I was sick June I believe a year or two years before I

22   left the restaurant.  I called Gennaro in the morning, Sunday

23   at 5:00 o'clock in the morning I had to rush in the hospital

24   for kidney stones.  For six days I didn't work.

25              THE COURT:  That was what year?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO - CROSS - LABUDA

1            THE WITNESS:  What year?

2            THE COURT:  Yes.

3            THE WITNESS:  Say probably 2011, '12.  It was -- it

4     was May or June I believe 'cause it was a lot of bodies and I

5     was concerned about it and I said to Gennaro, Gennaro, I'm

6     sorry but I really can't.  And I rushed to the emergency with

7     my wife.

8     BY MR. LABUDA:

9     Q    Other than that, there were other times that you were

10    sick as well and could not work, right?

11    A    If I was sneezing on some customers, you know, 'cause I

12    was a sick the manager would say, Max, you have --

13           THE COURT:  Just listen to the question.  Were there

14    other times that you took six days?

15           THE WITNESS:  No.

16           THE COURT:  Well, if you had cold did you go to work

17    and sneeze on the customers?

18           THE WITNESS:  Yes, yes, and the manager told me to

19    go.

20    BY MR. LABUDA:

21    Q    Okay.  So is it your testimony the only time you took six

22    days at Giardino's was in 2013 when you had this kidney stone?

23    A    Yes.  That was the longest one.

24    Q    I'm not -- Mr. Luongo --

25    A    Yes.

LUONGO - CROSS - LABUDA

1   Q      -- you have to listen to my question, okay?

2   A      Yes.

3   Q      Isn't it true that other than the kidney stone episode

4   when you were out for four, five or six days or whatever,

5   there were other times where you were sick, more than a cold,

6   more than a sneeze or whatever, and you didn't work?

7   A      No.

8   Q      Do you remember me asking you questions during your --

9   withdrawn.  You remember being deposed in this case, correct?

10  A      Yes.

11  Q      And that was at my office, right?

12  A      Yes.

13  Q      And that was on November 4th, 2014?

14  A      Uh-huh, yes.

15  Q      And I asked you a series of questions, correct?

16  A      Yes.

17  Q      And you answered those questions, right?

18  A      Yes.

19  Q      And you answered it under oath and penalty of perjury of

20  telling the truth, correct?

21  A      Yes.

22  Q      And witness -- Your Honor, if --

23             THE COURT:  What page?

24             MR. LABUDA:  This is page 110 of his deposition.

25  Q      This is page 110, line 14.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO – CROSS – LABUDA

1      "QUESTION:  All right, now let me turn to sick days.

2 Did you -- you were sick sometimes when you -- during your

3 time of employment at Giardino's, correct?

4              "ANSWER:  Sick, yes.

5              "QUESTION:  And would you call in sick and not come

6 to work on certain days?

7              "ANSWER:  That happened a few times, that I called.

8 The last time was April of 2013.  I called Gennaro.  It was a

9 Sunday.  Busy day.  I called Gennaro 5, 8:00 o'clock in the

10 morning around and I told him that I was in the hospital."

11             Do you see that?

12 A      Yes.

13 Q      Do you remember me asking you those questions and

14 answering those questions?

15 A      Yes.

16 Q      And in your deposition you said that you were sick a few

17 times, correct?

18 A      Okay, yes.

19 Q      So that was more than just the kidney stones, correct?

20 A      Yes.

21 Q      Now, in 2010, you were also in Italy for two weeks; is

22 that right?

23 A      Yes, probably, yes.

24 Q      Now, in general, between your vacation, sick days,

25 holidays, personal days that you would take, you would be out

LUONGO – CROSS – LABUDA

1    of work for a total of about four weeks a year; is that right?

2    A    I take vacation two weeks, sick every year.

3    Q    Sick, holidays --

4    A    I don't think so.

5    Q    -- personal days?

6    A    Personal day, I was not getting paid if I took a day off.

7    That's not called a personal day, it's just taking a day off.

8    It's called personal day, sick days when you get benefits,

9    right?

10   Q    I understand.

11   A    Okay.

12   Q    But you took off the day?

13   A    Yes.

14   Q    Right, okay.

15   A    Yes, that's correct, take off.

16   Q    Take off.

17   A    Yes.

18   Q    That's what I mean.

19   A    Uh-huh.

20   Q    And it's fair that you took off about four weeks a year

21   between the personal days, sick, vacation, other things; is

22   that right, correct --

23   A    No --

24   Q    -- holidays?

25   A    -- I would say less than that.  I would say less than

LUONGO - CROSS - LABUDA

1   that.

2   Q    At least three weeks, correct?

3   A    If you want to put it that way, okay.

4   Q    Now with respect to the time that you worked at

5   Giardino's, when it was on and off, you were working at

6   Atlantic car dealership between June 2010 and October 2010,

7   correct?

8   A    Yes.

9   Q    Now do you have a W-2 with you showing that you worked

10  for Atlantic in 2010?

11  A    Here with me?

12  Q    Yes.

13  A    No.

14  Q    You also worked at Cardozo High School in the kitchen?

15  A    Yes.

16  Q    Right?

17  A    Uh-huh.

18  Q    And do you have a W-2 with you in terms of the year that

19  you worked there?

20  A    It has to be at home, yes.

21  Q    You don't have it here?

22  A    No.

23  Q    Now at the restaurant there were approximately six or

24  seven waiters that served the customers, correct?

25  A    Saturday and Sunday and Friday, yes.

LUONGO - CROSS - LABUDA

1            THE COURT:  Wait a minute, what's your answer?

2            THE WITNESS:  Yes.

3            THE COURT:  Six waiters that worked there.

4            THE WITNESS:  Yes.  But if I can clarify or I

5    mean --

6    BY MR. LABUDA:

7    Q    I was talking about the staffing, the overall staffing.

8    That there were approximately six or seven waiters that worked

9    in any given week.

10   A    Any given weekend.

11   Q    Week?

12   A    No, weekend.

13   Q    There were more waiters that were available to be called

14   than six or seven?

15   A    Yes.

16   Q    More like 10?

17   A    There was -- no, it was probably six or seven waiters the

18   most.

19   Q    That's what I just said.

20   A    Yes.  You said the whole week and I said and the weekend.

21   The week was only the four waiters, me, Mario, Gennaro and

22   Nina working.

23            THE COURT:  What are you defining as the week,

24   Monday through Friday?

25            THE WITNESS:  Yes.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO - CROSS - LABUDA

1          THE COURT:  So there were a total of four people who

2     worked Monday through Friday.  You worked Monday, Wednesday

3     and Friday and then on the weekends there were a total of six

4     people who worked?

5          THE WITNESS:  Yeah, because on lunch there was only

6     one waiter.

7          THE COURT:  What?

8          THE WITNESS:  On lunch shift there was only one

9     waiter, and then the second one would come at 2:00 o'clock,

10    4:00 o'clock in the afternoon.  And Fridays --

11         THE COURT:  But whatever it was, it was just four

12    guys who --

13         THE WITNESS:  Yes, we would rotate, yes.

14         THE COURT:  -- came during the week.

15         THE WITNESS:  Yes.  And then on Fridays, Saturday

16    and Sundays because there was a lot of parties you needed more

17    people.

18         THE COURT:  So there were some people who only

19    worked on weekends?

20         THE WITNESS:  During the week as well covering one

21    day during the week, but Saturday, Sunday and Friday they

22    working like four days a week.

23         THE COURT:  I guess I'm misunderstood you then.  I

24    thought the same four people worked during the week, am I

25    mistaken about that?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO – CROSS – LABUDA

1          THE WITNESS:  No.  Some waiters were working six

2     days, some waiters working five, so it was according to the

3     shift.

4          THE COURT:  Okay.

5     BY MR. LABUDA:

6     Q    All right.  Now the restaurant hours were Monday through

7     Thursday 12 noon to 10:00 p.m., correct?

8     A    Correct.

9     Q    And on Friday and Saturday they were 12 noon to

10    11:00 p.m., correct?

11    A    Yes.

12    Q    And on Sunday when there was brunch it was from

13    11:00 a.m. to 9:00 p.m., correct?

14    A    To the public, yes.

15    Q    When you were serving customers, when you were working,

16    did you have time to do anything else, like were you able to

17    like read the paper while you were serving customers?

18    A    No.

19    Q    Were you busy serving the customers?

20    A    If it was busy, yes.

21    Q    Were you able to talk on the phone while you were

22    working?

23    A    I made a few calls to my wife, send a couple of messages

24    to my wife every day.

25    Q    Other than that though?

LUONGO − CROSS − LABUDA

1    A    No.

2    Q    And you used to call your wife once you finished your

3    shift you would call her when you were in the car going home,

4    correct?

5    A    Yes, sometimes, yes, I would.

6    Q    Most of the time you did that, correct?

7    A    Okay.

8    Q    Is that right?

9    A    Yes.

10   Q    Okay.  And you called her at home or you called her on

11   the cell phone, correct?

12   A    From my cell phone to --

13   Q    I'm saying you called her on her cell phone or at home,

14   correct?

15   A    Yes.

16   Q    And her cell phone number is -- that's (516)830-5109,

17   correct?

18   A    Correct.

19   Q    And the home number is (516)546-0019, correct?

20   A    Yes.

21           MR. LABUDA:  Does the witness have a set of exhibit

22   books in front of him?  If you can give the witness a set of

23   the exhibit books.

24           MR. KATAEV:  The witness has Exhibit E in front of

25   him.

LUONGO - CROSS - LABUDA

1  BY MR. LABUDA:

2  Q    I ask you to take a look at Exhibit EE.  Okay, these are

3  your phone records for the year 2011, correct?

4  A    Okay.  Yes.

5           MR. LABUDA:  We'd offer them into evidence as

6  Exhibit EE.

7           THE COURT:  All right, they'll be received.

8           (Defense Exhibit EE, was received in evidence.)

9  Q    Now if you look at -- Mr. Luongo, I'm going to be

10  referring to the bottom right-hand number, there is a D

11  number, do you see those?

12  A    Yes.

13  Q    I'm going to ask you to look at D1071.

14  A    Okay.

15  Q    All right.  Now on January 21st, 2011, you called home at

16  9:04 p.m., do you see that?

17  A    Yes.

18  Q    And you testified that you would normally call your wife

19  at the end of the shift, correct?

20  A    Yes.

21  Q    So you called your wife at the end of the shift at 9:04

22  on this particular day, correct?

23  A    It could have been that I left or I was still in the

24  restaurant and telling my wife that I would leave in an hour

25  or I had a few more tables.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO – CROSS – LABUDA

1    Q    Okay.

2    A    Okay.

3    Q    Well, let's back up.

4    A    Okay.

5    Q    Now, during your deposition --

6    A    Yeah.

7    Q    -- I asked you the question and you answered that you

8    called your wife from the car after you left.

9            MR. O'NEILL:  Objection.  He should read the

10   question and answer, Your Honor.

11           THE COURT:  He can ask him generally.

12   BY MR. LABUDA:

13   Q    Do you remember testifying to that during your deposition

14   that you called your wife at the end of the day from your car?

15   A    Yes.

16           (Continued on the next page.)

17

18

19

20

21

22

23

24

25

LUONGO – CROSS – LABUDA

1   CROSS-EXAMINATION

2   BY MR. LABUDA:

3   Q    Okay.  Now, after this entry where you called your wife

4   at 9:04, do you see any other calls to your wife?

5   A    That day, no.

6   Q    Okay.  Now, this day, January 21st, 2011, I'll represent

7   that was a Saturday.  Okay?

8   A    Okay.

9   Q    I'm sorry, that was a Friday.

10        Now, the restaurant closed at 11:00, right?

11   A    Yes.

12   Q    But you called your wife at the end of the day from your

13   car at 9:04; is that right?

14   A    Yes.

15   Q    Okay.  That's two hours before the restaurant closed,

16   right?

17   A    Could be, yes.

18   Q    Okay.  And sometimes that happened because it wasn't that

19   busy, this is January, it's cold, you would leave early,

20   right?

21   A    It might be that or it might be that I was at the

22   restaurant still working and calling my wife as well.

23   Q    All right.  Do you remember me asking you these questions

24   and you answering.  This is page 203.  I'm sorry, page 202 and

25   page 203, line 21.

LUONGO – CROSS – LABUDA

1          "QUESTION:  Did you ever, when you were driving to

2     or from work, did you ever call your wife?

3          "ANSWER:  Sometimes, yes.

4          "QUESTION:  How often would you do that?

5          "ANSWER:  In my car?

6          "QUESTION:  Yes, in your car.

7          "ANSWER:  Many times a week.  Basically almost every

8     night saying I'm coming back home, leaving.

9          "QUESTION:  Okay.  So generally speaking, once you

10    left the restaurant, you would call her and let her know you

11    were coming home?

12         "ANSWER:  Yes."

13    Q    Do you remember being asked those questions and

14    answering?

15    A    Yes, okay.

16    Q    And let me ask you again, on January 21st, 2017, you

17    called at 9:04 p.m., and that's the last call you made to your

18    wife, correct?

19    A    Yes.

20    Q    Okay.  Now, based on the testimony I just read to you,

21    that was from your car driving home, correct?

22    A    Could be, yes.

23    Q    Now, let's go back to the phone logs.

24         The next day, on Saturday, January 21st, 2011 --

25         THE COURT:  That's January 22nd.

LUONGO - CROSS - LABUDA

1  Q    January 22nd, 2011, which is at the bottom of the page at

2  1071?

3  A    Yes.

4  Q    You called home your wife at 9:51 p.m., correct?

5  A    Yes.

6  Q    Okay.  And the restaurant closed at 11, right?

7  A    Yes.

8  Q    But you were calling home from your car before 10:00,

9  correct?

10  A    Could be I was in the car.

11  Q    Now, let's look at the next day, or I'm sorry, the next

12  week.

13        If you turn to page 1074, Mr. Luongo.

14  A    Yes.

15  Q    That's January 29th, 2011, another Saturday, the last

16  call you made, again to your wife, is at 9:48 p.m., correct?

17  A    Correct.

18  Q    Okay.  And the restaurant closes at 11 and you're calling

19  your wife to tell her you're coming home at 9:48, right?

20  A    Could be.

21  Q    Now, let's look at February.  That was January.  Let's

22  look at February.  February 11th, 2011.  Okay, that's 1076.

23        At 8:40 -- and I'll represent this is a Friday,

24  Friday night, you called your wife at 8:44 p.m., correct?

25  A    Yes.

LUONGO – CROSS – LABUDA

1   Q    Okay.  And that's to tell her you're coming home?

2   A    Could be.

3   Q    Now, let's look at February 16th.  And I'll make a

4   representation that is a Wednesday, February 16th, and that's

5   1077.

6           Now the restaurant closed at 10:00 on Wednesdays,

7   right?

8   A    Yes.

9   Q    Okay.  And you called your wife at 8:53 p.m. to let her

10  know you're coming home, right?

11  A    Yes, could be.  Yes, sir.

12  Q    That's an hour before, hour plus before the restaurant

13  closed, right?

14  A    Okay, yes.

15  Q    Now, it's fair to say many, many, many, many, many days

16  you did not work until the restaurant closed, correct?

17  A    Could be.

18  Q    Well, it's true, right?

19  A    Could be.  Could be that I was at the restaurant calling

20  my wife, or it could be that I was in the car.

21  Q    You have to listen to my question, Mr. Luongo.

22  A    Yes.

23  Q    Isn't it true that many, many, many times you left the

24  restaurant before the end -- before the restaurant closed?

25  Yes or no?

LUONGO – CROSS – LABUDA

1  A    Yes, sir, I left the restaurant sometimes before it

2  closed.  As I mentioned before, when you work lunch and

3  dinner, double shift, you're allowed to go home even half

4  hour, 45 minutes, if there was the occasion to go.  If you had

5  a table, you couldn't leave.

6  Q    Right.  So there are plenty of times where you were

7  scheduled to come in, you were late, you came in at 11:15,

8  11:30, and you would go home at 9:00, is that right, because

9  you worked a double?

10 A    Yes.

11 Q    Now, the time period that we're talking about here was a

12 long time ago, this is 2008 to 2013, right?

13 A    Yes.

14 Q    And it's fair to say that on any given day you do not

15 remember the hours that you worked, correct?

16 A    The schedule?

17 Q    Not the schedule, the hours that you worked on a given

18 day.

19        So, for example, on February 11th, 2011, can you

20 tell me when you started and when you stopped that day?

21 A    No.

22 Q    Okay.  And if I asked you the same question for any day,

23 you couldn't tell me when you started and when you stopped,

24 right?

25 A    No.

LUONGO - CROSS - LABUDA

1    Q    You have a general recollection of the hours that you

2    work, right?

3    A    If I go by my schedule, yes.

4    Q    But that's it, you're just going by your schedule, right?

5    A    Yes.

6    Q    Okay.

7    A    I could have -- I couldn't leave two, three hours before.

8    Q    Now -- well, sometimes you got cut, right?

9    A    Cut?

10   Q    You got cut.

11   A    At 9:00 at night, when Susanna would tell me, Max, you go

12   home because there's nothing else.  But I wouldn't come in and

13   leave at 4:30.  It was not worth it for me.  You said --

14   Q    I understand so, but you got cut sometimes where your

15   shift was cut early, right?  That happened plenty of times,

16   right?

17   A    Cutting early by whom?

18   Q    By whomever.  By either -- my understanding is that at

19   the end of the night when it was -- when it wasn't busy, a lot

20   of times the waiters amongst themselves decided who was going

21   to go; isn't that right?

22   A    It did not happen a lot of times.

23   Q    But that happened, where the waiters would agree amongst

24   themselves somebody can go home.

25   A    Yes.  But I was living in Freeport, it was not worth it

LUONGO – CROSS – LABUDA

1   for me to go back, I had to stay.

2   Q    Right, and sometimes when it got slow, the manager would

3   send you home as well, correct?

4   A    Well, it depends on what time.  What time you talking

5   about?

6   Q    Well, with Susanna.

7   A    Yeah, what time are you talking about?

8   Q    I'm saying 9:00 at night.

9   A    9:00?  Yeah.  But it didn't happen every single night.

10  Q    And once you were cut and you didn't work, you don't

11  expect to be paid, correct?

12  A    Of course not.

13  Q    And if you're not working, you shouldn't be paid, right?

14  A    If I'm not working, I shouldn't be paid, no.  If I'm

15  working, I'm supposed to be paid.  Is that right?

16  Q    That's the way.

17           And so with your hours, you don't have a

18  recollection of on any given day that you worked did you ever

19  keep a diary of the hours?

20  A    No, unfortunately not, sir.

21  Q    You didn't keep a calendar in terms of this is when I

22  started, this is when I stopped; nothing like that?

23  A    No, no.

24  Q    Never wrote it on a piece of paper?

25  A    The schedule was the same.  It was easy for the manager

 1    to, you know, schedule the waiters, because it was like

 2    repeating every week.

 3    Q    Okay.  Now, based on the questions that Mr. O'Neill was

 4    asking you, is it fair to say that you didn't think you were

 5    getting paid back since at least 2008 for all the hours you

 6    worked?

 7    A    Yes.

 8    Q    Okay.  But even though you thought that you weren't

 9    getting paid for all the hours from '08 to 2013, so that five,

10    six-year period, you never kept track of your own hours?

11    A    Well, no.  Well, at least according to my schedule.

12    That's the schedule that's where, you know, my hours I worked.

13    Now, I could have left a half hour before, an hour before, but

14    the schedule is always the same.  We not talking about the

15    year, we're talking about --

16              MR. LABUDA:  Your Honor, could I instruct the

17    witness to answer the question?

18              THE WITNESS:  Yes, I'm sorry.

19              THE COURT:  I think he answered the question.

20              MR. LABUDA:  Move to strike that.

21    Q    No, you were late approximately 15 minutes to half an

22    hour each day; is that right?

23    A    I'd say probably 10 to 15 minutes.  I was coming in the

24    restaurant most of the times with the manager, Gabriella.  She

25    would see me.

LUONGO – CROSS – LABUDA

1    Q    Okay.  And you left early at least two days a week; is

2    that right?

3    A    I would say probably a Monday or a Wednesday when I was

4    working in Giardino.

5    Q    Okay.  Well, I'm asking you, is it two days a week, is

6    that fair, that you would leave early?

7    A    Yeah, two, three days; three times, yes.

8    Q    All right.  And at least two days a week you'd leave at

9    like 9:00, 9:30, correct?

10   A    It depends on what time was the restaurant closing.

11   Q    Now, you also took a lunch break; is that right?

12   A    No.

13   Q    You never take one?

14   A    I'll explain you.

15   Q    Just answer the question.

16   A    Oh, okay.  No.

17           THE COURT:  All right, ladies and gentlemen, I'll

18   excuse you for the evening with the admonition of course not

19   to discuss the case.  We'll begin at 9:30 tomorrow morning.

20   Good night.

21           THE WITNESS:  Thank you.

22           (Jury exits the courtroom.)

23           THE COURT:  All right, you may sit down.

24           Mr. Labuda, how much longer do you think with the

25   plaintiff?

PROCEEDINGS

1          MR. LABUDA:  I'd probably say, based on this

2    process, I'd say probably say about an hour, an hour and a

3    half.

4          THE COURT:  Okay.  And then Mr. O'Neill, what's your

5    next witness?

6          MR. O'NEILL:  Mr. Connolly.

7          THE COURT:  Is he available tomorrow?

8          MR. LABUDA:  Yes, you're going to call him right

9    after?

10          MR. O'NEILL:  Yes.

11          MR. LABUDA:  Okay, so we'll make sure he's

12    available.

13          THE COURT:  Okay, and what about after that?

14          MR. O'NEILL:  Well, if Mr. Connolly can't testify to

15    the records, then I need to keep the representative here.

16          MR. LABUDA:  Well, I mean we're stipulating to --

17          MR. O'NEILL:  I want somebody to explain the

18    records, not just to admit them into evidence.  They're not

19    self-explanatory.

20          THE COURT:  I presume Mr. Connolly -- are you

21    representing that Mr. Connolly is the best person to explain

22    the records?

23          MR. LABUDA:  Yes, Your Honor.  Yes.

24          MR. O'NEILL:  Chances are he'll be fine and I'll

25    rest.

PROCEEDINGS

1           THE COURT:  Okay, so that's just those two

2    witnesses.

3           Now, who are you going to call?

4           MR. LABUDA:  We're going to call PJ Connolly.

5           THE COURT:  I'm sorry, that's the same person?

6           MR. LABUDA:  Yes, Patrick Connolly.

7           THE COURT:  Is that the same person?

8           MR. LABUDA:  Yes, yes.  So we'll either do

9    cross-examination of him and we've got --

10          THE COURT:  Well why don't we do him all at once.

11   I'll explain to the jury what's going on.

12          MR. LABUDA:  That's fine.  That's fine.

13          And then we've got Gennaro Picano.

14          THE COURT:  That's the other waiter?

15          MR. LABUDA:  That's the other waiter.  And we got

16   Susanna Prage (phonetic), who's a manager.  And then Gabriella

17   Gambino.  And then that's it.

18          THE COURT:  I take it these are all witnesses that

19   will talk about the hours worked?

20          MR. LABUDA:  Yes.  Yes.

21          THE COURT:  They will principally talk about the

22   hours worked?

23          MR. LABUDA:  Right.

24          THE COURT:  Let me just ask you:  Do you expect the

25   other waiters to offer testimony that they ever worked

PROCEEDINGS

1   overtime?

2          MR. LABUDA:  I don't know if I'd say that.  I mean,

3   I think there's records Mr. Luongo you and was paid overtime.

4   So I don't know if we'd say necessarily that.  But it's not --

5   I would think the testimony is going to be that it's a rare

6   circumstance where something like that would happen.

7          THE COURT:  Or somebody worked more than 40 hours a

8   week?

9          MR. LABUDA:  Right.

10          THE COURT:  Okay.

11          MR. O'NEILL:  Your Honor, with Mr. Connolly being

12   shared, I take it that it would be -- I can cross-examine him

13   with leading questions but Mr. Labuda can't?

14          MR. LABUDA:  I mean --

15          THE COURT:  I think what will happen, unless you all

16   want to go through this artificial thing where you have to be

17   called by -- you should put on your direct examination of him,

18   which would be the same as any direct examination without

19   leading questions, unless he's hostile to your responses, then

20   counsel can ask him questions about what you asked him

21   questions about, then he can bring out what it is that he

22   wants to bring out on his case.  To that extent, you can

23   certainly cross-examine him about that information.

24          MR. O'NEILL:  Right.  Okay, I mean if he -- since

25   he's using him also for part of his case, obviously, I can't

PROCEEDINGS

1   object that it's beyond the scope.  So when he's putting on

2   his case, not discussing anything I brought up, I don't think

3   that should be cross, that should be direct examination.

4                  THE COURT:  Well, yes.

5                  MR. O'NEILL:  Okay.

6                  MR. LABUDA:  Right.  There may be some leading, just

7   because of the nature of some of the things that you're going

8   to be asking him about that I'll be doing on cross.

9                  MR. O'NEILL:  There's cross-examination.

10                  MR. LABUDA:  Yes, that's fine.

11                  And we're going to start up at 9:00 tomorrow, Your

12   Honor?

13                  THE COURT:  9:30.

14                  MR. LABUDA:  9:30, okay.

15                  THE COURT:  And what other witness, Mr. Connolly and

16   who else?

17                  MR. LABUDA:  We have Mr. Connolly, we have Mr. --

18                  THE COURT:  Oh, I'm sorry, all the other people who

19   worked there.

20                  MR. LABUDA:  Yes.

21                  THE COURT:  Okay, all right.  Thank you.

22                  MR. LABUDA:  Thank you, Your Honor.

23                  MR. O'NEILL:  Thank you, Your Honor.

24                  MR. KATAEV:  Thank you, Your Honor.

25                  (Proceedings adjourned at 5:35 p.m. to resume on

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

```
 1   June 27, 2017 at 9:30 a.m.)

 2

 3                    *     *     *     *     *

 4

 5                         I N D E X

 6   WITNESS                               PAGE

 7   MASSIMILIANO LUONGO

 8   DIRECT EXAMINATION     BY MR. O'NEILL        57

 9   CROSS-EXAMINATION      BY MR. LABUDA        112

10

11                     E X H I B I T S

12   PLAINTIFF              PAGE

13   6                       98

14   1                      104

15

16   DEFENSE               PAGE

17   EE                    127

18

19

20

21

22

23

24

25
```