```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2
      ------------------------------x
 3                                          13-CV-7420(CBA)
      MASSIMILIANO LUONGO,
 4                                          United States Courthouse
                 Plaintiff,                 Brooklyn, New York
 5
                 - versus -                 June 27, 2017
 6                                          9:30 a.m.
      44-37 RESTAURANT CORP., THE
 7    RUSSO'S PAYROLL GROUP, INC.,
      and FRANK RUSSO,
 8
                 Defendants.
 9
      ------------------------------x
10
                    TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
11             BEFORE THE HONORABLE CAROL B. AMON
                    UNITED STATES DISTRICT JUDGE
12                        BEFORE A JURY

13    APPEARANCES

14    Attorney for Plaintiff:  OFFICE OF MICHAEL G. O'NEILL
                               30 Vesey Street
15                             Suite 301
                               New York, New York 10007
16                             BY:  MICHAEL G. O'NEILL, ESQ.

17

18    Attorney for Defendant:  MILMAN LABUDA LAW GROUP, PLLC
                               3000 Marcus Avenue
19                             Suite 3W3
                               Lake Success, New York 11042
20                             BY:  JOSEPH M. LABUDA, ESQ.
                                    EMANUEL KATAEV, ESQ.
21

22
      Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
23                             Phone:  718-613-2330
                               Fax:  718-804-2712
24                             Email:  LindaDan226@gmail.com

25    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
```

Proceedings

1              (In open court; Jury not present.)

2              THE COURT:  Good morning.

3              MR. O'NEILL:  Good morning, Your Honor.

4              MR. LABUDA:  Good morning, Your Honor.

5              THE COURT:  The jury is here, do you want to bring

6    the jury out.

7              MR. LABUDA:  Judge, can I set up at the podium?

8              THE COURT:  Sure.

9              (Jury enters the courtroom.)

10             THE COURT:  Good morning, ladies and gentlemen,

11   please be seated.

12             Mr. Luongo, do you want to resume the stand, please.

13             THE WITNESS:  Yes.

14             (Witness takes the witness stand.)

15             MR. LABUDA:  Your Honor, if I may, just because we

16   were in the middle of a line of questioning I'd asked a couple

17   of questions, I just wanted to read back the last few

18   questions and answers on page 137 of the transcript.

19             THE COURT:  137?

20             MR. LABUDA:  Page 137 of the trial transcript from

21   yesterday.

22             THE COURT:  All right, go ahead.

23             MR. LABUDA:  Yes.

24             "QUESTION:  You also took a lunch break; is that

25   right?

LUONGO - CROSS - LABUDA

1    "ANSWER:  No.

2    "QUESTION:  You never take one?

3    "ANSWER:  I'll explain you.

4    "QUESTION:  Just answer the question.

5    "ANSWER:  Oh, okay, no."

6  CROSS-EXAMINATION (Continued)

7  BY MR. LABUDA:

8  Q    So yesterday I was asking you about lunch breaks and you

9  indicated that you never took a lunch break, correct?

10  A    Correct.

11  Q    Now you remember me asking you questions during your

12  deposition, correct?

13  A    Yes.

14  Q    And some of those -- again, those questions were all

15  under oath just like the oath you took yesterday, correct?

16  A    Correct.

17       MR. LABUDA:  And, Emanuel, if you could turn to

18  page 175 of the transcript.

19  Q    Do you remember me asking you and you answering the

20  following questions?  And it's page 175, line 4 through 9.

21       "QUESTION:  Okay.  Is it fair or accurate to say

22  that two days a week you were able to take a meal break that

23  was uninterrupted for at least half an hour?

24       "ANSWER:  Yes."

25  Q    Do you remember testifying to that?

LUONGO - CROSS - LABUDA

1   A    Yes.  May I say something as well?

2   Q    You cannot say anything, just answer my question.

3   A    Yes.

4   Q    So you told the jury -- you told me when I deposed you

5   that you took a lunch break two days a week, and you told the

6   jury something different yesterday; is that right?

7   A    Yes.

8   Q    Now if you worked dinner, you didn't have much to do in

9   order to get ready for the dinner shift; is that correct?

10  A    The restaurant was never closed.  We never closed the

11  doors.  The restaurant was open from three, the whole day.

12  Basically, if a table would come in, I took it up --

13  Q    Okay.

14  A    -- and served the table.

15  Q    Mr. Luongo, please answer my question.

16            I move to strike the answer.

17            THE COURT:  All right, the application is granted.

18  BY MR. LABUDA:

19  Q    Mr. Luongo, if you worked just the dinner shift, right,

20  and you came in at 4, 4:30, 5:00 o'clock or whatever, you did

21  not have much to do to get ready for dinner, correct?

22  A    Check the station.

23  Q    You didn't -- listen to the question.  You didn't have

24  much to do, correct?

25  A    Could be.

LUONGO - CROSS - LABUDA

1   Q     Now with respect to your lunch that you would take either

2   between lunch and dinner, you would take your lunch and the

3   only time that you would get interrupted from your lunch is if

4   you had to attend to a customer that came in, correct?

5   A     That would happen many times.

6   Q     Yes, but that's when you would have to get up from lunch

7   is when a customer needed something, correct?

8   A     Yes, and only me.

9   Q     Okay, thank you.

10  A     No problem.

11  Q     And the chef cooked lunch around 3, 3:15 after the lunch

12  crowd ended, correct?

13  A     Yes.

14  Q     And if you didn't have any customers you would relax

15  until 4:00 o'clock, correct?

16  A     Sometimes, yes.

17  Q     Now, again, with your schedule, you would leave early if

18  the restaurant wasn't busy, if it was raining, snowing, it was

19  hot or cold, whatever the reason, it wasn't busy, you would

20  get cut before the end of the -- before the restaurant closed,

21  correct?

22  A     No.  If it was hot and cold?  I don't understand the

23  question.

24  Q     I'm just saying when it wasn't busy for whatever

25  reason --

LUONGO – CROSS – LABUDA

1   A     Okay.

2   Q     -- that's when you would get -- instead of working 'til

3   10:00 o'clock you'd go home at 9:00 o'clock or whatever,

4   right?

5   A     Sometimes, yes.

6   Q     Okay.

7   A     Yeah.

8   Q     Now you punched in and out when there was a timekeeping

9   machine, correct?

10  A     Yes.

11  Q     And the timekeeping machine accurately reflected your

12  hours, correct?

13  A     I could be, yes, could be.

14  Q     You punched in when you got in in the morning, right?

15  A     Yes.

16  Q     And you would punch out at the end of the day, correct?

17  A     Right.

18  Q     Now there was a computerized system that started in

19  around 2011, 2012, correct?

20  A     Yes.

21  Q     And sometimes you would forget to punch out, correct?

22  A     Yeah, and I would call the manager.

23  Q     Right.  And you told the manager or like you said

24  yesterday, you'd even come back to the store and punch out

25  yourself, right, to the restaurant, right?

LUONGO - CROSS - LABUDA

1   A    Yes.

2   Q    When you told the manager this, your pay would get fixed,

3   correct?

4   A    I believe so.

5   Q    And when you got paid at the end of the week on your

6   paystub the paystub accurately reflected the hours that you

7   worked, correct?

8   A    Not actually not...

9   Q    All right.  If you can turn to page 87.  Now, do you

10  remember me asking you questions about this during your

11  deposition, right?

12  A    Okay.

13  Q    Okay.  Bear with me one minute.  I'm sorry, page 142,

14  sorry, line 4.

15       Do you remember being asked the following questions

16  and giving the following answer:

17       "QUESTION:  Okay, all right.  So your recollection

18  was that in around 2011, 2012 and that would -- and you would

19  do that at I'm guessing during the end of your shift,"

20  referring to punching out.

21       "ANSWER:  Yes."

22       Down to question line 19.

23       "QUESTION:  Okay, when you put in the amount of tips

24  at the end of your shift, weren't you punching out then?

25       "ANSWER:  Punching out?  We put the tips in and then

LUONGO — CROSS — LABUDA

1  close it, clock out, yes.

2          "QUESTION:  So just so I understand, once you

3  started -- once you started using the POS system, you punched

4  in in the morning and then -- or whenever your shift began,

5  and then you would punch out at the end of your shift and you

6  would put in the amount of tips that you earned for that day,

7  correct.

8          "ANSWER:  Yes."

9          Do you remember being asked those questions and

10  giving those answers?

11  A      Yes.

12  Q      Okay.

13          Now, Susanna was one of your managers, correct?

14  A      For a year and a half, yes.

15  Q      And you never complained to her about missing hours,

16  correct?

17  A      I had -- I complained to too many managers, nobody did

18  anything so why would I bother myself to go.

19          MR. LABUDA:  Move to strike.

20          THE COURT:  Yes, I'll strike the answer.  There is a

21  specific question and it was, did you complain to this

22  particular manager, Susanna, I believe was the name?

23          MR. LABUDA:  Yes, Susanna.

24  A      No.

25  Q      You didn't complain to Gabby about missing hours,

LUONGO − CROSS − LABUDA

1  correct?  She was another manager.

2  A     Yes, she was another manager.

3  Q     And you didn't complain to her, correct?

4  A     No, not at all.  It was not worth it.

5         MR. LABUDA:  Move to strike the last portion of the

6  answer.

7         THE COURT:  Yes, I will.  It's granted.

8         Just respond to the question, please.

9         THE WITNESS:  Okay, I'm sorry.

10  BY MR. LABUDA:

11  Q     Now the hours that you punched in on the POS system in

12  2013, those are the same hours that you would work in prior

13  years as well, correct?

14  A     My schedule always the same.  In 2013, the last part of

15  the 2013 I took some extra days off.  Instead of working five

16  days I would work one day less.

17  Q     Okay.  So once you started working one day less, that's

18  when you decided to reduce your hours or your weekly schedule,

19  correct?

20  A     That was not every week.

21  Q     Understood.  Let's go to your time sheets.

22         Emanuel, if you could turn to Exhibit U.

23         And it is −− I don't have Bates stamp numbers, let's

24  look at the first page, if you can focus it on week by week.

25  There we go.

152

LUONGO – CROSS – LABUDA

1              So the first week in 2013 you worked four days, that

2    was the end of -- that was beginning of the year you may have

3    worked four or five days that week with that yearly split up,

4    correct?

5    A    That's what the paper says, yes.

6    Q    The next week you worked five days, right?

7    A    Yes.

8    Q    Next week you worked five days, correct?

9    A    Yes.

10   Q    The next week you worked four days?

11   A    Okay.

12   Q    The next week you worked five days, right?

13   A    Yes.

14   Q    So it's fair to say in January you were working your

15   regular schedule, right?

16   A    Yes.

17   Q    Let's look at, let's say, in June.  Let's turn to June.

18   That's page 5, Emanuel, if you could focus that in.

19             In June of 2013, the first week you worked five

20   days, right?

21   A    Yes.

22   Q    Second week five days, right?

23   A    Yes.

24   Q    Third week five?

25   A    Yes.

LUONGO – CROSS – LABUDA

1    Q    Fourth, five?

2    A    Yes.

3    Q    And into July you were working five, right?

4    A    Yes.

5    Q    So this was your regular schedule, right?

6    A    Yes.

7    Q    Let's look on page 7, Emanuel, and the week ending

8    September 1st you worked five days, right?

9    A    Yes.

10   Q    And the next week you worked four days, right?

11   A    Yes.

12   Q    Next week five days, right?

13   A    I think it's six, right?

14   Q    Well, there's two punches for September 14th, so that's

15   just one day?

16   A    Okay, yes.

17   Q    So it's five days?

18   A    Five days.

19   Q    The next week five days as well, right?

20   A    Right.

21   Q    And the week after that five days as well?

22   A    Yes.

23   Q    You were still working your same schedule in through

24   September, right?

25   A    Yes.

LUONGO - CROSS - LABUDA

1    Q     And then let's look at the last few weeks.  September --

2    the next page the week ending October 6th you worked five

3    days, right?

4    A     Yes.

5    Q     And then the next two weeks you worked three days, right?

6    A     Okay.

7    Q     Right?  Is that right?

8    A     Yes.

9    Q     So earlier you testified that you cut back your hours in

10   July, but these indicate that you were working a full shift

11   until the end of September; isn't that right?

12   A     I mean, as I said, you know, before, I said my schedule

13   was, you know, I could do anything I want in a way.  If I

14   wanted to work three days, I work three days if I have some

15   substitution.  If I wanted to work five days, I work five

16   days.  If it's July or September, I mean it doesn't make any

17   difference.

18   Q     It doesn't make any difference to you in terms of what

19   you said yesterday about cutting back in July and the records

20   that indicate you worked your regular schedule through

21   September, it doesn't matter to you?  No?

22   A     Matters, I mean that's, you know, that's what the paper

23   says.  Right?  Okay.

24   Q     Well, you're here to tell the truth, right?

25   A     Yes, of course, I'm here to tell the truth.

LUONGO - CROSS - LABUDA

1   Q    The truth is you worked your schedule until the end of

2   September, your regular schedule until the end of

3   September 2013, right?

4   A    Yes, with some days I would take a day off.  Instead of

5   working five days I would work four days.

6   Q    All right.  And is it fair to say, as I was saying

7   before, that in September -- or I'm sorry in 2013 that from

8   January through September that you worked the same schedule

9   that you had worked in previous years?

10  A    Same schedule I was working five days a week, three

11  doubles, yeah, most of the time, yes.

12  Q    Right.  And this is indicating that you were working five

13  days, right?

14  A    Yes.

15  Q    In terms of Exhibit U.

16            And you would work the same hours in that schedule,

17  correct?

18  A    Possibly, yes.  Unless I would -- I would go home

19  earlier, an hour earlier if I was working lunch and dinner.

20  Q    And that would be the same for prior years.  So the same

21  hours that you worked in 2013 in your regular schedule you

22  worked in 2012, and '11 and '10, et cetera, correct?

23  A    Yes.  We --

24  Q    All right.  So now let's look at these punch ins, okay,

25  Exhibit U again, if you can turn to the first page.

1            So the week of week –– the week ending September 6th

2    you worked four days, right?

3    A    Right.

4    Q    On January 1st you clocked in at 9:02?

5            THE COURT:  Wait a minute, you are talking about

6    September and January, do you want to be more specific?

7            MR. KATAEV:  You said January.

8            MR. LABUDA:  I'm sorry, I meant January.

9    Q    So January 1st, 2013, you punched in at 19:02, right?

10   A    That's what is the paper says, yes.

11   Q    That mean 7:02, right?

12   A    Yeah.

13   Q    You didn't punch out that day, right?

14   A    It looks like that, no, it doesn't, no.

15   Q    The next day, January 4th, you punched in at 20:14,

16   right?

17   A    Could be, yes.

18   Q    Well, that's what it says, right?

19   A    Yeah, right.

20   Q    Okay.  And that's 8:00 o'clock, 8:14 right?

21   A    Uh-huh.

22   Q    You didn't punch out, right?

23   A    Yes.

24   Q    The next day you punched in at 11:31 a.m., correct?

25   A    Yes.

LUONGO - CROSS - LABUDA

1   Q    And you didn't punch out, right?

2   A    Right.

3   Q    And then the next day you punched in at 11:43 and didn't

4   and punch out, right?

5   A    Uh-huh, yes.

6   Q    Now you don't remember when you left the restaurant any

7   of those days where you didn't punch out, correct?

8   A    Um --

9   Q    January 1st, 2013, do you remember when you stopped

10  working that day?

11  A    No, I don't.

12  Q    Had you punched out we would know when you stopped

13  working that day, correct?

14  A    Yes.

15  Q    So now let's look at the next week.  I'll represent to

16  you that January 7th, 2013, that's a Monday that's usually, in

17  terms of the timekeeping, it started on a Monday and ended on

18  a Sunday, correct?

19  A    Correct.

20  Q    So Monday you punched in at 6:04 p.m., correct?

21  A    Yes.

22  Q    And you didn't punch out, right?

23  A    Yes.

24  Q    On Wednesday, January 9th, you punched in at 4:44 and

25  didn't punch out, correct?

LUONGO - CROSS - LABUDA

1    A    Correct.

2    Q    On Friday, you punched in at 6:21 and didn't punch out,

3    correct?

4    A    Correct.

5    Q    On Saturday, you punched in at 11:36 and didn't punch

6    out, correct?

7    A    Correct.

8    Q    And on January 13th, which is a Sunday, you punched in at

9    11:51 and didn't punch out, right?

10   A    That's what it looks like.

11   Q    And, again, had you punch out we would know when you

12   stopped working on those particular days, right?

13   A    It's --

14   Q    Had you punched out we would know --

15        MR. O'NEILL:  Let him answer, Your Honor.

16   Q    -- when you punched out, correct?  Yes or no?

17        THE COURT:  Can you answer the question?

18   A    Repeat the question, please.

19   Q    Had you punched out --

20   A    Right.

21   Q    -- we would know when you stopped working that day,

22   correct?

23   A    That's what the paper says.

24   Q    So now let's look at a week, a full week when you say you

25   were working your regular schedule and how many hours you were

LUONGO — CROSS — LABUDA

1    working.

2              So, Emanuel, if you can turn to page 4 of Exhibit U.

3              I'd like to offer Exhibit U, the time records into

4    evidence.

5              MR. O'NEILL:  Your Honor, I have no objection, I

6    just think that they should be offered in evidence before

7    they're shown to the jury.

8              THE COURT:  I had assumed they were in evidence by

9    stipulation.

10             MR. LABUDA:  Yeah, I think we had stipulated but

11   formally we'll offer them.

12             THE COURT:  All right.  Exhibit U is admitted.

13             (Defense Exhibit U, was received in evidence.)

14   Q    So the week ending May 26th, 2013, you punched in and out

15   every day that week, right?

16   A    That's what it looks like.

17   Q    And the total hours for that week aren't the 45, 47,

18   whatever hours you testified to yesterday, these total hours

19   are 40 hours, 40.2 hours, right?

20   A    If you write it out it looks like it's 42 point whatever.

21   Q    40.2?

22   A    40.2, okay.

23   Q    Right.

24             That's not --

25             THE COURT:  I'm sorry, is that number actually

LUONGO – CROSS – LABUDA

1   reflected?

2            MR. LABUDA:  It is.  It's on the right-hand column.

3            THE COURT:  You want to just show that.

4            MR. LABUDA:  Emanuel, can you scooch over a little

5   bit more.

6            THE COURT:  Where do the hours show?

7            MR. LABUDA:  40.2, there is a column regular hours.

8            THE COURT:  All right.

9   BY MR. LABUDA:

10  Q    So that's a clean week when you punched in and out every

11  day and you worked 40 hours less the lunch which you said you

12  took at least two days a week, correct?

13  A    That was not always the 40 hours that I would work.

14  Q    Just answer the question.  This week you punched in and

15  out --

16  A    Right.

17  Q    -- for 40.2 hours, correct?

18  A    Yes.

19  Q    You testified all -- and this doesn't account for any

20  lunch breaks, correct?  This is just the beginning of your

21  shift to the end of your shift, correct?

22  A    Correct.

23  Q    This doesn't account for any lunch breaks that you took,

24  correct?

25  A    Correct.

LUONGO - CROSS - LABUDA

1  Q    Now let's look at the week ending July 28th, 2013.  Now

2  in this week you punched in and out every week again -- every

3  day, correct?

4  A    Correct.

5  Q    And the total hours here are 39.28 hours, correct?

6  A    Correct.

7  Q    And that's less than what you were testifying to

8  yesterday in terms of working 45, 47 hours, right?

9  A    Not every week is the same, right?

10        THE COURT:  This week we're talking about --

11  Q    This week --

12        THE COURT:  Please, just so we're clear.  This is

13  the week of July 22nd through July 28th, 2013, that's what

14  you're referring to, Mr. Labuda?

15        MR. LABUDA:  Yes.

16        THE COURT:  That particular week?

17        THE WITNESS:  Yes.

18        THE COURT:  He's not talking about other weeks, he's

19  just asking you that week.

20        THE WITNESS:  Yes.

21  BY MR. LABUDA:

22  Q    The other weeks if you look at like, let's say the

23  subsequent week or let's look at the week -- let's look at the

24  first week again of July -- of January, week ending January 6?

25        THE COURT:  January.

LUONGO - CROSS - LABUDA

1          MR. LABUDA:  January 6th, 2013, right.

2     Q    By the punch cards that you were required to punch in and

3     out we can't tell how many hours you worked on that particular

4     week because you didn't punch out, correct?

5     A    Correct.

6     Q    But the two examples that I showed you where they were

7     clean punch ins and punch outs, they're 40 hours, 39 hours,

8     correct?

9     A    Correct.

10    Q    And you noticed like that first week there you didn't

11    punch out any of those days, right, you didn't punch out any

12    of those days, right?

13    A    That's what it looks like.

14    Q    Do you know how many times you didn't punch out in 2013?

15    A    No, but it's kind of like weird that for two weeks I

16    didn't punch out.

17          MR. LABUDA:  Move to strike.

18          THE COURT:  Yes.  I'll strike the response.

19          Just answer the question.

20    BY MR. LABUDA:

21    Q    That week it was four times, right?

22    A    Right.

23    Q    The next week it was five days?

24    A    That's what it looks like, yes.

25    Q    The week after that it was two times, right?

LUONGO - CROSS - LABUDA

1    A    Yes.

2    Q    The week after that it was two times, right?

3    A    You are showing me the same week.

4    Q    No -- well, yes, if you look down below --

5    A    Now, yes.

6    Q    -- the week ending January 27th, it's two times, right?

7    A    Right.

8    Q    Then the next week it's one time, right?

9    A    Right.

10   Q    On this one piece of paper that's 14 times you didn't

11   punch out, correct?

12   A    That's what it looks like, yeah.

13   Q    If you add them up it totals 79 times from January until

14   you stopped working in October that you didn't punch out.

15            THE COURT:  Are you asking him to confirm that?

16            MR. LABUDA:  Yes.

17   Q    You want to confirm that?

18   A    I will confirm 100 percent, the reason why --

19   Q    I'm not asking --

20            THE COURT:  What is the number you gave him?

21            MR. LABUDA:  Seventy-nine.

22            THE COURT:  Have you reviewed the records in order

23   to make that determination?  Do you know how many times the

24   records reflect that you didn't punch out between January and

25   October?  Have you reviewed the records to make that

LUONGO — CROSS — LABUDA

1    determination?

2              THE WITNESS:  Yes, it —

3              THE COURT:  You have?

4              THE WITNESS:  Yes.  It says 79.

5              THE COURT:  You looked at it, you believe that's

6    correct?

7              THE WITNESS:  It's correct for them, but if I may

8    say something.

9              THE COURT:  No.  That's what those records reflect,

10   right?

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.

13   BY MR. LABUDA:

14   Q    And that year you worked a total 42 weeks, correct?  If

15   you look on the last page it has week 42.  The last page of

16   Exhibit U —

17   A    Okay.

18   Q    — right?  You worked 42 weeks?

19   A    Right.

20   Q    Now out of those 42 weeks you worked four days on 12 of

21   those weeks, correct?

22   A    If — I don't know, I mean the paper says so, okay.

23   Q    Right.  And you worked three days in four of those weeks,

24   correct?

25   A    Might be, yes.

LUONGO – CROSS – LABUDA

1   Q    So now that's 40 percent of the time that you were

2   working less than five days, understand that?

3   A    Yes, I would take an extra day off.

4   Q    Now let's look at Exhibit T.  These are your punch cards

5   for the year 2012.

6          THE COURT:  Is Exhibit T in evidence?

7          MR. LABUDA:  We'd offer Exhibit T into evidence.

8          MR. O'NEILL:  No objection, Your Honor.

9          THE COURT:  It's received.

10         (Defense Exhibit T, was received in evidence.)

11         MR. LABUDA:  Now in Exhibit T let's look at the

12  first page of it, Emanuel.

13         MR. KATAEV:  Okay.

14  BY MR. LABUDA:

15  Q    That first week on February 3rd, 2012, you punched in at

16  4:18 and you didn't punch out, correct?

17  A    That's what it looks like.

18  Q    On February 4th you punched in at 10:58 and you didn't

19  punch out, correct?

20  A    That's what it looks like.

21  Q    And then on February 5th you punched in at 10:40 and you

22  didn't punch out, correct?

23  A    Correct.

24  Q    Now for this year, 2012, you didn't punch out 135 times,

25  correct?

LUONGO - CROSS - LABUDA

1          THE COURT:  For which?

2          MR. LABUDA:  For the year 2012.

3    Q    135 times, correct?

4    A    That's what the paper says, but you don't let me talk,

5    you don't let me say the reason.

6    Q    And nine of those weeks you only worked four days,

7    correct?

8    A    Might be, yes.

9    Q    And on six of those weeks you worked three days or less,

10   correct?

11   A    Might be.

12   Q    So it's fair to say sometimes you'd only work three days

13   a week, sometimes you'd work four days a week, and sometimes

14   you'd work five days a week, correct?

15   A    Most of the time five days.

16   Q    Now that's 33 percent of the time when you were working

17   four days, three days, two days, that's a third of your

18   schedule you were working less than five days, do you

19   understand that?

20   A    Yes.

21   Q    And again, if you punched out, we would know when you

22   stopped working, right?

23   A    Yeah.

24   Q    Right.  But on this week that I just showed you, you

25   didn't punch out at all, right?

LUONGO - CROSS - LABUDA

1    A    That's what it looks like.

2    Q    So now let's look at a clean week where you punched in

3    and out every day.  Turn to week 20, which is the week ending

4    May 6th, 2012.  You punched in and out every day that week,

5    correct?

6    A    Yes.

7    Q    You worked five days that week, right?

8    A    Yes.

9    Q    And the total hours that you worked are 20.25 hours,

10   correct?

11   A    What's the -- the last clock in, clock out, 19:42?

12   Q    You see where it says in the total to the right, Emanuel,

13   the total hours you clocked in and out every day and the total

14   hours worked are 20.25, correct?  That's what it says.

15   A    That's what it says but --

16   Q    All right.

17            THE COURT:  What week is this?  Do you want to just

18   indicate the time period this covers?

19            MR. LABUDA:  Yes, this was --

20            THE COURT:  It's hard to tell on these records.

21            MR. LABUDA:  This was the week ending May 6th, 2012.

22   All right.  Now let's look at another clean week.  Emanuel, if

23   you can turn to the next page, the week ending June 17th,

24   2012.

25            You clocked in and out every day that week, correct?

LUONGO – CROSS – LABUDA

1    A    Correct.

2    Q    And you worked a total of 35.35 hours, correct?

3    A    Correct.

4    Q    That's much less than the 45, 47 hours that you recall

5    working every week, correct?

6    A    Sometimes I work less, yes.

7    Q    But if you look at the following week, right, you

8    didn't -- of that week, there were three days that you didn't

9    punch out, right?

10   A    That's what it looks like, yes.

11   Q    So you don't remember when you stopped working that week

12   and if you had punched out we would know when you stopped

13   working on those days, right?

14        THE COURT:  That's a complex, double question.  You

15   want to ask your questions one at a time.

16   Q    I'm sorry.  You don't know when you stopped working those

17   days, right?

18   A    If you'll allow me to answer, Monday to -- no.

19   Q    I'm asking you --

20   A    You don't -- I'm not allowed to answer.

21   Q    On June 18th, 2012, you don't remember when you stopped

22   working, correct?

23   A    Very late.  Communion, baptism, a very, very busy month.

24   Q    I'm not asking --

25   A    That's my answer.

LUONGO – CROSS – LABUDA

1    Q    Do you remember when you stopped working that day?

2    A    Eleven, 12:00 o'clock at night.

3    Q    I'm not asking you for an approximation.  You didn't

4    punch out that day.  As you sit here today, now we're into

5    June of 2017, do you remember when you stopped working?

6    A    About 10:30, 11 o'clock.

7    Q    I'm not asking you for an about.

8    A    Late.

9    Q    What time?  Do you remember the time?

10   A    I said about 10:30, 11:00 o'clock.

11   Q    I'm not asking you for that, Mr. Luongo.

12             THE COURT:  What are you asking him for?  Are you

13   asking the time --

14             MR. LABUDA:  I'm asking for the exact time --

15             THE COURT:  -- excuse me.  You want to make your

16   questions clear.  You asked him a time and he gave you a time.

17   BY MR. LABUDA:

18   Q    What's the exact time that you stopped working that day?

19   A    As I said, June was a busy month for communion, baptism

20   and we would always leave late at night, 10:30, 11:00 o'clock.

21   Q    But you didn't punch out?

22   A    That's what it looks like.

23   Q    And the next day on the Wednesday you didn't punch out

24   either, right?

25   A    That's what it looks like.

LUONGO – CROSS – LABUDA

1    Q    And the next day you didn't punch out, right?

2    A    Correct.

3    Q    And had you punched out, we would know exactly when you

4    stopped working, correct?

5    A    Yes.

6    Q    Now it was your responsibility to punch in and out every

7    day, right?

8    A    It was my responsibility, but it's --

9    Q    Thank you.

10         THE COURT:  I'm sorry, does that document for that

11   week reflect the total number of hours on the sheet?

12         MR. LABUDA:  It does and it doesn't.  What it does,

13   Your Honor -- and let me explain, right.

14   Q    When it says 6:00 o'clock, that is when the total -- that

15   is when the time card system would automatically punch you

16   out, correct?

17         THE COURT:  All right.  I take it you'll have

18   someone explain these records then?

19         MR. LABUDA:  Yes.

20         THE COURT:  Okay.  I'm sorry.

21   BY MR. LABUDA:

22   Q    But that's the way the system worked, if you didn't punch

23   out it automatically punched you out at 6:00 a.m., correct?

24   A    I wouldn't know exactly that because I'm not a computer

25   guy, so I don't know.

LUONGO – CROSS – LABUDA

1   Q    Did you understand that, that it punched you out at

2   6:00 o'clock in the morning?

3   A    If that's what it says, that's what it is.

4   Q    You didn't work until 6:00 o'clock in the morning,

5   correct?

6   A    No.

7   Q    And it is fair to say that the time card -- the weeks

8   that you were working in 2012 though, I just showed you, those

9   were representative of the hours that you were working in

10  prior years as well, correct?

11  A    Not always.

12  Q    Well, there wasn't any of them, except for the one that

13  was 40.2 that I showed you that was over 40 hours, correct,

14  they were all 40 or less hours, correct?

15  A    According to the machine.

16  Q    Now, you understood that you were getting paid $5 an

17  hour, right?

18           MR. O'NEILL:  At what point in time?

19  A    Nobody told me.

20  Q    Well, your paystub --

21  A    Yes.

22  Q    -- indicated you were getting $5 an hour, right?

23  A    Yes.

24  Q    So you understood from your paystubs that you were

25  getting $5 an hour, right?

LUONGO - CROSS - LABUDA

1  A    It wouldn't reflect the amount of money I was making

2  every week paid by Russo's On The Bay.

3  Q    It would reflect the $5 an hour --

4  A    It would say for hours, yes.

5  Q    Yes, okay.

6        MR. LABUDA:  Emanuel, if you could just turn to

7  Exhibit G.  We'd offer Exhibit G into evidence.

8        MR. O'NEILL:  Can we at least go through the

9  formality of putting it in evidence?

10        THE COURT:  I'm sorry, he's offering it I think.

11        MR. O'NEILL:  I have no objection.

12        THE COURT:  All right, G is received.

13        (Defense Exhibit G, was received in evidence.)

14  BY MR. LABUDA:

15  Q    If you look at the first page, which is January 6th of

16  2013, at the top it has a column called, rate, do you see

17  that?

18  A    Yes.

19  Q    And down below on your line it indicates $5 an hour,

20  right?

21  A    That's what it says, yes.

22  Q    And you understood -- in 2013 you understood you were

23  getting paid $5 an hour, right?

24  A    That's what the paper says.

25  Q    So now let's look at Exhibit F.

LUONGO - CROSS - LABUDA

1           MR. LABUDA:  We'd offer F into evidence.  It's the

2    2012 payroll.

3           MR. O'NEILL:  2012 payroll, no objection.

4           THE COURT:  All right, it will be received.

5           (Defense Exhibit F, was received in evidence.)

6    BY MR. LABUDA:

7    Q    And if you look at D34 -- 434, sorry, of Exhibit F this

8    week, which is the week ending February 19th, 2012, you were

9    getting paid $5 an hour and you worked 39 hours and were paid

10   a total of $195, correct?

11   A    That's what the paper says.

12   Q    If you look at the next page, D435, this week you got

13   paid $5 an hour, you worked 40 hours regular, correct?

14   A    Correct.

15   Q    And you worked five hours of overtime, correct?

16   A    That's what the paper says, yes.

17   Q    For a total of 45 hours, right?

18   A    Yes.

19   Q    You got paid overtime that week you worked overtime,

20   correct?

21   A    That's what the paper says.

22   Q    So when you worked overtime you got paid overtime,

23   correct?

24   A    That's what the paper says.

25   Q    Now let's look at the next page, D436.

LUONGO - CROSS - LABUDA

1              You worked 38 hours and you got paid $190 at the

2    5-dollar an hour rate, correct?

3    A    Yes.

4    Q    And the next week, D437, you worked 34 hours at $5 an

5    hour and you got paid $170, correct?

6    A    That's what the paper says.

7    Q    These are substantially less than what you were claiming

8    in terms of working 40, 45, 47 hours; isn't that accurate?

9    A    Some weeks.

10   Q    Now let's look at Exhibit E, which is the 2011 payroll.

11             THE COURT:  Are you offering E into evidence?

12             MR. LABUDA:  We're going to offer E into evidence.

13             THE COURT:  Any objection?

14             MR. O'NEILL:  No objection.

15             THE COURT:  E is received.

16             (Defense Exhibit E, was received in evidence.)

17             MR. LABUDA:  Now let's look at that first page,

18   Emanuel.

19             MR. KATAEV:  Is that D364?

20             MR. LABUDA:  D364, yes.

21             THE COURT:  I thought we were on E?

22             MR. KATAEV:  Your Honor, that refers to the Bates

23   stamp number.  This is Exhibit E, Bates-stamped D364.

24             MR. LABUDA:  Yes.

25   Q    So this week you got paid $181, right?

Case 1:13-cv-07420-CBA-RML   Document 58   Filed 06/28/17   Page 33 of 129 PageID #: 553

1   A    That's what the paper says.

2   Q    At $5 an hour that comes out to 36 hours, correct?

3   A    That's what it says.

4   Q    So that is 2011.  Let's look at 2010.

5        MR. O'NEILL:  No objection.

6        MR. LABUDA:  Thank you.

7        THE COURT:  Which exhibit is this?

8        MR. KATAEV:  Exhibit D, Judge.

9        MR. LABUDA:  Exhibit D.

10       MR. O'NEILL:  If you could just slow down so I can

11  find the papers --

12       MR. LABUDA:  Yes.

13       MR. O'NEILL:  -- that would help.

14       THE COURT:  Exhibit D is received.

15       MR. LABUDA:  We have the old school books too if you

16  want that, Mr. O'Neill.

17       (Defense Exhibit D, was received in evidence.)

18       MR. LABUDA:  Exhibit D, right, it's on the monitor

19  too as well, Mr. O'Neill.  Exhibit D, Emanuel, if you could

20  turn to page D357.

21       For this week, which is the week ending

22  December 5th, 2010, you got paid $181, correct?

23  A    It says 181.

24  Q    $181?

25  A    Right.

LUONGO - CROSS - LABUDA

1  Q    Correct, right?

2            And did you understand that at point in time the

3  minimum wage for tipped waiters was $4.65, it was lower than

4  the $5?

5  A    That's what -- yeah.  Yeah.

6  Q    And at 4.65 per hour that totals 39 hours for the week,

7  correct?

8  A    Well, it doesn't say the paper 39 but if, yeah, I believe

9  it is probably.

10 Q    Right?

11 A    Yeah.

12 Q    And if you look at D350 --

13           MR. KATAEV:  One second.

14           MR. LABUDA:  Yes.

15 Q    This is the week ending June 27th, 2010, and you got paid

16 $179, correct?

17 A    That's what the paper says.

18 Q    At 4.65 an hour for the tipped wage that comes out to

19 38.5 hours, correct?

20 A    That's what the paper says, yeah.

21           THE COURT:  Does the paper say that?

22           MR. O'NEILL:  No.

23 Q    And let's look at --

24           THE COURT:  I'm sorry, does that say somewhere on

25 the paper the number of hours?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

LUONGO – CROSS – LABUDA

1        MR. LABUDA:  It indicates the total at that rate

2   that's what it comes out to, 4.65.

3        THE COURT:  It doesn't indicate the number of hours

4   on the page, correct?

5        MR. LABUDA:  It does not indicate it on this.

6        THE COURT:  All right.

7   BY MR. LABUDA:

8   Q    Then let's look at Exhibit C.

9        THE COURT:  Are you offering C into evidence?

10        MR. LABUDA:  Yes.

11        THE COURT:  Any objection?

12        MR. O'NEILL:  I don't know what it is, so...

13        MR. LABUDA:  Exhibit C is the 2009 payroll.

14        MR. O'NEILL:  No objection.

15        THE COURT:  All right.  It will be received.

16        (Defense Exhibit C, was received in evidence.)

17        MR. LABUDA:  If you turn to D323, Emanuel.

18        MR. KATAEV:  Okay.

19   Q    Now this indicates you got paid $166, correct?

20   A    That's what the paper says.

21   Q    And at 4.65 for the tip minimum wage that's 35 hours,

22   correct?

23   A    The paper doesn't say that.

24   Q    That's what it comes out to, right?

25   A    Okay, I guess.

Case 1:13-cv-07420-CBA-RML   Document 58   Filed 06/28/17   Page 36 of 129 PageID #: 550

1   Q   You want a calculator?

2   A   No, no.

3   Q   Right.  It comes out to 35.5 hours, okay?

4   A   Okay.

5   Q   And let's look at D319, right.  This week you got paid

6   138 hours, right?

7           THE COURT:  138 hours?

8   Q   $138, apologies.  D319.  Let me just tell you what the

9   week is.  This is the week ending December 6th, 2009, correct?

10  A   Correct.

11  Q   And at 4.65 an hour that comes out to 29.5 hours,

12  correct?

13  A   Could be, yeah.

14  Q   That's what you got paid, you got paid for 29.5 hours

15  right?

16  A   Okay.

17  Q   Now let's look at 2008 which is D -- I'm sorry, Exhibit B

18  that we'll offer into evidence as well.

19          MR. O'NEILL:  No objection.

20          THE COURT:  B as in boy?

21          MR. LABUDA:  B as in boy, yes, Your Honor.

22          THE COURT:  It will be received.

23          (Defense Exhibit B, was received in evidence.)

24  Q   Let's look at this first page -- or second page, this is

25  D8.  You got paid $74 for that week, correct?

LUONGO - CROSS - LABUDA

1    A    That's what the paper says, yes.

2    Q    That's when you were working part time, correct?

3    A    Part time?

4    Q    Yes, part time?

5    A    I never worked part time at Giardino restaurant.

6    Q    Well, at $74 --

7              THE COURT:  I'm sorry, what week is this?

8              MR. LABUDA:  This is -- I'm sorry.  That is the week

9    ending November 9th, 2008.

10             MR. KATAEV:  Where is that now?

11             MR. LABUDA:  That's in the upper left-hand corner,

12   pay period ending.

13   Q    At that time in 2008, the tip minimum wage for waiters

14   was $4.60 an hour, correct?

15   A    I believe so.

16   Q    So you were getting paid for 16 hours, correct?

17   A    According to?

18   Q    According to this document?

19   A    This document right here?

20   Q    Yes.

21   A    Could have been a day -- a week that I took two days off,

22   I only work three days and you say it's part time?

23   Q    Well, there were times that that happened, right?

24   A    You don't call that part time.  Part time when someone

25   works forever part time, I was never working part time.

LUONGO – CROSS – LABUDA

1  Q    Okay.

2  A    Okay.

3  Q    Well, would you say something if you didn't get paid for

4  all your hours, would you complain?

5  A    If I knew how this thing worked, yes.

6  Q    Well you had a wife at that time, right?

7  A    Yes.

8  Q    You had two kids, right?

9  A    Yes.

10  Q    You had a mortgage, right?

11  A    Yes.

12  Q    You had a car payments, right?

13  A    Yes.

14  Q    And are you saying that you had all these obligations but

15  you're saying you worked without getting paid for all the

16  hours?

17  A    My wife worked and I also had something else, rent.

18  Q    Just answer the question.  You're saying that you worked

19  extra hours on certain weeks and you're saying you never

20  complained about that?

21  A    What do you mean extra hours complaining?

22  Q    Well, this week that I'm showing you is for 16 hours,

23  right?

24  A    Right.

25  Q    You may have worked 16 hours that week when you only

1    worked two days or something like that?

2    A    That was my choice, yes.

3    Q    Right, exactly.  But you're saying that there were weeks

4    when you worked more hours and you didn't get paid for all the

5    hours?

6    A    What I'm saying is that I never understood how this thing

7    worked.

8    Q    But you didn't ask Susanna, PJ?

9    A    I didn't ask Susanna.  I asked the previous managers in

10   the past, and they always answered me I'll talk to Mr. Russo,

11   I'll talk to whoever, but there was not, you know, it was

12   never coming back to me or the other waiters saying, okay,

13   Max, we have a meeting or we'll explain that to you.

14   Q    You could have -- if you thought you weren't getting paid

15   you could have quit, right, for that?

16   A    That was my choice.

17   Q    Right.

18   A    That was my choice to stay or to quit.

19   Q    You worked there for 16 years, right?

20   A    I worked for 16 years, yes, absolutely, yes.

21   Q    And you could have gone to all these other restaurants --

22   A    To start --

23   Q    -- right?

24   A    Well, I tried.

25   Q    But you always came back.  You worked at Sunrise --

LUONGO – CROSS – LABUDA

1   A   The door was always open for me, that's from Mr. Russo.

2   Q   When you worked at Cardozo, right, you worked in the

3   cafeteria there, right?

4   A   Yeah, the kitchen.

5   Q   Kitchen?

6   A   Yeah.

7   Q   You worked at Russo's part time, right, you worked at

8   Cardozo's during the day, and then Russo's part time?

9   A   Giardino.  Giardino.

10  Q   I'm sorry, Giardino's?

11  A   Yes.

12  Q   Right?

13  A   Yes.  Part time.  I will come back, you know, like

14  4:00 o'clock to work, would go back home and come back.

15  Q   More like dinner shifts and the weekends, right?

16  A   Yes.

17  Q   Less hours, right?

18  A   I would say so.

19  Q   Now is it to fair to say you were confused about how you

20  got paid?

21  A   Yes, not only me.

22  Q   You didn't understand exactly how you got paid?

23  A   No.

24  Q   Now you signed statements indicating that you got paid $5

25  an hour, right?

LUONGO – CROSS – LABUDA

1    A    Right.

2    Q    Right?

3    A    Yeah.

4    Q    You can turn to Exhibit X?

5              THE COURT:  Is X in evidence?

6              MR. LABUDA:  We offer it into evidence.

7              MR. O'NEILL:  No objection.

8              THE COURT:  X will be received.

9              (Defense Exhibit X, was received in evidence.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LUONGO - CROSS - LABUDA

1  CROSS-EXAMINATION (Continued)

2  BY MR. LABUDA:

3  Q    You have X in front of you, Mr. Luongo?

4  A    Yes.

5  Q    Okay.  This is a wage statement form that you signed,

6  correct?

7  A    Correct.

8  Q    Okay.  And you signed these in prior years as well, you

9  signed one in 2011, and '12, correct?

10 A    Yes.

11 Q    And this indicates that in box three, Section 3, it

12 indicates that you got paid $5 per hour, correct?

13 A    Yes.

14 Q    Okay.  And you see below in box four, it says "allowance

15 taken," it says "tips, 2.25," correct?

16 A    Yes.

17 Q    Okay.  So you understood minimum wage was 7.25, they were

18 taking out -- I'm sorry, minimum wage was 7.25, they were

19 taking out $2.25 for the tip credit and you were getting paid

20 $5 an hour, correct?

21 A    According to this paper.

22 Q    Yes, exactly.  And that's what you signed in prior years

23 telling you that that's what Giardino's was going to do, they

24 were going to pay you less than the minimum wage?

25 A    Right.

LUONGO – CROSS – LABUDA

1        MR. O'NEILL:  Objection.  Compound.

2   Q    -- because you made tips?

3   A    It was on tips.

4   Q    Yes.

5   A    A hundred percent.

6   Q    Okay, and just so I understand, the signature on this

7   page, this is your signature?

8   A    It is mine, yes.

9   Q    And you knew that that's how the restaurant was doing it

10  in 2010, '9, '8 as well, they were paying you less per hour

11  because you were getting tips, correct?

12  A    According to the paper, yes.

13  Q    Right.  So you knew that for basically all the time that

14  you worked there, you got paid less per hour because you made

15  tips, correct?

16  A    When I signed this paper.  Not all the time.

17  Q    Okay.  So at least from 2008, correct?

18  A    When I signed this paper, it says 2000 on the thing,

19  2012.

20  Q    Okay.

21  A    It doesn't say 2008.

22  Q    I understand.  You understood that back in 2008 as well,

23  correct?

24  A    Yes.

25  Q    You understood that you got paid a little less per hour

LUONGO – CROSS – LABUDA

1    because you made tips, correct?

2    A     Right.

3    Q     Okay.  Right you -- the kitchen guys may have made more

4    than you per hour, but they didn't make tips, correct?

5    A     Yeah, I don't know whether they got paid per hour or they

6    were paid weekly or daily, I don't know.

7    Q     But your general understanding is the kitchen guys would

8    get paid more per hour, but they didn't get paid tips, right?

9    A     Right.

10   Q     And you and the other waiters, you got paid less per hour

11   because the company was taking -- the restaurant was taking a

12   little -- taking a tip credit and you got paid a little less

13   per hour, correct?

14   A     Yes.

15   Q     And you made up for that in tips, correct?

16   A     That's what I was told, yeah.  That's what my job was,

17   working on tips.

18   Q     And there was also a wage poster in the locker room

19   downstairs, correct?

20   A     I believe it was in the Tuscany room.  I believe, yeah.

21   Q     But it indicated the minimum wage, the tip credit and all

22   that information, correct?

23   A     Lately, yes.

24         THE COURT:  What do you mean "lately?"

25         THE WITNESS:  Yeah, in the last two years, three

LUONGO – CROSS – LABUDA

1    years.

2    Q    Since 2008, correct?

3    A    I would say so, yes.

4    Q    Okay.  And you also -- at the end of the year, you also

5    got a Christmas bonus from Giardino's, correct?

6    A    Christmas bonus.  If you tell me when, I would be happy

7    to.

8    Q    Well, I'm going to guess it's around Christmastime.

9    A    What year.  You have to have something that -- you know,

10   to show me that had a bonus.

11   Q    Okay.

12   A    You have to show me something that had a bonus.  Show

13   that to me.

14   Q    All right, so let me show you this.  Let's turn to

15   Mr. Luongo's deposition transcript page 110, line 3.

16           "QUESTION:  Did you guys get any type of like

17   Christmas bonus or end of year bonus from the restaurant?

18           "ANSWER:  I remember the last bonus was in check

19   $99.  It was a regular check.  It was about 2000, probably.  I

20   don't recall exactly, but 2012, 2012 probably."

21   A    I would say probably before that we received a check for

22   a hundred dollars, taxed on it, of course.  It was probably

23   75, $80.

24   Q    Well, you got to pay taxes on it?

25   A    Yes, of course; yes.  But that's what -- I'm trying to be

LUONGO - CROSS - LABUDA

1   honest, you know.

2   Q    Well, that's what you're here for, to tell the truth,

3   right?

4   A    Right.  Absolutely.  Absolutely.

5   Q    Now, you can see, going through the paystubs -- you know,

6   paychecks and whatnot, that your pay fluctuated, correct?

7   A    My pay?

8   Q    Yes, it changed, right?

9   A    Right.

10  Q    Right.  And did you ever -- you never anyone why it was

11  changing, correct?

12  A    As I said, I asked a few managers in the back -- back in

13  the years, but we never had an answer.

14  Q    Okay.  Do you remember me asking you -- Emanuel, can you

15  turn to page 230.

16          Do you remember me asking you the following question

17  and giving the following answer when I was asking you

18  questions during your deposition?

19          "QUESTION:  All right.  Did you ever ask anybody why

20  your regular pay each week would fluctuate?  Why it would

21  change?

22          "ANSWER:  No."

23          MR. O'NEILL:  What line is that?

24          MR. LABUDA:  I'm sorry, page -- this is line 21

25  through 25.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

LUONGO - CROSS - LABUDA

1   Q    Do you remember giving those answers and being asked that

2   question and giving that answer?

3   A    Yes.  Yes, what it says.

4   Q    And that's different from what you just told the jury,

5   right?

6   A    Yes.

7   Q    Now, with respect to your tips, your tips also fluctuated

8   as well depending on the day, correct?

9   A    Yes.

10  Q    All right.  Mondays you might make 80, $100, correct?

11  A    Sometimes a little more.  Depends on the party.

12  Q    Depends on the day.

13  A    Right.

14  Q    Wednesday you might make $150, correct?

15  A    Right.

16  Q    Saturday and Sunday -- or Saturday, though, was a big

17  day, 200, $250, correct?

18  A    Right.

19  Q    Right?

20  A    Right.

21  Q    And Sunday you'd made like $200 in tips, right?

22  A    Yeah.

23  Q    You earned about $750 a week in tips, right?

24  A    Yeah.

25  Q    And the way that it worked was that with the computerized

LUONGO – CROSS – LABUDA

1   system that we've shown in 2011 and '12, when that system was

2   in place, at the end of the night, you had to punch in your

3   tips when you punched out, correct?

4   A    Yes.

5   Q    Okay, so you had to -- you had to declare how much you

6   were making in tips, correct?

7   A    It was on the paper as well.

8   Q    Yes, but it was in the computer, you would put in -- you

9   would log out, Massimiliano Luongo, 9:35, and you put in X

10  amount of dollars for tips?

11  A    I think so.

12  Q    Right, and that was the system.

13        So when you testified earlier in terms of the

14  manager asking you how much you declared, that's not the

15  system, the system was you punched it in yourself, you told

16  the restaurant how much you made in tips, correct?

17  A    It was -- we tell the managers.

18  Q    Right, but that -- that was the system and how it worked.

19        Now, you did not declare all your tips, correct?

20  A    No.

21  Q    Right, there were times that you didn't report all the

22  income, all the tips that you got, correct?

23  A    Probably 20 percent of tips.

24  Q    Yes, you would declare about 20 percent less, that's like

25  80, $150 a week, right?

LUONGO - CROSS - LABUDA

1   A    If I was making $700, I would say 550, 6.  I would never

2   go $50 or $150.

3   Q    Let's say if you're making $750, at 20 percent that's

4   $150 a week, correct?

5   A    Less.

6   Q    Yes, less.

7   A    So that means that whatever -- it was less, it was 550,

8   that's what I would declare.

9   Q    That's what you would declare.  You make 750, and you

10  declare 550, right?

11  A    Right.

12  Q    And you saw the declared amount of your tips in -- on

13  your paystub, right?  That's the amount that you put down,

14  right?

15  A    Right.

16  Q    Okay.  And then that amount would be the amount that

17  you -- that was put into your W-2 at the end of the year,

18  correct?

19  A    Right.

20  Q    Okay.  And you never declared any extra income when you

21  filed your tax returns, correct?

22  A    When we do taxes, the taxes with my wife, it's a family

23  plan.

24  Q    You only reported the W-2 of the amount of tips that you

25  declared, correct?

LUONGO - CROSS - LABUDA

1  A    From the restaurant, yes.

2  Q    So that would be 20 percent less that you did not

3  declare, correct?

4  A    Could be, yeah.

5  Q    Okay.  And you put that on your taxes, correct?

6  A    Right.

7  Q    Okay.  And you signed your taxes every year?

8         THE COURT:  Put what on his taxes?

9  Q    You put the 80 percent of your tips on the taxes, not the

10 100 percent of your tips in your taxes, correct?

11 A    Right.

12 Q    Okay.  And so you would declare -- if you made, let's

13 say -- let's say $20,000 in tips, you would declare $16,000 in

14 tips.  That would show up on your W-2, and you would say I

15 only made $16,000 in tips, correct?

16 A    Yes.

17 Q    Okay.  And you signed that under the penalty of perjury,

18 correct?

19         You swore to tell the truth on your taxes, right?

20 A    I signed it.

21 Q    Okay.

22 A    And I would give the paper to my accountant.

23 Q    Okay.  And the tax returns indicates that you need to

24 sign it under penalty of perjury, correct?

25 A    Right.

LUONGO - CROSS - LABUDA

1   Q     Right?  And that's the same oath that you took today to

2   tell the truth and say -- and say, you know, what hours you

3   were working, correct?

4   A     Right.

5   Q     Okay.  Now, and during your deposition when I was asking

6   you about your taxes, you asserted your Fifth Amendment right

7   against self-incrimination, correct?

8   A     Right.

9   Q     Right?  You understood that that means that you were --

10  you didn't want to answer questions because you didn't want to

11  incriminate yourself about your taxes, correct?

12  A     When I was doing taxes, I was not doing taxes myself.  I

13  would give the papers to the accountant and sign the paper for

14  my return from going to him and that's about it.

15  Q     Okay.  Well, do you remember me asking you the following

16  questions, and this is page 139, line 25 into page 140.

17          "QUESTION:  Are you going to follow your attorney's

18  advise and not answer the question based on your

19  Fifth Amendment privilege?

20          "ANSWER:  Yes.

21          "QUESTION:  Okay.  And you understand that the

22  Fifth Amendment privilege has to do with self-incrimination?

23          "ANSWER:  Yes."

24  Q     Do you see that?

25  A     Yes.

LUONGO – REDIRECT – O'NEILL

1   Q    You took the Fifth Amendment when I was asking you

2   questions about your taxes, correct?

3   A    That's what it says.

4   Q    Now, in this case, you think you should have been paid

5   that $5 an hour for extra hours that you think you worked,

6   correct; $5 an hour, 4.60, 4.65, correct?

7   A    Right.

8   Q    Do you know how many hours you think you worked extra

9   that you didn't get paid?

10  A    I don't have an idea.

11  Q    Do you know how much you think you're owed?

12  A    No.

13          MR. LABUDA:  Just bear with me one minute, Your

14  Honor.

15          (Pause.)

16          MR. LABUDA:  I don't have any other questions.

17          THE COURT:  Anything on redirect?

18          MR. O'NEILL:  Yes, Your Honor.

19  REDIRECT EXAMINATION

20  BY MR. O'NEILL:

21  Q    Good morning, Massimiliano, how are you?

22  A    Good, how you doing?

23  Q    Good.

24          Now, do you have a calculator on your phone?  Oh,

25  you don't have your phone with you.

LUONGO - REDIRECT - O'NEILL

1   A    No, I don't.

2             MR. O'NEILL:  Your Honor, may I lend the witness my

3   calculator?

4             THE COURT:  Yes.

5   Q    Now, in 2008, what was the minimum wage?

6   A    It was 65, as I remember.

7   Q    Okay.  Now, you were asked some questions about your

8   74-dollar paycheck in 2008.  Do you remember being asked

9   questions by Mr. Labuda?

10  A    Right.  Yes.  Yes.

11  Q    And he said, isn't it true if you divide 74 by 4.65, it

12  comes out to 16 hours?

13            Do you remember that?

14  A    Yes.

15  Q    Did you actually do the math?

16  A    No, I don't.

17  Q    Would you do it now with the calculator?

18  A    Seventy-four divide by 4.65, right?

19  Q    By whatever Mr. Labuda said, I don't know.

20            MR. LABUDA:  I had said, this is for 2008, it was

21  4.60.

22            MR. O'NEILL:  4.60.  4.60.

23  A    Comes out to 16.

24  Q    Exactly?

25  A    160869565.

LUONGO - REDIRECT - O'NEILL

1  Q    Okay, so it's 16.08, right?

2  A    Right.

3  Q    Okay.  So it's not 16 hours; is it?  In other words, if

4  you worked 16 hours and multiplied it by $4.60, it's not going

5  to be $74, right?

6           MR. LABUDA:  Objection.  This is argumentative and

7  leading.

8           THE COURT:  Overruled.

9           You want to have him multiply --

10          MR. O'NEILL:  16.

11          THE COURT:  -- times 4.60?

12          MR. O'NEILL:  By 4.60.

13 A    7360.

14 Q    Okay.

15          Now, you realize that you don't have to agree with

16 something that Mr. Labuda says to you, right?

17          MR. LABUDA:  Objection.  Objection.

18          THE COURT:  I will sustain the objection.

19          MR. O'NEILL:  Yes, Your Honor, understood.

20          THE COURT:  I repeated it because the court reporter

21 didn't hear, me.

22          MR. O'NEILL:  Oh, I'm sorry.

23 Q    You were asked some questions about a meal break.

24 A    Right.

25 Q    Were you ever free to leave the restaurant during the

LUONGO – REDIRECT – O'NEILL

1    meal break?

2    A    No.

3    Q    And if there were customers, would you have to wait on

4    the customers during your so-called meal break?

5    A    Absolutely.  Who else would do that?

6    Q    I'm sorry?

7    A    Who else would do that?

8    Q    I don't know.

9            Now, you were asked about punching and time keeping

10   machine.

11           When's the first time there was a system for keeping

12   track of your time?

13   A    The last one was --

14   Q    The first, the first.

15   A    Oh, the first?

16   Q    Yes.

17   A    Ah, punch in was in -- the real one, in 2012, the new

18   one.

19   Q    The fingerprint.

20   A    The fingerprint, yes.

21   Q    Is that the first time they kept track of your hours

22   coming and going?

23   A    Yes.

24           THE COURT:  What year was that?

25           THE WITNESS:  2012.

PROCEEDINGS

1      THE COURT:  Prior to that, you're not aware that

2  your hours were calculated?

3      THE WITNESS:  No.  Not from us.  You know, we would

4  come in, punch in on the computer where we would initiate a

5  table to put the order in to the kitchen, the bar, and that's

6  what we would do.

7      THE COURT:  When would you do that, when you first

8  came in?

9      THE WITNESS:  Yes.

10      THE COURT:  So you punch in to show that you were

11  there with your number.

12      THE WITNESS:  Yes; my number, yes.

13      THE COURT:  Was there anything that you did to

14  signal you're leaving?

15      THE WITNESS:  I would close it, like out.  It was my

16  number would be always on.

17      THE COURT:  Would that realistically represent the

18  time that you were there?

19      THE WITNESS:  I wouldn't know that.

20      THE COURT:  No, what I mean is, when you punched in

21  the computer, you did that when you came?

22      THE WITNESS:  Oh, yeah.

23      THE COURT:  When you closed it, that's when you

24  left?

25      THE WITNESS:  Yes.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1    THE COURT:  So that would approximate the time you

2    were there then, right?

3    THE WITNESS:  Yes.  Yes, that means that I wouldn't

4    have any tables I was ready to leave.

5    THE COURT:  And that's the initial -- that's what

6    you did when you first came in, when you first began to work?

7    THE WITNESS:  Yes.

8    THE COURT:  And then there came a fingerprint system

9    in 2012.

10   THE WITNESS:  Yes.

11   THE COURT:  Did you also punch in with your number?

12   Did you do that same thing?

13   THE WITNESS:  It was a punching in in the morning in

14   the room by the entrance, and then I was also punching in on

15   the computer.

16   THE COURT:  Putting your number in?

17   THE WITNESS:  Yeah, the computer that initiate a

18   table, you know.

19   THE COURT:  Right.  So in 2012, you also followed

20   the old practice as well, which is logging into the computer

21   for your table.

22   THE WITNESS:  Right.

23   THE COURT:  And then closing out at the end.

24   THE WITNESS:  Closing out at the end of the night,

25   yes.

LUONGO - REDIRECT - O'NEILL

1      THE COURT:  So you did that plus this fingerprint

2  system.

3      THE WITNESS:  Yes.

4      THE COURT:  Okay.

5  BY MR. O'NEILL:

6  Q    You said "initiating a table," what did you mean by that?

7  A    When you take an order at the table, everything has to be

8  put in the computer.

9  Q    Is that the first time you would put something in the

10  computer, when you got an order?

11  A    In the morning, at lunch, first table you would -- you

12  know, you wouldn't do it by voice, you put everything in the

13  computer.

14  Q    Right, but the question I'm asking you is this:  Before

15  you got an order, did you sign into the computer?

16  A    I had to sign in, yes.

17  Q    Okay.  And that was when exactly?

18  A    In the morning?  Oh, you mean the year?

19  Q    No.  In terms of arriving at work, did you do anything

20  before you signed in?

21  A    I was already dressed up, so the first thing that I would

22  do, I would clock in.  I mean, punch in my number and -- and

23  wait for a table to come.

24  Q    That was the point of sales system, right?

25  A    Point of sales, yes.

LUONGO - REDIRECT - O'NEILL

1   Q    They didn't always have that system.

2   A    Say again?

3   Q    Did they always have this system?

4   A    Yes, for many years.

5   Q    Now, you were asked about your paystubs and you were

6   asked questions about whether they were accurate.

7         Do you remember those questions?  Or did they

8   accurately reflect the number of hours that you worked?

9   A    Yes, I remember.

10  Q    Okay.  Did you ever see your time sheets, your sign-in

11  and sign-out sheets --

12  A    No.

13  Q    -- you were shown today?

14        When you were working at Giardino's, did they ever

15  show those to you?

16  A    No, because that was more like paperwork for managers,

17  you know, in the office I believe work.

18  Q    Okay.  And you didn't keep track of your own hours; did

19  you?

20  A    No.

21  Q    So how would you know if the hours in your paycheck were

22  accurate?

23  A    I wouldn't know.

24  Q    Okay.  So you assumed, is that what did, you just assumed

25  they were accurate?

LUONGO – REDIRECT – O'NEILL

1   A     Yes.  Well, by schedule, by arriving in the morning at 11

2   and leaving like at 10:00 or 11:00 at night, you know, I would

3   count this 12 hours.  But it was like more mental.  You know,

4   it was like almost repeating a routine every day.  Because the

5   schedule is almost the same, unless I wanted to, you know,

6   have an extra day off.  Leaving an hour earlier some days,

7   half hour, or because the manager would tell me, Max, it's not

8   busy so you could leave a half hour early, the other waiter's

9   gonna take care of it.

10  Q     All right.  Now --

11        MR. O'NEILL:  Your Honor, I'm going to introduce

12  Plaintiff's Exhibit 12.  These are the weekly time sheets.

13  It's all of them as opposed to broken out by years.

14        MR. LABUDA:  We don't have that.

15        MR. O'NEILL:  Well you gave it to me.

16        MR. LABUDA:  We don't have copies of your exhibits

17  when you're introducing them.

18        MR. O'NEILL:  Oh, sure.

19        MR. LABUDA:  We don't have any objection, Your

20  Honor.

21        THE COURT:  What are you representing Exhibit 12 to

22  be?

23        MR. O'NEILL:  These are the weekly time sheets

24  printed out by Giardino's.

25        THE COURT:  For what time period?

LUONGO – REDIRECT – O'NEILL

1              MR. O'NEILL:  The first entry is February 3, 2012,

2    and the last entry is October 20, 2013.

3              THE COURT:  October what?

4              MR. O'NEILL:  October 20, 2013.

5              THE COURT:  All right, so Exhibit 12 will be

6    received in evidence.

7              (Plaintiffs Exhibit 12, was received in evidence.)

8              MR. LABUDA:  Your Honor, could we just have a

9    sidebar just on this?

10             (Continued on the next page.)

11             (Sidebar conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1  　　　　MR. LABUDA:  Okay, these documents were produced,

2  you know, to the plaintiff.  These are documents that were

3  made after the case began.  In terms of the handwriting, it

4  would be the handwriting here indicates the total hours

5  assuming the end of the shift, so these are made after

6  litigation.

7  　　　　THE COURT:  By who?

8  　　　　MR. LABUDA:  By one of the managers to indicate what

9  these hours were.  So they're not -- this is not like their

10  payroll system.  This document was used in terms of settlement

11  to show this is the total hours assuming -- because he doesn't

12  punch out, assuming that he's not working 12 hours and 12

13  hours and 10 hours, it's just indicating that's the total

14  hours are listed on there.

15  　　　　MR. O'NEILL:  What I understood, when it was

16  produced, Your Honor, was that those are the hours, the total

17  hours the restaurant was open.

18  　　　　MR. LABUDA:  Yes.

19  　　　　MR. O'NEILL:  Frankly --

20  　　　　MR. LABUDA:  That's fine.  Yes, they're the hours --

21  　　　　MR. O'NEILL:  And I'm not going to pretend they're

22  anything but that, to the extent that I even refer to them.

23  I'm just using it because your copy was poor and hard to see

24  and this is more legible.

25  　　　　MR. LABUDA:  The hard copy is a good copy --

SIDEBAR CONFERENCE

1          MR. O'NEILL:  It is?

2          MR. LABUDA:  -- of these.

3          MR. O'NEILL:  All right.

4          MR. LABUDA:  I just think it's confusing and they

5    were done after the fact.

6          MR. KATAEV:  It's prejudicial --

7          THE COURT:  Can we have one lawyer argue --

8          MR. KATAEV:  I'm sorry.

9          THE COURT:  -- the issue?  If you want to take the

10   laboring law and argue at sidebar, that's fine, but we're not

11   going to listen to two different lawyers.

12         MR. KATAEV:  Sorry.

13         THE COURT:  The problem is this is not the way the

14   document appeared, it's not the way it appeared in this

15   record.

16         MR. LABUDA:  Correct.

17         THE COURT:  Do you have a copy that doesn't have

18   this writing on it?

19         MR. O'NEILL:  Somewhere I'm sure I do, yes.

20         MR. LABUDA:  Yes, I think he's offered --

21         MR. O'NEILL:  We had a stipulation that this could

22   be used --

23         MR. LABUDA:  No.

24         MR. O'NEILL:  -- and so I got my notes on my working

25   copy and so it's going to just I'm going to have to now --

SIDEBAR CONFERENCE

1          MR. LABUDA:  But that's -- this is not one of the

2     exhibits that's listed in their witness handwriting.  This

3     isn't one of the ones that we -- and we went through this.

4     This is 2012, January through there.  This is the same

5     document that I was using, it's exhibit, I think it's --

6          MR. KATAEV:  G.

7          MR. LABUDA:  No, it's Exhibit T, I think.

8          So he can just use Exhibit T, which, again, if he's

9     got an issue with the copy, it's a clean copy --

10         MR. KATAEV:  Yes.

11         THE COURT:  You don't have a clean copy of something

12    that looks like this?

13         MR. O'NEILL:  I could redact.  I'm not -- I can

14    redact.

15         MR. LABUDA:  Your Honor, if we can just show you

16    Exhibit T in here.

17         THE COURT:  Does it look like this without the

18    numbers?

19         MR. O'NEILL:  Except it has no Bates stamp because

20    it wasn't produced in discovery.  When they listed their

21    exhibit on the pretrial order, they listed it by Bates stamp.

22    I looked it up by Bates stamp and they were illegible.  So

23    they've now created a legible copy that I never got.

24         MR. LABUDA:  In the copy that Mr. O'Neill received,

25    you know, for all the exhibits, is a clean copy.  I can

SIDEBAR CONFERENCE

1    acknowledge that it's a --

2              THE COURT:  Is this the clean copy?

3              MR. LABUDA:  Yes.

4              THE COURT:  If it is, just remark this --

5              MR. O'NEILL:  Okay.

6              THE COURT:  -- as 12 and use it.

7              MR. LABUDA:  Thank you, Your Honor.

8              THE COURT:  Make sure he thinks it's the same thing.

9    I mean, it's just as legible.

10             MR. O'NEILL:  Yes, I don't have any problem with

11   that.

12             MR. LABUDA:  Okay.

13             THE COURT:  All right, then offer this -- if you

14   want to call it Plaintiff's 12.

15             MR. O'NEILL:  Well, T is in?

16             MR. LABUDA:  T is already in evidence.

17             MR. O'NEILL:  I don't need to --

18             THE COURT:  Okay, then use it.

19             T is in?

20             MR. LABUDA:  Yes, T is in evidence.

21             Does Your Honor want to have the books here?

22             THE COURTROOM DEPUTY:  No.

23             (End of sidebar conference.)

24             (Continued on the next page.)

25

LUONGO - REDIRECT - O'NEILL

1   BY MR. O'NEILL:

2   Q    Okay, Massimiliano, you were shown some of the time

3   sheets during your cross-examination.

4            May I have them online, Your Honor?

5            THE COURT:  I'm sorry, what?

6            MR. O'NEILL:  I Just need the Elmo.

7            THE COURT:  It's on.  There you go.

8   BY MR. O'NEILL:

9   Q    All right, so now this is the beginning of 2013.  Can you

10  read the exhibit all right, Massimiliano?

11  A    Yes.  Yes.

12  Q    Okay.  Now, the first day there is, of course, January 1,

13  2013.

14            Do you remember January 1, 2013?

15  A    No, I don't remember.

16  Q    And do you remember January 4, 2013?

17  A    No, I don't remember.

18  Q    Or January 5, 2013?

19  A    No.

20  Q    January 6, 2013?

21  A    No.

22  Q    So you really -- would you be able to say from looking at

23  this whether these are accurate?

24  A    No.

25  Q    Okay.  Now, the entry for January 1, 2013, is 1902.

LUONGO - REDIRECT - O'NEILL

1    That's 7:02 in the evening, correct?

2    A    Yes.

3    Q    Okay.  Now, I'm going to tell you that that was a

4    Tuesday.

5          Now, does that make sense to you, showing up for

6    work at 7 in the evening?

7    A    Coming from Freeport, Long Island?  No.

8    Q    Wherever you're coming from --

9    A    Right.

10   Q    -- did you have any shifts that began at 7 in the

11   evening?

12   A    On Tuesday, no, not that I recall.

13   Q    Did either of your shifts, lunch or dinner, start at 7 in

14   the evening?

15   A    No.

16   Q    Now, the next day, January 4, and that's a Friday, shows

17   a punch in at 8:14 in the evening.

18          Did you come to work at 8:14 in the evening?

19   A    No.

20   Q    Did any of your shifts begin at 8:14 in the evening?

21   A    No.  But sometimes I would come in for the late party.

22   Q    You were scheduled to work Fridays.

23   A    Right.  Right.

24   Q    Okay.  So if you came in for a late party, do you think

25   you would have had to stay late, right?

LUONGO - REDIRECT - O'NEILL

1   A    Right.

2   Q    And that Saturday and Sunday, 11:31, and it could be 51,

3   11:43, those are normal starting times, correct?

4   A    Yes.

5   Q    Okay.  Now, can you, using normal leaving time, add up

6   the number of hours that if these time records or sign-in

7   times are accurate, would show -- would be how many you

8   worked?  In other words, if you actually did come to work at

9   7:00 on Tuesday, how late would the restaurant open on

10  Tuesday?

11            MR. LABUDA:  Objection, Your Honor.  Hypothetical.

12            THE COURT:  Overruled.

13            Do you remember how late -- in 2013, do you remember

14  how late the restaurant was open on Tuesdays?

15            THE WITNESS:  I don't remember exactly, but I could

16  tell you if I woke up at 7:00 because there was a party, so I

17  guess give it like four hours.

18  BY MR. O'NEILL:

19  Q    Four hours?

20  A    And the party it's 11, by the time you clean, by the time

21  you leave.

22  Q    And for the Friday coming at 8, would that be four hours,

23  three hours?  What would it be?

24  A    Could be a party as well.  Could be --

25  Q    Well, how many hours would that be?

LUONGO - REDIRECT - O'NEILL

1    A    Oh, I'm sorry, Friday, 12, 12:30.

2             THE COURT:  How many hours?

3    Q    How many hours would you work?

4             THE WITNESS:  I'm sorry.

5    A    Four, five.

6    Q    Four to five.

7             And on Saturday, coming in at 11, I think that's

8    11:51, you would work, you said, on Saturdays 'til about 10:00

9    if you worked a double?

10   A    Yes.  10, 10:30.

11   Q    So make that 11 hours?

12   A    Uh-huh.  Yes.

13   Q    And on Sunday 11:43, Sunday closed a little earlier?

14   A    Sunday we would close at 10:00, probably 9.

15   Q    Okay, so nine hours?

16   A    Yeah.  Yes.

17   Q    Nine hours would take you to 8:43.  Maybe ten hours?

18   A    Yes.

19   Q    Now, if you add that up, four -- four to five, eleven and

20   ten, that's under 30 hours, right?

21   A    Yes.

22   Q    All right.  Now, do you know how many hours you were paid

23   that week?

24   A    No, I don't.

25   Q    All right.  You were paid 35 hours that week.

212

LUONGO - REDIRECT - O'NEILL

1    A    Okay.

2    Q    So --

3              THE COURT:  Where are you getting that figure from,

4    Counsel?

5              MR. O'NEILL:  From the records, Your Honor.

6              THE COURT:  Well, you're not allowed to testify.

7    Q    This is the first page of Plaintiff's Exhibit 6, which

8    are the 2008 records.

9              Do you see there how many hours you were paid for?

10             MR. LABUDA:  Do you have a page?

11             MR. O'NEILL:  D164.

12             MR. LABUDA:  Okay.

13             THE COURT:  This is now 2008?

14             MR. O'NEILL:  '13.

15             THE COURT:  I thought you said -- you said "2008."

16             Can you show where that document has a date on it,

17   and where does this document appear, what exhibit is it?

18             MR. O'NEILL:  Well, it's Plaintiff's Exhibit 6.

19             THE COURT:  All right, Plaintiff's Exhibit 6.

20             All right, so that's a paystub for January --

21   payroll record for January 6th, 2013.

22             That's the week ending January 6th, 2013?

23             MR. O'NEILL:  That's correct.

24             THE COURT:  Okay, do you want to go down and ask

25   another question?

LUONGO – REDIRECT – O'NEILL

1    MR. O'NEILL:  Sure.

2    Q    So knowing now that you were paid 35 hours for that week,

3    did the defendant pay you according to their own time records?

4    A    No.

5    Q    Now, going back to this exhibit with the punch-in and

6    punch-out records, do you remember that you did not punch out

7    on January 1, 2013?

8    A    No.

9    Q    Or January 4?

10   A    No.

11   Q    Or the rest of the days of that week?

12   A    No.

13   Q    Okay.  So when you're shown this document, all you're

14   doing is reading the document, correct?

15   A    Correct.

16   Q    You don't know if the document's accurate; do you?

17   A    Correct.

18   Q    Now, when I asked you how often you forgot to punch out,

19   do you remember what you told me?

20   A    Yes.  Not too many times.

21   Q    And is that from memory?

22   A    Yes, from memory and from calling the restaurant and

23   saying, Can you clock me out, please?

24        Seventy-nine and 140 times not clocking out?  I

25   don't know, it seems –– it seems –– at least the manager was

LUONGO – REDIRECT – O'NEILL

1  supposed to come to me and say, Max, what's going on?

2  Q    Okay, forget about what the manager's supposed to do.

3        Are those numbers, 79 and 100, whatever it is, are

4  they consistent with your memory?

5  A    No.

6  Q    Okay.  Do you know why the defendant's computer system

7  shows so many zero, six, zero, zero --

8  A    No.

9  Q    -- checkouts?

10 A    No.  The computer was in the office.  I don't know.

11 Q    Nobody ever said to you that you were causing a problem

12 by never punching out; is that correct?

13       MR. LABUDA:  Objection.  Asked and answered.

14       THE COURT:  I'll allow him to answer it.

15 Q    Did anyone ever comment to you about forgetting to check

16 out?

17 A    No.

18 Q    Dozens of times?

19 A    No.

20 Q    Now, Mr. Labuda showed you what he called a "clean week,"

21 and that was May 6th of 2013.  So let's take a look at this.

22       Now, you worked four days that week; is that

23 correct?  According to this record.

24 A    Yes.

25 Q    Okay.  So on the May 10th -- so this is a normal week;

215

LUONGO - REDIRECT - O'NEILL

1  5/6 will be Monday, correct?

2  A    Yes.

3  Q    5/8 will be Wednesday?

4  A    Yes.

5  Q    5/10 would be Friday?

6  A    Right.

7  Q    And that's a week, that's not including -- okay, the

8  week, the one before that, I'm sorry, 4/29, that's a five-day

9  week, correct?

10  A    Yes.

11  Q    Okay.  And it shows that you worked 46 hours, correct?

12  A    Right.

13  Q    Okay.  I'd like you to look at these sheets and tell

14  me --

15        THE COURT:  Which week are you referring to?

16        MR. O'NEILL:  Yes, the one that ends May 5.

17        THE COURT:  So the week of 4/29 to May 5?

18        MR. O'NEILL:  That's right.  That's right.

19        THE COURT:  You say it shows how many hours?

20        MR. O'NEILL:  It shows 46.65 hours.

21        THE COURT:  And that's where?

22        MR. O'NEILL:  That is going to be over here

23  (indicating.)

24        THE COURT:  Okay.

25  BY MR. O'NEILL:

216

PROCEEDINGS

1    Q      It has you working overtime on a five-day week.

2    A      Right.

3    Q      And that would be a fairly normal week?

4    A      Considering the May?  Yes.  It's a busy month.

5    Q      Now he showed you June 17th, the week ending June 17th.

6           I'm in the wrong year, Your Honor.

7           THE COURT:  Ladies and gentlemen, why don't we take

8    a morning recess for about ten minutes.

9           (Jury exits the courtroom.)

10          (In open court; Jury not present.)

11          THE COURT:  All right, Mr. O'Neill, one thing you

12   need to do is to prepare an exhibit that both of you will

13   stipulate to, which is the calendars that are at issue here

14   for the purposes of the jury.

15          MR. O'NEILL:  Yes.

16          MR. LABUDA:  We have one, we printed out all the

17   years, and we can stipulate, we can show them to Mr. O'Neill

18   that we have the calendars.

19          THE COURT:  All right, we're going to need that.

20          MR. LABUDA:  Yes.

21          THE COURT:  You can't just throw that to the jury.

22          MR. LABUDA:  Agreed.  Agreed.

23          THE COURT:  All right.  So whoever wants to

24   introduce that as an exhibit, it needs to be in the record.

25          MR. LABUDA:  We can just stipulate to its admission.

PROCEEDINGS

1                MR. O'NEILL:  Make it a court exhibit, Your Honor.

2                MR. KATAEV:  Judicial notice of the calendars.

3                THE COURT:  Well I guess you would need to have it

4      be a --

5                MR. KATAEV:  And, Your Honor --

6                THE COURT:  -- plaintiff's exhibit; wouldn't you?  I

7      mean it's your burden.

8                MR. O'NEILL:  I don't have any problem with that.

9                MR. LABUDA:  That's fine, if you want to put it in.

10               MR. KATAEV:  For the jury, this is a clean copy.  So

11     I guess, I don't know, if we'll give it the jury.  One is for

12     you and one is for --

13               THE COURT:  Which color?

14               MR. KATAEV:  The color is on the top one.

15               THE COURT:  All right, so you'll just mark it as

16     whatever you next exhibit is and offer it by stipulation.

17               MR. O'NEILL:  I will.

18               MR. LABUDA:  What do you want to call it?

19               THE COURT:  Whatever your next one is, plaintiff's

20     what is it, 13?

21               MR. O'NEILL:  13.  Yes, Your Honor.

22               (Whereupon, a recess was taken at 11:26 a.m.)

23               (In open court; Jury not present.)

24               THE COURT:  All right, one thing I wanted to bring

25     out about the calendar.

218

PROCEEDINGS

1          Do we also have a stipulation of the dates?  Was he

2     working?  By that I mean, he was working at another place?

3          MR. O'NEILL:  Yes.

4          THE COURT:  I think the calendar should be -- you

5     need to make an agreement on a redacted calendar?

6          MR. LABUDA:  It's in the payroll, Your Honor.  As I

7     was indicating before, in 2010, the payroll has no

8     punch-in/punch-out, there's no pay in late June through

9     October.  So I mean we can stipulate that, you know, it's

10    clear.

11         THE COURT:  Well, why make it harder for them.

12         MR. LABUDA:  Okay, that's fine.

13         THE COURT:  Just, you know, get together an exhibit

14    that has, you know, covers -- if everyone agrees, covers the

15    time that he was there at the restaurant, and the time that's

16    subject to the complaint.

17         All right, you want to bring the jury out?

18         (Jury enters the courtroom.)

19         THE COURT:  All right, please be seated.

20         Mr. O'Neill.

21         MR. O'NEILL:  Yes, Your Honor.

22    BY MR. O'NEILL:

23    Q    Massimiliano, do you remember being asked questions about

24    a paycheck in the amount of $181?

25    A    Yes.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1   Q     Okay.  And you were asked whether or not that represented

2   some number of hours and a minimum wage rate of some kind; do

3   you remember that?

4   A     Right.

5   Q     Did you actually do the math on that one?

6   A     No.

7   Q     Do you know why you were paid $181 that week?

8   A     No.

9           MR. O'NEILL:  May I approach the witness, Your

10  Honor --

11          THE COURT:  Yes.

12          MR. O'NEILL:  -- with the 2011 paperwork?

13          THE COURT:  This is exhibit?

14          MR. O'NEILL:  Well, this is actually Plaintiff's

15  Exhibit 4, they are the 2011 payroll records.

16          MR. LABUDA:  Okay, if you are going to use yours --

17          THE COURT:  What exhibit?  Have you already

18  introduced the payroll records under another number?

19          Mr. Labuda, did you introduce all the payroll

20  records under another number?

21          What exhibit it is of yours, Mr. O'Neill.

22          MR. O'NEILL:  4.

23          THE COURT:  Do you have a exhibit list that you

24  prepared for the Court, Mr. O'Neill?

25          MR. O'NEILL:  It's in the joint pretrial order, Your

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1    Honor.

2            THE COURT:  So you haven't previously offered it to

3    the Court.  Are you offered Exhibit 4?

4            MR. O'NEILL:  I am.

5            I'll use defendant's exhibits, Your Honor.  I'm

6    going to give the witness Exhibit E.

7            THE COURT:  It's E?

8            MR. O'NEILL:  E.

9            THE COURT:  All right.

10           So you're withdrawing your offer of 4?

11           MR. O'NEILL:  Yes, Your Honor.

12   BY MR. O'NEILL:

13   Q    Massimiliano, I've given you the payroll records for

14   2011, and I'd like you to look through them and just tell me,

15   how many checks are in the amount of $181?

16           (Whereupon, the witness is reviewing the document.)

17   A    Every single one except for three.

18   Q    Okay.  Do you know why you were paid $181 every single

19   week except for three in 2011?

20   A    No.

21   Q    Do any of those payroll records indicate anywhere on them

22   how many hours you worked on any of those weeks?

23   A    No.

24   Q    Do any of those payroll records indicate anywhere on them

25   the hourly wage that you were being paid?

221

PROCEEDINGS

1    A    No.

2    Q    You mentioned working at Cardozo High School.  When did

3    you work at Cardozo High School?

4    A    It was probably 2008, 2009, somewhere in that time.  I

5    really don't recall the right year.

6    Q    How many months did you work there?

7    A    Ah, less than a year, probably ten months.

8    Q    If I told you that you testified in your deposition --

9            MR. LABUDA:  Objection.

10   Q    -- 2006 to --

11           MR. LABUDA:  Objection.  He cannot impeach his own

12   witness.

13           MR. O'NEILL:  I'm not impeaching.

14           THE COURT:  Are you trying to refresh his

15   recollection?

16           MR. O'NEILL:  Yes, I'm trying to refresh his

17   recollection.

18           MR. LABUDA:  He can show him the document if he

19   wants to, Your Honor.

20           THE COURT:  Can you show him a document?

21   Q    I'm going to show you something and then my question is

22   going to be, I don't want you to read this, but the question

23   is:  Having read this, does it refresh your recollection as to

24   when you worked at Cardozo High School?

25   A    Okay, so should I read the question?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1    Q    Yes.  Does it remind you when you worked at Cardozo?

2              MR. LABUDA:  Can you just share with us what page

3    you're looking at?

4              MR. O'NEILL:  Page 43, plaintiff's deposition.

5              MR. LABUDA:  Bear with us one second.

6              MR. O'NEILL:  Are you good?

7              MR. LABUDA:  Yes.

8    Q    Okay.  Having seen that now, Massimiliano, does it

9    refresh your recollection as to when you worked at Cardozo

10   High School?

11   A    Yes.

12   Q    When did you work at Cardozo High School?

13   A    2006.

14             THE COURT:  2006?

15             THE WITNESS:  Yes.

16   Q    So you're working at Cardozo High School wouldn't impact

17   any of your pay for 2008, 2009 and so forth; would it?

18   A    No.

19             MR. LABUDA:  Objection.  Argumentative.

20             THE COURT:  Overruled.

21   Q    Now, you were shown a couple of wage statements by

22   defendants.

23             What were those exhibits?

24             MR. KATAEV:  10.

25   Q    I'm going to show you what is Exhibit X.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

223

PROCEEDINGS

1          And you signed this in March of 2013; is that

2    correct?

3    A    Yes.

4    Q    Okay.  Had you ever signed one of these before?

5    A    I don't -- I don't remember.  I believe not.

6    Q    Do you realize that when Mr. Labuda asked you questions

7    that you said you did sign some of these earlier?

8          Did you realize --

9    A    Right.  Right.

10   Q    Did you sign these earlier?

11   A    I remember I signed this one right here.  But I don't --

12   I don't recall exactly, you know, if I signed the other.

13   Q    Were any given to you of a copy for you to keep?

14   A    I believe not.

15   Q    When you were given this to sign, did anyone explain it

16   to you?

17   A    No.  But, you know, it says $5 per hour and 2.25 tips per

18   hour.

19   Q    Okay.  What did you take that to mean?

20   A    What it means?

21   Q    What did you take it at that time?  Not now, but at that

22   time, what did you think it meant?

23   A    That the shift that I was paying $5 an hour -- per hour

24   for the waiter, that's what it says.

25   Q    Uh-huh.  And what did you think the 2.25 meant?

PROCEEDINGS

1    A    That tips, 2.25 per hour.  Allowance taken.

2    Q    What did you understand that to mean?

3    A    It was not clear enough for me at that time.

4    Q    Did you have any understanding --

5    A    No.

6    Q    -- of what it meant?

7    A    No.

8    Q    Do you know now what it means?

9    A    Well, after this experience, yes.

10   Q    You were asked questions about a wage poster.  Do you

11   remember being asked the question about that?

12   A    Yes.

13   Q    What did that wage poster have on it?

14   A    The last one that I recall was a wage poster that would

15   say 7 -- $7 and change was in the Tuscany room, was the very

16   last one before I left.  Must have been a year, a year and a

17   half ago.

18   Q    To your recollection, from memory, did that wage poster

19   say anything about tips?

20   A    No.

21   Q    Do you realize when Mr. Labuda posed the question to you,

22   he had the words "tips" and "tip credits" in that question; do

23   you realize that?

24   A    That he said that?

25   Q    Yes.

PROCEEDINGS

1   A     He said that, yes.

2   Q     Okay.  Well, did this wage poster, to your memory, have

3   anything about tips or tip credit?

4   A     No.

5   Q     Now, you were asked some questions about wage

6   fluctuations, and I think your testimony was what you earned

7   every week went up and down because the tips went up and down,

8   correct?

9   A     Yes.

10  Q     And you've asked questions not about the tips, when you

11  asked the questions of the managers, what did you ask them?

12  A     I asked the questions about being paid per hour.

13  Q     What was the question?

14  A     I spoke one of the managers said, you know, it has to be

15  clarified the fact that, you know, why is that these checks

16  look always the same or sometimes zero.

17  Q     These are the checks that every week were zero; is that

18  correct?

19  A     Yes.  I believe that's what I gave to you.

20  Q     Now, I'm not going to go through all the different weekly

21  time sheets and things that you were shown.

22        Is it fair to say that when you're asked questions

23  about these weekly time sheets, you don't have any specific

24  recollection of the time in and time out on any particular

25  day; do you?

PROCEEDINGS

1   A    No.  But I could remember when I served certain people.

2   Q    Okay.  That's great, but I'm not asking about that.

3   A    No, I know.

4   Q    All right.  So you look at a piece of paper for a sign-in

5   sheet, you're just reading from that paper, correct?

6   A    Yes.

7            MR. LABUDA:  Objection.  Argumentative.

8            THE COURT:  I'll allow it.

9   Q    And do you have any idea whether those records are in the

10  least bit accurate?

11  A    No.  Those papers were not for us, for the waiters, those

12  papers were for, you know, strictly for managers or payroll

13  people and the computer figures.

14            (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

LUONGO – REDIRECT – O'NEILL

1  REDIRECT EXAMINATION (Continued)

2  BY MR. O'NEILL:

3  Q    The paychecks the stubs that you get, they didn't list

4  the actual number of hours you work each day, did they?

5  A    Right.

6  Q    They didn't have anything on them about punching in and

7  punch out.

8  A    No.

9            MR. O'NEILL:  No further questions.

10           THE COURT:  Anything further?

11           MR. LABUDA:  Yes, a few questions.

12           If we can switch the monitor back to the computers.

13  as a matter of housekeeping, your Honor, we have no objection

14  to Plaintiff Exhibit 13 with the calendar coming in evidence.

15           THE COURT:  Have they been --

16           MR. O'NEILL:  They haven't been marked or

17  introduced.

18           THE COURT:  Have they been annotated to reflect the

19  periods of time that the plaintiff was not working during

20  those years?

21           MR. O'NEILL:  No.

22           MR. LABUDA:  No.  If you wanted that on the

23  calendar, we'll do that at a different time.

24           THE COURT:  I want to make this as easy for the jury

25  as possible.

LUONGO – RECROSS – LABUDA

1        MR. LABUDA:  Understood.  We'll do it later.

2   RECROSS-EXAMINATION

3   BY MR. LABUDA:

4   Q    Now, at Giardino before the computer punch in system

5   there was a time card system, correct, like a manual punch

6   time card system, correct?

7   A    Not for us, not for the waiters.

8   Q    There was a time card, correct?

9   A    Not for the waiters.

10  Q    Move to strike.

11       There was a time card at Giardino, correct?

12  A    For busboys.

13  Q    I'm going to move to strike.

14       THE COURT:  Your question should be, was there a

15  time card for the waiters.

16  Q    My question is, there was a time card machine at the

17  restaurant, correct?

18  A    Not for the waiters.

19  Q    That's not my question.

20       THE COURT:  Was there a time card machine for

21  others --

22       THE WITNESS:  Yes, yes.

23       THE COURT:  -- physically located at the place.

24       THE WITNESS:  Yes.

25  Q    And it's your testimony that you don't recall, you don't

LUONGO - RECROSS - LABUDA

1    remember, whether or not you used that time card system,

2    right?

3    A    I never use it, yes.

4    Q    Okay.  Isn't it true that you don't remember whether or

5    not you used it, one way or the other?

6    A    It is true that I don't remember because I never used it.

7    Q    Do you remember me asking me about whether or not you

8    recall using the time card system on page 72 in the

9    deposition, line ten, do you remember the following question

10   and giving the following answer during your deposition:

11        "Was there any system that you recall between 2006

12   and 2013, other than what you've already described" -- which

13   is the computer punch in system.

14        "Answer:  Other system, no.

15        "Question:  Yeah, so I just want to understand.

16   There wasn't any punch card system where you punched your --

17   punched a card each day in and out?

18        "Answer:  There was a machine over there but I don't

19   recall if I ever used that."

20        Correct, do you remember giving those answers and

21   being asked those questions?

22        MR. O'NEILL:  Objection, your Honor, it's

23   incomplete.

24        THE COURT:  Let me see the rest of it going down, I

25   can't tell that.

LUONGO - RECROSS - LABUDA

1    Q    So your testimony during the deposition is you didn't

2    recall using the time machine, correct?

3    A    Yes, there was a machine over there, yes.

4    Q    You do report that in 2012 once they switched over to the

5    computer your pay stubs indicated your hours, we went through

6    that before, correct?

7    A    Right.

8    Q    And in 2012 and 2013 the hours that you worked were

9    accurately reflected in your pay stubs for those years,

10   correct?

11   A    According to my schedule.

12   Q    Yes, correct.  You got paid for the hours that you

13   worked?

14   A    Correct, to my schedule.

15   Q    And if there were days that you didn't punch in, how ever

16   many days it was, you told your manager and she fixed it,

17   correct?

18   A    A few times, yes.

19   Q    Well, that's what happened every time.

20   A    Not 149 and 174.

21   Q    I'm saying, when you told the manager she fixed it and

22   then you were okay?

23   A    I guess there was a job.

24          THE COURT:  On what?

25          THE WITNESS:  I guess it was a job when I told her

LUONGO – RECROSS – LABUDA

1   can you fix it.

2   Q    And she did, right?

3   A    Yes.

4   Q    What I'm saying is even though you didn't punch out it

5   showed 6:00 o'clock on the punch out, you got paid for the

6   hours you worked that day, that was 2012 and 2013, correct?

7   A    I don't know.

8   Q    Well, isn't that what happened?

9   A    That I got paid?

10  Q    Yes.

11  A    Even though I didn't clock out?

12  Q    Yes, but you went to the manager --

13  A    Right.

14  Q    -- told them, I forgot to punch out, lets say it's 2013,

15  Suzanne, and she fixed it, right?

16  A    Those days I called her, yes.

17  Q    And when you forgot to punch out, you would tell her,

18  correct?

19  A    Yes, those times that I forgot, yes.

20  Q    Now, Mr. O'Neill asked you some questions about working

21  at Cordoza High School, right?

22  A    Yes.

23  Q    And you said that you worked in Cordoza High School in

24  2008, 2009, you don't remember exactly when it was, correct?

25  A    Right.

LUONGO – RECROSS – LABUDA

1   Q    Fair to say it was a long time ago, you don't remember

2   exactly when that was, correct?

3   A    I don't remember the year exactly, but I remember what

4   happened.

5   Q    Right.  You do recall that sometimes you would punch, you

6   would come in late to work because Giardino said, look,

7   there's a party at 6, 7 or 8 that's when you would start for

8   the day?

9   A    Sometimes, yes.  Sometimes I would just go back to work

10  even though I was there for 2, 3 hours without doing anything.

11  So it was easier for me to go to work and do something,

12  helping the other waiters and not going back home.

13  Q    But that would explain why sometimes you would punch in

14  at seven or 8:00 o'clock at night because there was a party

15  and you would work the party four or five hours?

16  A    Sometimes, yes.

17              MR. LABUDA:  Bear with me one second.

18              No further questions.  Thank you.

19              THE COURT:  All right.  Thank you.  You can step

20  down.

21              THE WITNESS:  Thank you.

22              (Whereupon, the witness was excused.)

23              THE COURT:  Call your next witness.

24              MR. O'NEILL:  Yes, I call PJ Connolly.

25              (Witness takes the witness stand.)

CONNOLLY - DIRECT - O'NEILL

1          (Witness takes the witness stand.)

2    PATRICK CONNOLLY, called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4               THE COURT:  State and spell your name.

5               THE WITNESS:  Patrick Connolly, P-A-T-R-I-C-K,

6    C-O-N-N-O-L-L-Y.

7    DIRECT EXAMINATION

8    BY MR. O'NEILL:

9    Q    Good afternoon, how are you?

10   A    Fine.

11   Q    We never met?

12   A    Yes we did, yes.

13   Q    Yesterday?

14   A    Yes.

15   Q    During the course of this lawsuit I meant.

16   A    We have not.

17   Q    Who are you employed by?

18   A    Vetro Group, it's a restaurant in Howard Beach.

19   Q    What is it called?

20   A    Vetro.  The corporate name is Vetro Group, Vetro

21   restaurant.

22   Q    What do you do at Vetro Group?

23   A    I'm a general manager there.

24   Q    What does that entail?

25   A    Overseeing the daily operations, pretty much the buck

CONNOLLY – DIRECT – O'NEILL

1    stops with me.  I oversee the employees, the service, the

2    entire operation from day to day.

3    Q    What is your connection with Giardino?

4    A    Giardino is one of our sister restaurants.  I was there

5    between 2008 and 2009 daily while we were building our new

6    restaurant.  Then I would see that weekly.  I do have a profit

7    share with the restaurant, so it's in my interest every week

8    to make sure that things are being run the right way.

9    Q    Who owns Giardino?

10   A    Frank Russo.

11   Q    Is he your boss?

12   A    Yes, sir.

13   Q    Fair to say that you do what he wants you to do, correct?

14   A    If he asked me, yes.

15   Q    Well, even when he doesn't ask you, you're doing what you

16   believe to be what he would want you to do, correct?

17              MR. LABUDA:  Objection.

18              THE COURT:  I'll sustain the objection.  The

19   question is terribly broad.

20   Q    In terms of operating Mr. Russo's restaurant, you are

21   there to maximize the profits for Mr. Russo, correct?

22   A    That's correct.

23   Q    And that's what you see as your mission, correct?

24   A    No.  My guests come first, then the service for us in the

25   restaurant business is the most important, profits would be

CONNOLLY - DIRECT - O'NEILL

1   second.

2   Q    The idea being that serving the customer, the profits

3   will come, correct?

4   A    Agreed.

5   Q    Okay.  Now, as the owner of Giardino, you agree that

6   Mr. Russo has the ability to hire and fire people, correct?

7   A    He would have that ability, yes.

8   Q    And he would have the ability to set and supervise

9   employees and set work schedules, correct?

10  A    He would have that ability.

11  Q    He would have the ability to determine how many people

12  are paid and how they are paid, correct?

13  A    No, that's determined by the state.

14  Q    Really?  That's the minimum wage.

15  A    At a minimum.

16  Q    He can determine whether or not the restaurant is going

17  to follow that, correct?

18  A    No, we don't have a choice in that matter.

19  Q    Let's talk a little about the Russo Payroll Group, what

20  is that?

21  A    Russo Payroll Group is a company that processes the

22  payroll checks.  It was set up when Russo and Vetro switched

23  payroll companies.  It allowed for the payroll company we use

24  to issue checks at a lower rate of cost to the employees.

25  Q    Mr. Russo owns that company as well?

236

CONNOLLY – DIRECT – O'NEILL

1   A    Yes, sir.

2              THE COURT:  I'm sorry, you said issue checks at a

3   lower cost to the employee?

4              THE WITNESS:  We were under one company issuing all

5   the checks, your Honor, the cost of that check.  So I was

6   paying a dollar per check that was being issued, that was

7   reduced down to perhaps 75, 80 cents.

8              THE COURT:  That's saving the company money, not the

9   employees.

10             THE WITNESS:  A reduced rate for us to give that

11  check to the employee.

12             THE COURT:  I thought you said it was saving, I

13  misunderstood what you said, I thought you said saving the

14  employees money.

15  Q    What are the annual sales of Giardino?

16  A    Year specific?  Or do you have any --

17             MR. LABUDA:  Objection.

18  Q    2013.

19  A    2013.

20             THE COURT:  What are you asking, for the annual?

21  Q    Revenue, gross revenue.

22  A    In 2013 upwards of a million-and-a-half dollars.  I would

23  have to refer to tax returns.

24  Q    In 2012?

25  A    Maybe a little bit lighter, I have to check the returns

CONNOLLY – DIRECT – O'NEILL

1   for that.

2   Q    Taking the period 2008 through 2012, say roughly at that

3   level?

4   A    Yes.  They fluctuate from year to year, but it would be

5   in that ballpark.

6   Q    Never below $500,000, would it?

7   A    No, sir.

8   Q    You alluded to this earlier, but you know that wagers

9   have to be paid for every hour they work?

10  A    That's correct.

11  Q    A restaurant is required to keep track of time?

12  A    That's correct.

13  Q    As the starting time and the leaving time, right?

14  A    Yes, sir.

15  Q    And the restaurant can't delegate that responsibility to

16  the employee, right?

17  A    Which responsibility?

18  Q    To keep track of the hours.

19           MR. LABUDA:  Objection.

20  A    It's their responsibility to clock in and out.  And it's

21  our responsibility to tally that and pay them for those hours.

22  I don't clock people in and out.

23  Q    If an employee doesn't clock in or out, you don't pay

24  him?

25  A    We do pay them, of course, we pay them.

CONNOLLY – DIRECT – O'NEILL

1   Q    How are you going to pay them if they are not clocking in

2   and out?

3   A    The managers have to make adjustments.  They review with

4   the employee this hour you did not clock out this day, back

5   and forth, the manager would have to say you don't have a

6   punch, do we have a time out for you?  And that's how those

7   hours would be determined.

8   Q    That is the responsibility of the restaurant to do that,

9   correct?

10  A    Yes, sir.

11  Q    An employee that refuses to punch out consistently would

12  be a problem, correct?

13               MR. LABUDA:  Objection.

14               THE COURT:  Overruled.

15  A    Not clocking out would be a problem, yes.

16  Q    If somebody did not clock out for weeks at a time, that

17  would be an issue, wouldn't it?

18  A    It would be for me.

19  Q    It would call for some corrective action?

20  A    On a disciplinary level, probably not.

21  Q    You would just allow an employee to just never to punch

22  out?

23  A    No.  Like I said, we would make adjustments to find out

24  what time, when they came in when they left.

25  Q    It's also the restaurant's responsibility to pay a waiter

CONNOLLY – DIRECT – O'NEILL

1    a minimum wage established by federal or state law, correct?

2    A    Yes.

3    Q    If you looked at a waiter's paycheck, it should show the

4    numbers of hours worked and the hourly wage, correct?

5    A    Different times would call for different, depending on

6    the payroll we were using which show different line items.

7    Q    I'm thinking more about New York state law and federal

8    law, which you said there is no option about, correct?

9    A    With respect to the time card or pay stub?

10   Q    With respect to payroll records, the company is required

11   to keep a record of how many hours the employee worked, how

12   much he was paid, and at what rate, correct?

13   A    Correct.

14   Q    That should be on the payroll records, correct?

15   A    Yes, sir.

16   Q    If it's not in the payroll records then the company is

17   not following the law, correct?

18   A    That would be correct.

19        MR. O'NEILL:  May I approach the witness, your

20   Honor?

21        THE COURT:  Yes.

22   BY MR. O'NEILL:

23   Q    I'm going to show you Defendant's Exhibit B, which are

24   the payroll records for 2008.  They actually are not in order,

25   that's the way the exhibit was created.  But those are the

CONNOLLY – DIRECT – O'NEILL

1    records that were produced by the restaurant I think beginning

2    in March of 2008.  Are you familiar with those records?

3    A    I am.

4    Q    I'd like you to look through those.  These are the

5    records for Mr. Luongo, of course, and tell me if any of those

6    records show anywhere the number of hours that he worked on

7    any given week?

8              THE COURT:  What exhibit is this again?

9              MR. O'NEILL:  B, as in boy, your Honor.

10   A    Just 2008, sir?

11   Q    I'm sorry?

12   A    Just 2008 or the whole?

13   Q    Do you have something other than 2008?

14   A    There is one that goes past.

15   Q    Just 2008 then.

16   A    It shows the regular at being at 74.

17   Q    My question is, anywhere in those records do you see

18   anything that tells you how many hours Mr. Luongo worked on

19   any given week?

20   A    No, sir.

21   Q    Do those records show anywhere what wage was paid to him?

22   A    The 74 divided by whatever the pay time which in 2008 was

23   four, $4.60.

24   Q    That's not, here is it?

25   A    That's not on here, no, sir.

CONNOLLY – DIRECT – O'NEILL

1  Q    If we look at these records we don't know how much per

2  hour he was earning, do we?

3  A    74 divided by 4.60, I'd have to do the math.

4  Q    Well, that's assuming that he's paid $4.60 an hour,

5  correct?

6  A    No, the math is not assuming.  It's 74 by pay rate and

7  gives the hard number.

8  Q    Where is the pay rate on the payroll?

9  A    That is the minimum rate at the time of -- on the paper,

10 it's not there.

11 Q    In these records where is the pay rate?

12 A    There is no pay rate on these documents.

13 Q    Every week it's $74, correct?

14 A    No, there are a few that change.  It's right around

15 there.

16 Q    There is one that is $89 I think?

17 A    I believe another one for 60 something, but consistent

18 with 74.

19 Q    Now, if you look at any one of these records I'm going to

20 put page D227 on the screen.  What I want to point out to you

21 is this box here, that box has a label of rate, do you see

22 that on your papers in front of you?

23 A    Yes.

24 Q    It indicates that the rate is weekly, correct?

25 A    That would be how often he's paid.

CONNOLLY – DIRECT – O'NEILL

1   Q    Rate, rate would be how often he's paid?

2   A    Every week.  Compared to if somebody got paid every two

3   weeks.

4   Q    Why don't we look over here where it says hours/units,

5   which is blank, do you see that?

6   A    Yes.

7   Q    That would be the number of hours that an hourly worker

8   worked, correct?

9   A    That's correct.

10  Q    Here it says rates as well, right?

11  A    That's correct.

12  Q    Is that how often he's paid?  So if he worked 30 hours it

13  would say 30 hours weekly?

14  A    It appears that's the way it would be listed, yes, sir.

15  Q    You don't think that rate would be what his hourly rate

16  were, $5.67 an hour?

17  A    I -- these are not ours.  These are from EDP.  We didn't

18  produce these.  We were given these back after the payroll was

19  called in.  ADP is the company that generated these documents.

20  Q    That's obvious, but these are your records, aren't they?

21  A    Our record would be a summary of the hours that he worked

22  and that would have been called into this company, and they

23  would have sent and issued a pay check and sent this back to

24  us.

25  Q    You're saying you told ADP how many hours to pay the

CONNOLLY – DIRECT – O'NEILL

1   employee for and they produced this?

2   A     Yes, sir.  They would be called over every --

3   Q     That's not my question.  Are you testifying that somebody

4   would call up ADP and tell them how many hours Mr. Luongo

5   worked?

6   A     Yes, yes, either the hours or the rate, sir.  I can't

7   testify how they called it, either it was hours or dollars.  I

8   wouldn't have done that at that time.

9   Q     So you don't know.

10  A     I don't know how it was called in, no.

11  Q     Who did the calling in?

12  A     At the time a woman Debbie, Italian last name, a long

13  Italian last name.

14  Q     Where did she work?

15  A     At the offices the Russo.

16  Q     So she would be at Russo Payroll Group?

17  A     No, she would have worked for TARK.  Russo Payroll Group

18  didn't come later when we switched from ADP.

19  Q     That's where Mr. Russo had his office as well?

20  A     Yes, sir.

21  Q     So she worked in the same office with Mr. Russo?

22  A     No, it was separate.  It was downstairs, the accounting

23  and payroll.

24  Q     I don't mean literally same office, but the same offices?

25  A     Same building.

CONNOLLY – DIRECT – O'NEILL

1    Q     That's part of Russo on the Bay?

2    A     Yes, sir.

3    Q     What floor was her office on?

4    A     Like the ground level.  It's not a numbered floor.  It's

5    a split level of the first floor and the basement.

6    Q     It's fair to say, isn't it, that somebody decided that

7    Mr. Luongo was going to be paid $74 a week?

8    A     Can you repeat the question, sir?

9    Q     Somebody decided that Mr. Luongo was going to be paid $74

10   a week for his time; isn't that correct?

11   A     He wasn't paid $74 per week.  He was paid by the hour.

12   The management would tally up a time card at that point and

13   submit that.  So if it was consistent it would have been

14   because of his scheduling.

15   Q     But you have personal knowledge of that?

16   A     Personal knowledge of the fact that the time card was

17   submitted or somebody?

18   Q     That he worked the same number of hours every week and

19   that those hours times some hourly wage would equal $74?

20   A     No.  But the managers at the time would have written the

21   summary on the time cards.  They would have sent that.  And

22   back in 2008 which is the time that I went there we changed

23   that, because the managers that we had were a little bit loose

24   and would just estimate on the time card.  If it was like

25   5.72, they would do six or round it.  So they would send that

CONNOLLY – DIRECT – O'NEILL

1    in like 16 or 17 hours.  Or if he had three days on the shift

2    the managers, we found, would be giving them either he went

3    home early or got the full shift, or he went home a little

4    later and still got the time that he was in for the shift.

5    It's part of the reason why we changed away from the time

6    cards.

7    Q    You came to Giardino in 2008?

8    A    At the end of 2008.

9    Q    You changed that system?

10   A    We started moving away from the time cards. I don't

11   remember exactly the year that we switched over, but it took

12   me sometime to figure out that that was what was going on.  I

13   can't testify to exactly the date we started switching away

14   from the time cards.  It was definitely after I got there.

15   Q    The time cards, they calculate the exact number of hours

16   that somebody worked, don't they?

17   A    If you clock in and out it would be calculated for

18   Monday.  It would say this time to that time.  So you would

19   have to make a summary on those time cards and submit them

20   over to Russo.  For example, if you worked four days that may

21   equal 16 hours, it may equal 32 hours depending on the shifts.

22   But that would have to have been each day, each day would have

23   been calculated.  It wouldn't total the punches for you.

24   Q    That time clock system didn't calculate the number of

25   hours that the employee works?

CONNOLLY – DIRECT – O'NEILL

1    A    Not total it.

2    Q    On a daily basis it did.

3    A    It gave you time in and out.  If you clocked in at four

4    or five, clocked out nine, you would have to calculate it be

5    four hours.

6    Q    Okay.  That's not hard to do, is it?

7    A    Depends on who is doing it.

8    Q    If the person is hired to do that, maybe the person

9    shouldn't be doing it, right?

10             MR. LABUDA:  Objection.

11             THE COURT:  Sustained.

12   BY MR. O'NEILL:

13   Q    That's certainly within the capability of the Russo

14   Payroll Group; isn't it?

15   A    In 2008 Russo Payroll Group didn't exist.  But of course,

16   the person doing the payroll would have enough knowledge and

17   sense to calculate it properly, absolutely.

18   Q    All right.  And in fact, that's the legal obligation,

19   isn't it?

20   A    Yes, sir.

21   Q    Let's look at 2009.  Before we get away from 2008, you're

22   familiar with the tip credit?

23   A    Yes, sir.

24   Q    A tip credit allows an employer to allocate tip towards

25   the minimum wage obligation?

CONNOLLY – DIRECT – O'NEILL

1    A    Yes.

2    Q    Doesn't relieve the employer of the minimum wage

3    obligations, does it?

4    A    I don't understand.

5    Q    If the tips don't make up for the difference, the

6    employer has to pay it, correct?

7         MR. LABUDA:  Objection, calling for a legal

8    conclusion from the witness.

9         THE COURT:  Overruled.

10        You understand how the tip credit works?

11        THE WITNESS:  Yes, your Honor.  I believe he's

12   asking, if they did not make the minimum tip credit we would

13   be responsible in the difference in that dollar amount.

14        THE COURT:  Is it your understanding that there is a

15   minimal amount you have to pay regardless of whether they have

16   grade tips or not?

17        THE WITNESS:  Yes your Honor.

18        THE COURT:  And you get to use the tip credit when

19   they receive tips and how much credit do you give them.  In

20   other words, do you know how it works?

21        THE WITNESS:  Yes, every year it changed since 2008.

22        THE COURT:  Explain how it works.

23        THE WITNESS:  So if the minimum wage is $7.25, for

24   example --

25        THE COURT:  Okay.

CONNOLLY - DIRECT - O'NEILL

1              THE WITNESS:  -- and the tip credit is $2.25, that

2      means you can give the pay rate of $5, allow that $2.25 coming

3      in as tips, that would meet the minimum wage requirement.

4      Frankly, the tip credit for these guys is almost irrelevant

5      because you're talking about making a minimum of $7.25 and

6      they are making 25, $30 an hour, it never would come up.  Let

7      me correct that, it may come up on a particular day they may

8      not meet the tip credit, but within 40 hours it would be

9      impossible in our business to not make that in tips.

10             THE COURT:  If they make the tip credit -- if they

11     don't make the tip credit you would have to pay $7.25.

12             THE WITNESS:  We would have to pay the difference.

13     So if their tips equal $2 an hour, then we have to pay an

14     additional quarter per hour.

15             THE COURT:  But you always have to pay the $5 an

16     hour regardless, even if they are making a thousand dollars a

17     day in tips, correct?

18             THE WITNESS:  Not necessarily the five, your Honor,

19     depends on the year.  In 2008 it was $4.60.  The base pay then

20     increased to five.  They just changed it again.

21             THE COURT:  So you have to pay that no matter how

22     much they make in tips.

23             THE WITNESS:  Yes.

24     BY MR. O'NEILL:

25     Q    I heard you say that on a given day they may not make up

CONNOLLY - DIRECT - O'NEILL

1    the tip credit; is that correct?

2    A    It would be possible, virtually impossible, but it is

3    somewhat possible.

4    Q    The tip credit works on a daily basis not a weekly basis.

5            MR. LABUDA:  That's not true.  Objection calls for

6    legal --

7            THE COURT:  The witness can indicate if he's got a

8    answer or not.

9            THE WITNESS:  It's my understanding.

10           THE COURT:  I don't want any comments from lawyers

11   about what is true or not true.

12   A    It's my understanding, Mr. O'Neill, that at the end of

13   the 40 hours you work X amount of hours, receive X amount of

14   tips, as long as the minimum wage was met at that point then

15   our obligation for an extra quarter of an hour would have been

16   met by far.

17   Q    That's your understanding, correct?

18   A    Yes.

19   Q    Looking at the 2008 payroll records, where on it does it

20   indicate the tip credit that the employer is taking?

21   A    Well, every one of these documents has the amount of tips

22   on it that he put.  So do the hours and the tips and that's

23   your tip credit.

24   Q    You're saying you can figure it out, is that what you're

25   saying?

CONNOLLY - DIRECT - O'NEILL

1    A    I think it's figured out for you on the paper.

2    Q    Tell me, on the paper that's up here on the screen, how

3    much of the tips, what amount of the tips was allocated to the

4    tip credit?

5    A    Well, he made $573 in tips, that's with the T.  So $573

6    in tips, he got 74, can you do the math for me on the 74.

7    Q    I'll try.

8              THE COURT:  What math are you asking him to do?

9              THE WITNESS:  To understand how many hours to do.

10             THE COURT:  What mathematical procedure are you

11   asking?

12             THE WITNESS:  This is rate, so whatever the minimum

13   wage at that time was, 4.60 I think we established.  So 74

14   divided by the 4.60 is, I don't know, 15, 16, 16-something

15   hours.

16   Q    16.08.

17   A    So he made $647, divided by 16 hours.  What does that

18   come to now?  I think the tip credit is far exceeded.

19   Q    That's how you calculate it?

20   A    Well, I think that's how anybody would do it.  You made

21   $674 on that one -- $647.

22   Q    What you're doing is you're calculating what his overall

23   hourly rate was to some assumption on the hours he worked and

24   if the hourly rate is over the minimum wage, that's what

25   you're doing, right?

CONNOLLY – DIRECT – O'NEILL

1    A     Well, you asked me to do that.  He made $647 that week.

2    He worked 16, 17 hours.  Without doing the math, I don't have

3    a calculator, what does that come out to?  More than

4    20-something dollars in hours.  I think the tip credit more

5    than exceeded in that.

6    Q     Maybe I'm not asking the question clear.

7           If he made nothing in tips the employee would have

8    to have paid some extra money, right?

9    A     Yes.

10   Q     That's the tip credit?

11   A     Yes.

12   Q     What I'm asking for is where does it show that the

13   employer took that amount of tips and allocated it to toward

14   minimum wage?

15          MR. LABUDA:  Objection.

16   A     It's an allowance.  You take it, we don't take it.

17   Q     It's an allowance, correct?

18   A     That's correct.

19   Q     And an employer is obligated to keep in his records as a

20   separate item how much the tip credit was taken on a weekly

21   basis?

22          MR. LABUDA:  Objection.

23          THE COURT:  He's asking him if he understands that

24   to be the case; if he doesn't, he doesn't.

25   Q     Do you recall that to be the case?

CONNOLLY – DIRECT – O'NEILL

1   A    I'm not sure I follow you, Mr. O'Neill.  Because the

2   money is only an allowance.  We don't take it from them and

3   then give it back to them in their paycheck.  It's just an

4   allowance.

5   Q    I understand.

6   A    Then I don't understand what you're asking me.

7   Q    Let's move on.  So the records for 2008, they don't show

8   a number of hours that the employee worked, correct?

9   A    If you want to see it in hours, it's in dollars, it's not

10  in hours.  I can say that's correct.

11  Q    They don't show how much per hour he was paid.

12  A    It does indirectly.

13  Q    You have to -- I'll leave it at that.  Let's look at

14  2009.

15          MR. O'NEILL:  May I approach your Honor?

16          THE COURT:  Yes.  Which exhibit are you showing him?

17          MR. O'NEILL:  C as in Charlie.

18  Q    You were in charge of Giardino for all of 2009, correct?

19  A    Yes, sir.

20  Q    And looking at the 2009 records, I'll put one up on the

21  screen so everyone can see what the records look like.  It's

22  the same as the 2008 records, correct?

23  A    Yes.  These fluctuate a little more than those do, sir.

24  Q    I'm just asking now for not to necessarily looking at the

25  amounts, but the records themselves.  Again, this the same

CONNOLLY – DIRECT – O'NEILL

1   payroll company, right?

2   A     Yes, yes, sir.

3   Q     So this is in January 2009?

4   A     Yes, that's correct.

5   Q     So just as with the 2008 records, there is no indication

6   as to the number of hours worked or the rate of pay, is there?

7   A     That's correct.

8   Q     Then at some point in 2009 you changed payroll companies,

9   does that sound right?

10  A     I believe so.

11  Q     Let me put up D281, payroll by Paychex?

12  A     Yes.

13  Q     You're no longer using ADP?

14  A     That's correct.

15  Q     Looking at this record can you tell how much Mr. Luongo

16  was paid for that week?  This is the week of pay period ending

17  3/15/09.  I invite you to tell us, you got the records in

18  front of you if that helps you.

19  A     Yes, it's a lot of pages.

20  Q     D281.

21        THE COURT:  This is in exhibit C?

22        MR. O'NEILL:  In Exhibit C, your Honor.

23  A     Okay, here it is.

24  Q     Just so the jury can see, on the top there is columns

25  with labels and the first grouping is hours, do you see that?

CONNOLLY – DIRECT – O'NEILL

1    A    Yes.

2    Q    It has rate, that's the rate per hour that the employee

3    is paid, correct?

4    A    Regular rate, yes.

5    Q    Wouldn't that be the regular hours and OT would be

6    overtime hours?

7    A    Yes.

8    Q    Then where it has earnings, that would be multiplied up,

9    regular earnings, overtime, correct?

10   A    Yes.

11   Q    So if we go down, there is nothing under the hours for

12   Mr. Luongo, is there?

13   A    No, this was probably called in the same way as ADP was.

14   Q    All you have is $74 in regular earnings, correct?

15   A    That's correct.

16   Q    Again, this record doesn't show how many hours he worked

17   or what hourly wage he was paid, does it?

18   A    No, sir.

19   Q    So these records are not in compliance with New York

20   state law, are they, as you understand it?

21   A    Currently, no.  I can't answer for 2008 if they are in

22   compliance.  I know that there has been changes and currently

23   these would not be acceptable.  But this is almost ten years

24   ago, so I don't recall the requirements were at that time.

25   Q    What were the changes?

CONNOLLY - DIRECT - O'NEILL

1    A    They were various, I have to refer back.  They changed

2    the minimum wages.  They changed the tip credit.  They changed

3    the meal allowance.  I have to refer back to them all.  I know

4    various changes on how we needed to handle these things.  I

5    can't say if they were in compliance at that point or not.

6    Q    In November 2009 it looks like Paychex changed its form,

7    do you see this?

8    A    What page number, sir?

9    Q    315.

10   A    Does it say that this is from Paychex on there?  One of

11   them looks more like his pay stub, and this one is more like a

12   report that they send over to you versus a pay stub.  I don't

13   know that this was directed from Paychex.  If that's not

14   important, then I'm okay with that.  I don't know.

15   Q    The reason is because whoever copied this blocked out

16   Paychex.  Why don't you look at 316 or 317?

17   A    Okay, so, 315 and 316 look a little different.

18   Q    How about 320?

19   A    Yes, those say Paychex on them.  We were probably still

20   using them at this time.

21   Q    Nothing here that indicates the number of hours the

22   employee works and the rate that he's paid, correct?

23   A    Again, do the 138 by the minimum wage in 2009, that's

24   your hours.  If it was called in by rate or if it was called

25   in by hours, I can't speak for that.  Clearly it was called in

CONNOLLY – DIRECT – O'NEILL

1   by dollar amount.

2   Q    The fact that Paychex has on its form a place to put the

3   hours and the rate, why wouldn't they put it in there if you

4   called it in that way?

5             MR. LABUDA:  Objection speculation.

6             THE COURT:  He can answer.

7             MR. O'NEILL:  I'll rephrase the question, your

8   Honor.

9             THE COURT:  Go ahead.

10  Q    You don't have any doubt that Paychex had the capability

11  of putting in your payroll records the number of hours your

12  employees worked and the rate you paid them?

13  A    Most likely not.

14  Q    You've been there almost a year now, right?

15  A    At Giardino, yes, sir.

16  Q    You didn't have that done, right?

17  A    No, again, those were called in from the payroll office

18  at Russo.  Again, it had an old system in place.  I don't know

19  the date that we changed.  If they called it in and say we

20  have to issue Massimiliano Luongo a check for $138, that's

21  what they did; versus saying we have to issue a check for

22  Massimiliano Luongo for 12 hours and-and-a-half.  I'm not

23  saying it's right or wrong, at that point they were calling it

24  over.

25            THE COURT:  What do you understand they were calling

257

CONNOLLY – DIRECT – O'NEILL

1    over, just the amount to put on the paycheck?

2           THE WITNESS:  The fact to pay Massimiliano Luongo

3    $138.  They would cut out the payroll check and take care of

4    taxes for us.

5           THE COURT:  It may be that they weren't reporting

6    the hours and hourly rates to them.

7           THE WITNESS:  I would not say that.

8           THE COURT:  Meaning, what they might have been or

9    might not have been doing, or you don't know.

10          THE WITNESS:  No.  The amount reflected on here

11   would be the exact amount that would be due for that week.

12          THE COURT:  But when they called over, are you

13   saying that they are saying to the payroll company, he worked

14   ten hours at $5 so put down X; or are they doing that math

15   ahead of time and just calling the company and saying pay him.

16          THE WITNESS:  That would have been in the office.

17   They would have called over, 'Massimiliano Luongo, $138.'

18          THE COURT:  But the calculation of the hours, hourly

19   rate, that would be done at the office.

20          THE WITNESS:  That would have been done at the

21   office, correct.

22          THE COURT:  So just so I understood what you were

23   saying.

24   BY MR. O'NEILL:

25   Q    You didn't have anything to do with that process,

CONNOLLY – DIRECT – O'NEILL

1   correct?

2   A     No, sir.

3   Q     You don't know what was done in the office, do you?

4   A     No.  I know it was called -- it was just referred to

5   calling over the payroll.  That's why managers would have to

6   submit it by a certain time so it could be called in, that was

7   the term that it was referred to.  Now it's uploaded right

8   from the machine, totally changed.

9   Q     Isn't one of the advantages of using a payroll service

10  like Paychex, you just tell them how many hours an employee

11  worked they can do the calculations?

12  A     That's the way it's done now, sir.

13  Q     It wasn't done that way, was it?

14  A     Technology was different.

15  Q     What technology was different?

16  A     Giardino was using an old punch machine at the time.  Now

17  they can upload the files directly from the computer.

18  Q     So what you're saying is that they had a punch card

19  system, right?

20  A     That's correct.

21  Q     Okay.  And somebody would sit here and do the arithmetic,

22  right?

23  A     Yes.

24  Q     And that would yield the number of hours, right?

25  A     Yes, sir.

CONNOLLY – DIRECT – O'NEILL

1   Q    So why couldn't they call in those hours to Paychex or

2   ADP?

3   A    I don't know why they didn't do that.  I don't know why

4   it was done like that.  It may have been just ongoing and the

5   way they called it in.  I can't answer for why they called in

6   the amount versus the hours that they were owed.

7   Q    The reason they didn't do it that way is they weren't

8   keeping track of hours.

9   A    That's not correct.

10  Q    So every week an employee worked the same amount of

11  hours; is that right?  Is that how it works in the restaurant

12  business?

13  A    No, sir.

14  Q    Let's go to 2011.

15          MR. O'NEILL:  May I approach?

16          THE COURT:  Yes.

17          MR. O'NEILL:  I have Exhibit D as in dog, 2010

18  payroll.

19  Q    If you look through those, my question is going to be, do

20  those indicate the number of hours that Mr. Luongo worked or

21  how much he was paid per hour?

22  A    No.  Again, these are done the same way like they were

23  called over.

24  Q    You've been there for two years now, right?

25  A    No.

CONNOLLY – DIRECT – O'NEILL

1    Q    You didn't come in 2008?

2    A    At the end of 2008, sir.

3    Q    So at the end of 2010 it would be two years, right?

4    A    Yes.  But I said earlier, I was only there for 2008 and

5    2009 when they opened up the other restaurant.

6    Q    I see.  I thought you said you changed the system?

7    A    Again, I did say I couldn't recall exactly what time we

8    changed the system, but I recall that we did.

9    Q    Did you change it when you were there?

10   A    I don't recall.

11   Q    You implemented a tip pooling system, didn't you?

12   A    I don't remember when we did that, I have to refer back

13   to the records to tell you when that was put in place.

14   Q    What records would indicate when the tip pooling --

15   A    They have a tip share agreement that says, okay, the

16   waiters get X amount of share, the busboys get X amount of

17   share, the bartender gets X amount of the tips.  I don't

18   remember what year we started that.

19   Q    I gave you Exhibit D, correct?

20   A    Yes, sir.

21   Q    Let's go to 2011.

22              MR. O'NEILL:  May I approach, your Honor?

23              THE COURT:  Yes.

24              MR. O'NEILL:  I've given the witness Exhibit E,

25   these are payroll records for 2011.

CONNOLLY – DIRECT – O'NEILL

1   Q    Take a look through those and tell me if these records

2   indicate how much Mr. Luongo was paid per hour or how many

3   hours he worked in any given week?

4   A    It looks like he worked more hours in these, but it's

5   indicated by dollar amounts.

6   Q    You're saying he was paid more dollars, is that what

7   you're saying?

8   A    That's correct.

9   Q    That could be for a number of reasons, right, it could

10  have been a raise in his hourly rate?

11  A    The pay, he worked more, there are a number of reasons

12  why.

13  Q    And those records don't indicate why.

14  A    No, sir.  Maybe he had another day.  They probably added

15  another day on.

16  Q    You don't know anything about Mr. Luongo's schedule, do

17  you?

18  A    No.

19  Q    Not a thing, right?

20  A    No, I wouldn't say not a thing.  I understand that he had

21  one.

22  Q    Other than that?

23  A    You can't give me a direct question?

24  Q    Other than the fact that he had a schedule, do you know

25  anything about his schedule?

CONNOLLY – DIRECT – O'NEILL

1   A    No, sir.

2             MR. O'NEILL:  May a approach, your Honor?

3             THE COURT:  Yes.

4             MR. O'NEILL:  I'm going to give the witness Exhibit

5   F, 2012 records.

6   Q    At some point in 2012 they started noting the number of

7   hours that an employee allegedly worked, correct?

8             MR. LABUDA:  Objection.

9   A    Are you asking me or telling me?

10  Q    Let me rephrase the question.  Looking at the 2012

11  records do you agree with me that at some point those records

12  have some information regarding the rate and the hours worked

13  by an employee?

14  A    Two completely separate documents.  These are produced by

15  us, these were produced by us in the restaurant.  The other

16  documents were produced by the payroll companies.

17            THE COURT:  So when you say "this," you're referring

18  to the Exhibit E as being produced by you?

19            THE WITNESS:  Your Honor, this is Exhibit F that he

20  gave me.

21            THE COURT:  So F are the records produced in-house?

22            THE WITNESS:  Yes your Honor.

23            THE COURT:  All right, ladies and gentlemen, we'll

24  break for the lunch recess now and resume at two.

25            (Jury exits the courtroom.)

CONNOLLY – DIRECT – O'NEILL

1          (Whereupon, a recess was taken at 1:00 p.m.)

2          THE COURT:  Can I just see the lawyers for a second?

3     We can go off the record.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

```
 1                (Time noted:  2:22 p.m.)

 2                (In open court; outside the presence of the jury.)

 3                THE COURT:  Do the parties want to see the Court?

 4                MR. LABUDA:  Yes.

 5                THE COURT:  Or no?

 6                MR. LABUDA:  Yes, we did.  We just wanted to report

 7      back.

 8                We've talked in terms of resolution.  We are close,

 9      but we're not there and we wanted to just let the Court know

10      where we were and see if the Court might be willing to just

11      talk with the parties and see if we can bridge the gap or

12      something.

13                THE COURT:  We've got the jury waiting back there.

14      Should we do this after or -- I can't actually.

15                Come over here a second.

16                You want this off the record?

17                MR. LABUDA:  Off the record.

18                (Discussion off the record.)

19                THE COURT:  Ms. Holley, do you want to bring the

20      jury in.

21                You all can continue to discuss this if you want.  I

22      just don't want to keep the jury back there waiting.

23                (Brief pause.)

24                THE COURT:   I understand that we have a settlement

25      under the following terms:  That the defendants will pay to
```

Proceedings

1    the plaintiff $45,500; that the question of the counsel's fees

2    will be determined by the Court separately on a fee

3    application; is that correct?

4            MR. O'NEILL:  Yeah.  The amount of the fees will be

5    considered.

6            THE COURT:  The amount of the fee.

7            MR. LABUDA:  We're considered a prevailing party.

8            THE COURT:  So the amount of the fees will be

9    separately determined by the Court on a fee application.  This

10   will be a standard settlement.  Because this has Cheeks

11   review, we're not going to have secret settlements or any of

12   those other things.  It has to follow the decisions.

13           MR. LABUDA:  Yes.  Understood.

14           THE COURT:  In terms of whatever document that is

15   ultimately signed.

16           Does everybody understand that?

17           MR. LABUDA:  Yes.

18           MR. O'NEILL:  Yes, Your Honor.

19           THE COURT:   Mr. Luongo, are you willing to accept

20   $45,500 to end this -- as a settlement of this lawsuit?

21           MR. LUONGO:  Yes.

22           THE COURT:  Do you understand if you tell me that

23   today, this is the end of it.  I've got a jury here.  I've

24   spent a lot of time doing this.  You can't change your mind

25   tonight and tell your lawyer that you don't want to do it.

Proceedings

1  Even if you haven't signed on the dotted line, you are being

2  held to that today.

3           Do you understand that?

4           MR. LUONGO:  Yes, absolutely.

5           THE COURT:  And the reason that I want to make sure

6  you understand that is I'm not sending this jury home if

7  there's any equivocating about that.  So is that clear to you?

8           MR. LUONGO:  Yes, it is.

9           THE COURT:  You want to settle this case at that

10 amount of money?

11          MR. LUONGO:  Yes.

12          THE COURT:  Has anyone put pressure on you or forced

13 you or threatened you to take this settlement?

14          MR. LUONGO:  No, absolutely not.  Nobody.

15          THE COURT:  And you've discussed it thoroughly with

16 Mr. O'Neill?

17          MR. LUONGO:  Yes, I did.

18          THE COURT:  Does anybody want me to ask anymore

19 questions?

20          MR. LABUDA:  No, Your Honor.

21          THE COURT:  Before I come to the conclusion that the

22 case is settled and I can send the jury home?

23          MR. LABUDA:  That's fine.

24          MR. O'NEILL:  Massimiliano, have I answered all of

25 your questions?

Proceedings

1          MR. LUONGO:  Yes.  Absolutely, yes.

2          MR. O'NEILL:  Are you satisfied with the

3     representation?

4          MR. LUONGO:  Yes.  Yes.

5          THE COURT:  All right.  I'll bring the jury in and

6     tell them what happened.

7          MR. LABUDA:  Okay.  Thank you, Your Honor.

8          THE COURT:  Or would you prefer that I just go back

9     to the jury room and tell them what happened?

10         MR. O'NEILL:  We'd like to thank them for their

11    service.

12         THE COURT:  Okay.  All right.

13         (Jury enters the courtroom.)

14         THE COURT:  Ladies and gentlemen, please be seated.

15         I'm sorry that we were delayed in bringing you back

16    in here, but I have some news for you which is the parties

17    have between themselves resolved the case, settled the case.

18         Now, one thing I want to talk to you a little bit

19    about jury service so you understand this, I don't want you to

20    think that your time has been wasted, that these are lawyers

21    who just don't get around to figuring things out until they

22    bring a jury in and do all of that.  That is not the case

23    here.  Both counsel have worked very diligently on this case.

24         As the case progresses, we often have these

25    discussions about whether the case will settle before we bring

Proceedings

1   a jury in, and my practice as the Court is the last thing I

2   want to do is waste a jury's time.  And I have discussions

3   about aspects of the case.  We try to get as much resolved as

4   we can so you all are not sitting back in a jury room waiting.

5   And everybody has worked very hard on this case to do that so

6   things go smoothly in front of you.

7          But it often happens that parties' decisions on what

8   they should do often don't really become that clear or

9   apparent and change based on how things develop during the

10  course of the trial.  So I'm explaining all of this to you all

11  only so that you don't think that this is a bunch of lazy

12  lawyers who didn't get around to doing something until they

13  saw the jurors face-to-face.  That's not the case.  And I do

14  my level best in every case I have to make sure that that kind

15  of thing doesn't happen, you know, that people just wait until

16  the last minute to decide what to do in the case.  That didn't

17  happen here.  The attorneys worked very hard on this case as

18  did the Court, and they believe between themselves that they

19  have reached a fair resolution of the case.

20         So I just wanted you to know.  I know that both

21  counsel and the Court really very much appreciate your

22  service.  It's often said that apart from military service,

23  that the most important thing you can do for your country in

24  terms of serving your country is to serve on a jury, and it is

25  a very, very important part of our system.  And I just want

Proceedings

1    you to know that you have my sincere thanks and I know the

2    thanks of the parties for the time and attention that you

3    spent looking at all the numbers and charts and things.  But

4    they have made this determination and I have approved it.  So

5    I'll let you go on your way and thank very much.

6              MR. O'NEILL:  The plaintiff wants to thank the jury.

7    We appreciate your service.

8              MR. LABUDA:  As do the defendants.

9              And, Your Honor, with the Court's indulgence, if any

10   of the plaintiffs -- I mean the jurors are willing to speak

11   with us, we're always interested as attorneys.

12             THE COURT:  If you want to, you can, but you can go

13   right on home now and not talk to any of these guys, okay.

14   It's okay to talk to them, but you don't have to.  If you

15   prefer to get home and to your business, you can do that.

16             MR. LABUDA:  Can we go back into the jury room?

17             THE COURT:  No.

18             MR. LABUDA:  Just into the hallway?

19             THE COURT:  If you catch somebody outside.  You're

20   not going back into my jury room.

21             MR. LABUDA:  Okay.  That's fine.

22             THE COURT:  Okay.

23             MR. LABUDA:  Thank you, Your Honor.

24             MR. O'NEILL:  Judge, in view of the fact that all of

25   the evidence was or most of the evidence in the case, the

Proceedings

1    plaintiff's case anyway was put forth, that's the fairness

2    hearing, right?  You've already approved the settlement?

3            THE COURT:  Yes.  In terms of the fairness hearing,

4    I have found that that number fairly settles the case.  But if

5    you were to present me with an ultimate settlement document

6    that had something in there that I thought was inappropriate,

7    I would have to say that you have to change that.  But I have

8    made a determination based on the testimony that I heard over

9    the past couple of days that this was a fair amount to settle

10   the case.

11           And I think as I explained to Mr. O'Neill and to

12   counsel when we were talking about settlement, I think that it

13   would be difficult for plaintiff to establish a number.  The

14   testimony was vague in that regard, and I think coming to a

15   higher -- that it would have been very difficult for the

16   plaintiff to come to any higher number than has been agreed to

17   be paid to him.  So that's why I determined that the

18   settlement was fair.

19           So to that extent the amount of money I have made

20   that determination.  Again, I have to see the actual

21   documents.  As I said, I don't want to see something about it

22   being a sealed settlement or anything like that.  Those are

23   problems with these kinds of cases so.

24           MR. KATAEV:  We'll submit a settlement agreement in

25   accordance with Cheeks as mentioned, Your Honor.

*ANGELA GRANT, RPR, CRR*
*Official Court Reporter*

```
 1              THE COURT:   Okay.  And can you do that within two

 2    weeks?

 3              MR. KATAEV:  Absolutely, Your Honor.

 4              THE COURT:  All right.  Thank you.

 5              MR. O'NEILL:  Thank you, Your Honor.

 6

 7              (Whereupon, the matter was concluded at 2:51 p.m.)

 8

 9                    *    *    *    *    *

10

11                         I N D E X

12    WITNESS                               PAGE

13    MASSIMILIANO LUONGO

14    CROSS-EXAMINATION   BY MR. LABUDA      145
      REDIRECT EXAMINATION BY MR. O'NEILL    194
15    RECROSS-EXAMINATION  BY MR. LABUDA     228

16    PATRICK CONNOLLY

17    DIRECT EXAMINATION   BY MR. O'NEILL    233

18                    E X H I B I T S

19    PLAINTIFF              PAGE
      12                     203
20
      DEFENSE                PAGE
21    U                      159
      T                      165
22    G                      172
      F                      173
23    E                      174
      D                      175
24    C                      177
      B                      178
25    X                      183
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*